# Richmond.

## McCue v. Commonwealth.

### January 26, 1905.

1. CRIMINAL LAW—*Competency of Grand Juror—Plea in Abatement—Replication—Verdict.*—Upon an issue of fact made on a plea in abatement to an indictment, to determine whether or not a grand juror was, at the time of finding an indictment, a resident of the city in which the indictment was found, the verdict of the jury will be considered in this court as upon a demurrer to evidence, and will not be disturbed if there was evidence in the case sufficient to sustain it. Where no right of the prisoner has been prejudiced, the court will not stop to enquire whether a replication to the plea should have concluded to the country instead of with a verification.

2. CRIMINAL LAW—*Jurors—Competency—Opinions.*—The trend of recent decisions is in the direction of limiting rather than extending the disqualification of jurors by reason of mere opinion, hence the courts enquire into the character of that opinion. If it is a decided or substantial opinion as to the guilt or innocence of the accused, no matter upon what ground it was formed, the juror is incompetent, but if the opinion is merely hypothetical, and the court is satisfied from an examination of the juror on his *voir dire,* or otherwise, that he is not biased or prejudiced, and that he can give the prisoner a fair and impartial trial according to the law and the evidence, he should be accepted. No fixed and invariable rule can be laid down whereby to test the competency of jurors, but each case should be determined by its own facts and circumstances, and great weight should be attached by an appellate court to the opinion of the trial judge.

3. EVIDENCE—*Admissibility—Weight.*—It is for the court to determine what evidence should be admitted, and for the jury to determine

the credibility of witnesses and the weight to be given to their testimony.

4. Evidence—*Statements by Third Persons—Efforts of Prisoner to Induce Denial—Accusation by Third Person—Denial.*—Where evidence has been introduced of a statement made by the prisoner's son, which was damaging to prisoner's case, a subsequent conversation between the prisoner and his son, while the former was in jail charged with the offense to which the statement related, may be given in evidence for the purpose of showing that the prisoner endeavored to induce his son to deny the statement attributed to him; and the fact that the prisoner, in the conversation referred to, denied the conduct attributed to him in the son's statement does not render the son's allegations in the conversation an accusation of a third person denied by the prisoner.

5. Evidence—*Opinion of Expert—Matter of Common Knowledge.*—That a medical expert was permitted to express an opinion upon a matter of common knowledge is harmless error.

6. Evidence—*Code, Sec. 3351—Applicable to Criminal Cases—Adverse Witness—Prior Inconsistent Statements.*—Section 3351 of the Code, as amended by Acts, 1899-1900, p. 124, allowing a party whose witness has unexpectedly proved adverse, with leave of the court, to prove his prior inconsistent statements, applies to criminal as well as civil cases. Its language is broad and general, and there is no suggestion on its face to limit its operation to civil cases. While it is true that the statute is found in the Code under the title of "Proceedings in Civil Cases," yet, in the same chapter with that section, there are other sections applicable alike, by their terms, to criminal and civil cases, and the mere collocation of that section cannot be permitted to over-ride every other consideration, and require the courts to confine it to civil cases, when it is a remedy for an evil as great in criminal cases as in civil, and the consequences of which may be even more serious.

7. Evidence—*Impeaching One's Own Witness—Prior Inconsistent Statements—Details of Statement.*—In proving the prior inconsistent statements of a witness who has unexpectedly proven adverse to the party calling, the party is not restricted by the provisions of Sec. 3351 of the Code (1904) to proof of the fact that such statements were made, but may give in evidence the details of such statements.

8. Criminal Law—*Reasonable Doubt.*—It is difficult, if not impossible, to define "reasonable doubt," but the instructions in this case fully protected the prisoner's rights in this regard.

9. Instructions—*Fully Instructed.*—It is not error to refuse an in-

struction when the jury has already been fully and correctly instructed on the point upon which the instruction is asked.

10. INSTRUCTIONS—*"Ninety and Nine Guilty Men."*—The expression "it is better that ninety and nine guilty persons should escape than that one innocent person should be punished" is unobjectionable as a rhetorical phrase, but is of no value as a guide to a jury in reaching a conclusion, and it is not error to refuse to so instruct a jury which has already been fully and correctly instructed on the "presumption of innocence" and "reasonable doubt."

11. CRIMINAL LAW—*Assisting Prosecution—Criticism—Reply.*—The right of a public prosecutor to have associated with him an attorney to assist in the prosecution is established law in this State, and is not a proper subject of animadversion. The fact that such an assistant, in response to adverse criticism by counsel for a prisoner, replied that he had "refused a large fee in this case to prosecute," is not good cause of exception or objection on the part of the prisoner.

12. CRIMINAL LAW—*Jurors—Reading Newspapers—Waiving Objection.*— While it is the safer and better practice to exclude newspapers from a jury sitting in a felony case, yet, when the court, in the presence of a prisoner and his counsel, and without objection on their part, at the instance of the jury, permits them to have access to newspapers under instructions that they shall scrupulously avoid reading any parts of said papers that have reference to the trial, the prisoner cannot after verdict make objection on that account. He has no right to sit mute, prepared to abide by the results if favorable, and to make objection if adverse.

13. CRIMINAL LAW—*Writ of Error not Matter of Right—Refusal—Precedent.*—A writ of error to the judgment of a trial court is not one of the rights of one convicted of crime; neither is it a part of "due process of law," nor one of the inalienable rights guaranteed by the Constitution. It is a right regulated entirely by statute, and, under the statute of this State, it is as much the duty of this court to deny the writ when the decision complained of is plainly right, as it is to grant it when any doubt exists as to the propriety of the decision. While the accused is entitled to a fair and impartial trial, yet when he has had this, and has been rightly condemned, the safety of society demands that the administration of justice shall be swift and certain. Nor, where the judgment of the trial court is plainly right, is the refusal of a writ of error to one convicted of murder of the first degree an innovation, but is in strict accord with the practice in this State from the earliest date to the present time.

Petition for a writ of error to a judgment of the Corporation Court of the city of Charlottesville, sentencing the petitioner to be hanged.

*Denied.*

J. Samuel McCue resided in the city of Charlottesville, where he had been practicing law for twenty years prior to the commission of the offense for which he was convicted. He was a man of social standing, and reputed wealth. His family consisted of himself, his wife, Fannie Crawford McCue, and four children, three boys and a girl. The eldest of these children was J. William McCue, a boy of about seventeen years of age. J. Samuel McCue had been three times elected mayor of the city—his last term expiring September 1, 1904.

On September 2, 1904, he left home on a trip to the city of Washington, and on the same day his wife went out into the country, about seven miles from Charlottesville, on a social visit. About five o'clock in the evening, on Sunday, September 4, 1904, Mrs. McCue returned to her home. About an hour later, on the same day, her husband returned from Washington. When he reached home his wife was in the parlor entertaining a guest. He did not go in to see her, and the record is silent as to the character of their meeting, or whether they did meet prior to the evening meal. Shortly after supper Mrs. McCue went, unattended, to the Presbyterian church, several blocks from their home. Soon after that J. Samuel McCue also went to church and occupied the family pew, together with his wife. The services at the church seem to have lasted about one hour, and Mr. and Mrs. McCue returned to their residence about 9:15 o'clock. The weather was warm and the windows and doors of residences were open for purposes of ventilation, and many persons were sitting on their galleries.

After Mr. and. Mrs. McCue entered the house they prepared to retire, and the details of what took place in the next few minutes is unknown.    There were in the house at this time Mr. and Mrs. McCue, and John Perry, a colored boy, who occupied a servant's room on the second floor of the rear part of the house, which was shut off from the main residence by a hall door generally kept locked.    The son, J. William McCue, was in the city of Charlottesville, but had not then come in, nor were any of the other children in the house.    The next person who entered the house was Dr. Frank C. McCue, a brother of J. Samuel McCue, who was a practicing physician in the city, and resided three and one half or four squares off. He says that the first intimation that he had of any trouble was about 9:15 or 9:30 P. M. on September 4; that he and his family had gone up stairs to retire, and that he was nearly undressed when the telephone rang; that he went to the 'phone and recognized his brother's voice, who said:    "Frank, come down right quick, somebody is in the house, has knocked me senseless, and has probably shot Fannie."    Dr. McCue says he hung up the receiver quickly, went to his room, dressed, with his wife's assistance, and started to his brother's house.    As he started out he asked his wife for his pistol, but recalled that he had loaned it.    He went to his brother's house, went up the front steps, and, finding the door ajar, pushed it open with his emergency grip.    The first person he saw was the colored boy, John Perry, going from him toward the stairs.    He did not take off his hat, and kept his grip in his hand.    There was a low light in the hall.    He met his brother on the steps, a little above the centre of the stairway.    There was a dim light in his brother's room on the upper floor.    His brother, J. Samuel McCue, had on a pair of dark trousers, a pair of slippers and an undershirt.    There was a wound on his brother's right cheek, and some blood on the right side of his face.    He did

not reply to several of Dr. McCue's questions, but seemed dazed, and would give no definite history of the case. He pushed Dr. McCue back, and said: "Go on and find Fannie." Dr. McCue went up the steps, put down his grip, took matches and struck a light. About that time Policeman Grady arrived and came up the steps before Dr. McCue made the first light. There was an odor and fumes of powder in the upper hall, and water running in the bathroom at the rear end of the hall. Going into the bathroom, he struck a light, and asked John Perry, the colored boy who was with him, where the gas jet was. Perry said behind the door. After lighting the gas jet, the first thing he saw was the body of Fannie McCue, wife of J. Samuel McCue, lying in the bath-tub. She was pulseless and lying almost stretched out—right leg drawn out against the base of the tub, and left knee raised, with her gown floating above her body. The water was within four inches of the top of the tub, but did not cover her. Her mouth was partially open, but no water had entered her body. There was no discoloration of the water. She was lifted out of the tub by Dr. McCue, Grady and John Perry, and laid on a rug on the bath-room floor.

At a *post mortem* examination held later during the night there was found on the deceased an incised wound on the nose, from which a small amount of blood had flown, but no bones were broken. The right ear was cut almost in two, as if a lick had been struck from above downward and backward. It skinned the ear, and cut it in two for a short space, perhaps one-half an inch. There was a marked contusion on the front and back of the ear. The wound was such as might have been made by a baseball bat, and would probably have produced insensibility. There were finger prints on her throat—four on one side and one on the other—as if she had been choked. These could only have been made during life. On the back of

the head there was a slight cut—perhaps a quarter of an inch—which might have been made after death by falling into the bath-tub, and there was a gunshot wound in the chest, which went in practically solid, and must have been made at close range, as the wound was full of powder. The physicians who made the examination were of opinion that the gunshot wound produced practically instantaneous death. They were also of opinion that Mrs. McCue could not have gotten into the bath-tub, in the position in which she was, after receiving that wound, and that the range of the wound was such that it was impossible for it to have been made while she was lying in the bath-tub.

The prisoner gave various accounts as to what had happened. To one witness, among the first to get to the house, he said: "A burglar has shot and killed Fannie, and has escaped," and when asked about the slight wound on his face, replied: "The rascal must have shot me too." When his son William arrived he said: "Your mother is dead—a burglar has killed her." He said to Policeman Grady that some one had nearly killed him, and had probably killed Fannie. He further said that he was "undressing when he heard a rattling, and looked around. He saw a dirty, greasy man, as if a railroad man. He reached for his gun, but the man got hold of him before he got the gun and got it in position." They had a tussle before he was knocked out. He stated that his wife was in the room when the man came in. To another witness he said that he heard a noise in the hall and went out and grappled with the man; that he backed away from the man, and went and got his gun. As he returned with the gun the man knocked him down and got the gun. To another witness he stated that some one had entered his room, knocked him senseless and shot his wife. He said he was in front of a chiffonier and his wife near the bureau; that he tried to get his gun out of the

case when the man knocked him senseless and took the gun. To another witness he stated that his wife was prepared for bed, and that he had on his undershirt; that the lights were turned low; and that he heard a sound like a click and turned and saw a man; that he went to his chiffonier where he kept his pistol, but the pistol had·been removed; that he reached for the gun which was in the corner. When he got the gun he was struck by a bat or some object, and he knew nothing further after that." At a later time he stated to another witness that he saw a man in the mirror as he (McCue) was standing in front taking the buttons out of his shirt; that his wife was then in the bath-room; that he went and got his gun, put two shells in it and started to the door, but when he got to the door he was struck and knocked senseless. He described the man as a dirty, greasy looking white man. The testimony of the prisoner at the coroner's inquest was not introduced on his trial.

Just outside of the bath-room door, in the hall, there was found a pump gun, which was identified as belonging to the prisoner. This gun was picked up by the negro boy, John Perry, who ejected an empty shell from the magazine. Just inside the bed-room, standing in one corner, was found a base-ball bat, which was identified as belonging to one of the boys of the family. This bat had stains on it at the large end which appeared to be blood. No blood stains were found in the bed-room, nor in the hall leading therefrom to the bath-room, although diligent search was made therefor. Numerous blood spots were found on the prisoner's undershirt, a number of which had been washed, or had at least come in contact with water.

Although the bath-room was examined for traces of the criminal on the night of the murder and none were found, during the next day a piece of undershirt was found there, which was shown by witnesses for the Commonwealth to correspond with

the undershirt worn by the prisoner the night before—being of same quality and material. The chain stitch and the thread hanging to the piece were torn from the back of the shirt, and that piece was missing from the shirt worn by the prisoner the night of the murder. The thread of the piece matched that of the shirt, and the chain stitch seemed to be the same. The piece corresponded with the shirt.

Mrs. McCue wore her finger-nails long. One of these was found broken and turned back. Screams of a woman were heard by one witness in the McCue residence, and later a shot. The prisoner gave no alarm, but called a lady over the 'phone, and also claimed to have called in the same way his brother, Dr. McCue, but the latter was questioned by the Commonwealth. The first alarm was given from the central telephone office. Nothing was stolen from the residence, and there was no other evidence of attempted burglary.

The physicians also gave the prisoner a thorough examination, but could find no wounds upon his person, except an abrasion of the skin on one side of his face, such as a boy would receive from scraping his knee against a brick, or such as usual with foot-ball players. They expressed the opinion that this could not have been caused by a lick from a base-ball bat, and, by whatever instrument inflicted, it would not have caused unconsciousness. His scalp and body were carefully examined, but no other wounds or bruises could be found upon him.

The theory of the defense was that the husband had been struck with a sand-bag, or something of that kind, and knocked senseless, and afterwards the wife had been shot, and that this had been done by some person, either for the purpose of burglary or for revenge.

There was evidence tending to show that the domestic relations of the husband and wife had not been pleasant for several years past. There was also evidence, however, tending to show the contrary, and letters of both husband and wife of the most

Statement.

affectionate kind, during the years 1899 and 1900, and one as late as 1901, were introduced in evidence. It also appeared that the husband carried upwards of $60,000 of insurance on his life, payable to his wife, if living at the time of his death. Most of these policies were taken out during the two or three years immediately preceding the murder—one of them for $10,000 in the year 1904.

Circumstances strongly pointed to the husband as the murderer of his wife. On Tuesday, September 6, Mrs. McCue was buried. On Wednesday afternoon, September 7, J. Samuel McCue was arrested on a warrant charging him with the murder of his wife. Subsequently, he was indicted, tried, and convicted of the offense.

The time for the execution was fixed for January 20, 1905. When the Court of Appeals convened in Richmond, January 5, 1905, an elaborate petition, covering 124 printed pages, was presented to the court, asking for a writ of error. Forty-five bills of exception had been filed during the trial. On January 12, 1905, the court unanimously refused a writ of error, on the ground that the judgment of the trial court was plainly right. Thereafter an amended petition, or a petition in the nature of a petition for a rehearing was filed, and, as the day fixed for the execution was very near at hand, the Governor, at the request of the court, granted the prisoner a reprieve until February 10, 1905. On January 26, 1905, the court handed down the present opinion, unanimously refusing a writ of error. The prisoner was executed February 10, 1905.*

---

*Note by the Reporter.—Immediately after the execution, the following signed paper was given out by the late spiritual advisers of the prisoner:

"J. Samuel McCue stated this morning in our presence and requested us to make public that he did not wish to leave this world with suspicion resting on any human being other than himself; that he alone is responsible for the deed, impelled to it by an evil power beyond his control; and that he recognized his sentence as just.

(Signed)                          "GEORGE L. PETRIE,
                                  "HARRY B. LEE,
                                  "JOHN B. TURPIN.

" Charlottesville, Va., February 10th."

When this case was first called, the prisoner, in proper person, pleaded in abatement that one of the members of the grand jury which found the indictment was not, at the time of finding the indictment, and had not been for one year prior thereto, a resident of the city of Charlottesville, and was, therefore, incompetent to serve. The plea concluded with a verification, and prayer of judgment. The prisoner, by counsel, "asked for a jury to try the matters contained in the sworn plea." To this plea the attorney for the Commonwealth filed the following replication:

"And thereupon, Frank Gilmer, attorney for the Commonwealth for the city of Charlottesville, who prosecutes for the Commonwealth in this behalf, says that, notwithstanding anything by the said J. Samuel McCue in pleading alleged, this court ought not to be precluded from taking cognizance of the indictment aforesaid, because he says 'that Henry L. Lyman, one of the members of said grand jury, was, at the time of the finding of said indictment, and had been for one year prior thereto, a resident of the said city of Charlottesville, Virginia, and could, therefore, legally act as a member of said grand jury.' And so the said Frank Gilmer, attorney for the Commonwealth, as aforesaid, says that the said indictment is legal and valid, and this he is ready to verify. Wherefore, he prays judgment, and that the said J. Samuel McCue may answer to this said indictment.

                                      "FRANK GILMER,
"Atty. for the Commonwealth for the City of Charlottesville."

The prisoner, by counsel, objected to the filing of this replication, but declined to state his reasons therefor, and thereupon the court overruled the objection, and the prisoner excepted. "Thereupon, the prisoner having asked that the issue of fact set up in said plea, and denied in said replication, be

tried by a jury," the court directed a jury to be summoned for that purpose to the next day. On the next day, the following proceedings were had on the plea in abatement:

(Sept. 22, 1904.)

Commonwealth

v.

J. Samuel McCue.

"This day came the attorney for the Commonwealth, and the prisoner was led to the bar in the custody of the jailor of this court, and the City Sergeant, having returned the writ of *venire facias,* together with the names of sixteen persons summoned by him and taken from the list furnished by the clerk of the court (which said list was drawn by the clerk of this court in the presence of the judge of said court), and a panel of sixteen jurors appeared in court, and, after due and legal examination on oath by the judge as to their fitness as jurors, fourteen of the panel summoned were found free from all legal exceptions, and in all respects qualified to act as jurors, and it is ordered by the court that the clerk issue *venire facias* No. 2 for two persons to be summoned from the bystanders, which was accordingly done, and, the said *venire facias* No. 2, being duly executed by the City Sergeant, and after due and legal examination on oath by the judge as to their fitness as jurors, the two of the panel summoned were found free from all legal exception, and in all respects qualified to act as jurors which completed the panel of sixteen qualified jurors, from which panel four names, to-wit, J. S. Burnley, Thomas O. Yowell, C. V. Lang and A. L. Stevens, were stricken from the list by the prisoner. And the remaining twelve, to-wit, L. E. Watson, L. A. King, J. J. Letterman, S. J. Florence, E. F. Markwood, E. T. Jessup, W. J. Tyson, Jr., Maynadier Mason, Quintus Tinder, M. E. Norris, O. E. Hawkins, and J. P. El-

lington, constituted the jury who were sworn to well and truly try and determine the following issue, made up and presented to them by the court, as the issue created by the plea in abatement filed by the prisoner, and the replication thereto filed by the attorney for the Commonwealth: 'Was Henry L. Lyman, at the time of the finding of the indictment of the *Commonwealth* v. *J. Samuel McCue* for a felony, to-wit, September 19, 1904, a resident of the city of Charlottesville, Virginia, and had he been such resident for one year prior to such time?' Thereupon the prisoner, by counsel, moved the court to quash the two writs of *venire facias*, but declined to state any reasons for such motion, which motion the court overruled. Thereupon the prisoner, by counsel, objected to the issue the jury was sworn to try, but declined to state any reason therefor, which objection the court overruled. And the jury, having heard the evidence, retired to their room to consider of their verdict, and after some time returned into court with a verdict as follows: 'We, the jury, find that Henry L. Lyman was a resident of the city of Charlottesville, Virginia, at the time of the finding of the indictment of the *Commonwealth* v. *J. Samuel McCue*, to-wit, September 19, 1904, and had been such resident for one year prior to such time. E. O. Hawkins, Foreman.' Whereupon, the prisoner, by counsel, moved the court to set aside the verdict as contrary to the law and evidence, which motion the court overruled, and thereupon the court refused to quash the indictment, and, on motion of prisoner, by counsel, and with the consent of the attorney for the Commonwealth, this case is continued until Tuesday morning next, September 27, 1904, at ten o'clock. Thereupon, the prisoner was remanded to jail."

Objection was made to two jurors—J. G. Stockdell and Jud. B. Wood—who were accepted on the panel. The statements

of Stockdell are set out in the opinion of the court. Those of Wood were as follows:

By the Court:

Q. Have you been a resident of the State of Virginia for the past two years, and of the city of Richmond for the past year?

A. I have.

Q. Have you formed or expressed any opinion as to the guilt or innocence of the prisoner at the bar?

A. I have.

Q. How is that opinion formed—from what source?

A. Formed from reading the newspapers.

Q. Could you dismiss that opinion from your mind, hear this case according to the evidence produced before you, and give a fair and impartial verdict, according to the evidence?

A. I think I could.

Q. Do you think you could enter into the trial of the case, dismissing that opinion and give the prisoner the presumption of innocence, knowing the burden of proving him guilty is upon the Commonwealth—give him a fair and impartial trial?

A. Yes, sir. Sorry to say so, but think I could.

Q. Are your opinions of such a character as to prevent your finding a verdict in a case punishable with death?

A. Not at all. I am very sorry to answer as much, but cannot help it.

Q. Well, sir, it is a manly thing to do.

A. I have not expressed an opinion.

By Mr. Harmon (for the prisoner):

Q. I understand your opinion as formed is from reports published in the newspapers?

A. Yes, sir.

Q. Have those reports caused a very decided opinion?

A. Well, unfortunately, I have read a little law, and

while I know that all that comes in the newspapers is not proper, yet I have formed a decided opinion on the subject, which is on what I conceive to be the case. I am not a lawyer, but still I have read a little law.

Q. And you say that is rather a decided opinion?

A. Yes, sir. Well, it is an opinion, and it is a decided opinion on the evidence, or on what I conceive to be the evidence.

Q. As I understand, if you went on the jury you would go with bias in your mind?

A. Well, I would feel, if 1 were put on the jury, I would consider the evidence as offered in the trial and decide purely on that. I think I have character of mind and sufficient firmness to do that. Of course, I would have to leave everything else out that I have read and commence over anew.

Q. Still, as I understand you, you would go upon the jury with rather a fixed opinion in your mind?

A. Well, I have an opinion based on what I have read. Of course, that opinion was not formed like I would form it if I were on the jury. But I think in my mind, of course, I have formed an opinion, and don't think any sensible man could read the papers without forming an opinion, and perhaps a decided opinion; but I don't think I am so biased that I could not be changed, and change with ease, if necessary, according to the evidence.

. By Mr. Lee (for the prisoner):

Q. Mr. Wood, if you went upon the jury now, as I understand you, you would go upon the jury with an opinion in your mind, would you not?

A. Yes, sir.

Q. Would it require evidence to remove that opinion from your mind, and change the view which you have already in this case?

A. I think it would.

Q. It would require evidence?

A. Yes, sir.

Q. Then, to that extent, you would go on the jury with your mind made up, and to the extent it would require evidence to change that opinion, you would go upon the jury biased, would you not, to that extent?

A. Yes, sir.

Q. So that you would have some bias at the time you entered upon the discharge of your duties of juror, although that bias might be removed by evidence which you would hear?

A. Yes, sir.

Q. All right; we do not care to ask you any further question.

By the Court:

Q. Mr. Wood, if you went upon the jury could you dismiss your previous opinions, hear the evidence, and decide solely according to that evidence?

A. I could.

Q. I think he is a competent juror.

A. I am very sorry, Judge, that I have to talk that way.

Mr. Lee: We except to Mr. Wood.

By the court:

Q. I asked you the question if, in a proper case, you could bring in a verdict in a case punishable with death, and believe you answered yes?

A. Yes, sir.

Q. Take a seat.

Mr. Lee: We except to this juror.

Exception was also taken to the action of the court in excluding from the panel Frank K. Tyler, who was a competent juror. It is unnecessary to state the evidence on this point, as it is not assignable error. See *Fishburne's Case, post.*

J. William McCue, the prisoner's son, was offered as a wit-

ness on behalf of the Commonwealth. Soon after his examination began, counsel for the Commonwealth announced that they were taken by surprise by the prisoner's testimony, and asked to be allowed to examine him according to the rules applicable to cross-examination, and this request was granted. The extent, character, and details of this examination will best appear from the examination itself.

J. William McCue stated that he was the oldest son of J. Samuel McCue, and would be seventeen years old in December. The night his mother was killed he was on Main street. His mother went to Red Hill the Friday evening before she was killed, and his father took the fast train, No. 4, on the C. & O., and he did not know exactly where he went. His father left that Friday, before his mother was killed, on the C. & O. train going east. She returned about 5 P. M. Sunday, and he (William) met her at the Union Station with a buggy, and drove her home. He then went to his father's office, and read the papers, when his father came into the office down street, and they drove home. His father arrived about an hour after his mother. His father entered his house from the rear, coming through the back door near the kitchen, and went into the house. He (William) was at home during the absence of his parents, and his sister was with his mother and his brothers at Mr. Browning's. His sister always went with his mother. Ruby (J. Samuel McCue's daughter) was left at Red Hill for a couple of days. His father had written to him that he would be home Saturday or Sunday. John Perry was the manservant on the premises that night, and staid in the servant's room over the kitchen. The door leading from the servant's room to dwelling at the head of the passage near both rooms was locked that night, and John Perry could not possibly have gotten in the house. His father had three guns. Sometimes they kept one in witness' room, and the other

two staid in his room right beside the wardrobe, near the chiffonier. When shown the pump gun that was found in the upper hall he identified it as one of his father's guns. Sometimes the guns were just set down loaded. He had done that often. He could not say if the pump gun was loaded that night. He had left it loaded. His father never gave any particular instructions as to leaving them loaded or unloaded. The base-ball bat shown him he identified as one that generally staid in the yard. He did not know where it was that evening, and had never seen it in the house. It generally staid at the woodpile. The last time he saw it, it was in the garden below the woodpile. It belonged to his little brother. The cartridges for the guns were lying all around the house—no special place at all. He had a few in his wardrobe, some in the closet there and in the hall, and some in his room—mostly in his room—no definite place for them. He remained at home when he came with his father that evening. His mother was in the library when his father came, he thought, with a lady friend. That was about fifteen or forty-five minutes.

Q. Did you remain to supper?

A. Yes, sir.

Q. I wish you would state to the jury what happened between your mother and father at the supper table, or during the supper, and just after that; just tell them about it?

A. We talked there in a general way; just anything that would come up; any question at all; just talking. I know they asked me about the horses, and the negro who worked for us had taken our horses and driven them to Keswick, and she told me that she did not want her phaeton to go there again, driven by the negro man, and she reprimanded me for that, and then my father came down afterwards from her room, and he told me he never wanted this man to take those horses out, that he was tired of this nonsense.

Q. During supper, did you or not go out on the porch, or on the front of the house?

A. No, sir; I was right there all the time at the supper table; all the time they were.

Q. When did you get up and leave?

A. I and my father and mother all left the table about the same time. I think my mother was the last to leave, because she had some other work to do there.

Q. Since the death of your mother, state whether or not you have visited your father in the jail?

A. I have visited him several times; as often as I could.

Q. State whether, before his arrest, you staid with him at the house and saw him at home?

A. Yes, sir; I saw him at the house and staid there.

Mr. Woods, for the Commonwealth: If your honor please, I have never interviewed the witness for good reasons, but the witness has made a statement that is entirely different, and has entirely surprised me in this matter, because I was advised by reputable people that—

Mr. Lee, of counsel for prisoner: I take it, Mr. Woods, that it is not necessary to go any farther. If you are taken by surprise, of course, you are entitled to avail yourself of the law regulating that.

Mr. Woods: Certainly, sir.

Q. William, on Tuesday morning after your mother was killed, didn't you tell Earnest Crawford and Albert Baldwin, on the porch or under that big oak tree, under that end of the porch, sitting on the step, or on the porch, that your father and mother had had frequent and many violent quarrels?

Mr. Lee: We object to that question, for the reason that counsel has never laid the foundation for asking that kind of a question. He has never asked the witness that question at all.

Mr. Woods: I am asking it now.

Question withdrawn.

Q. I will ask you this question: State whether or not, prior to this murder of your mother, your father and mother had had frequent and violent quarrels?

A. No, sir.

Q. Did not you state to Earnest Crawford, your uncle, and Albert Baldwin, on the porch on Tuesday morning after your mother was killed, that they had had, before the killing, many quarrels and bad quarrels?

A. No, sir.

Q. You deny that you told them that?

A. Yes, sir; emphatically.

Q. Did you also, in that same conversation, tell these gentlemen that they were mad with each other at the supper table?

A. No, sir; I did not.

Q. You deny that?

A. Yes, sir; emphatically.

Q. And that you got up and went out from the supper table on to the porch?

A. I did not leave the dining-room while they were there.

Q. Didn't you tell those gentlemen that you did so, though?

A. I did not.

Q. And didn't you also tell those gentlemen that your father followed you out there, and that he was in a great rage, and that he walked up and down the porch, and remarked, "I will be damned if I will put up with this another day," walking backwards and forwards?

A. He came to me and reprimanded me for letting this negro take this driving horse and phaeton to Keswick, and he was lecturing me, but he didn't even refer to her.

Q. You deny having told those gentlemen that?

A. Yes, sir; I do.

Q. Didn't you, at the Gleason Hotel, after that, and in the presence of William G. Baldwin and Albert Baldwin, and also

in the presence of Earnest Crawford, your uncle, make the same statement, not once, but repeatedly?

A. No, sir; I did not; I never made such a statement.

Q. Didn't you tell them—that is, the two Baldwins and Mr. Earnest Crawford, that as soon as you heard of the killing of your mother that you knew your father had killed her?

A. No, sir; I didn't tell them that; he made that statement himself.

Q. You deny that?

A. Yes, sir.

Q. Didn't you make an appointment with Mr. Baldwin, one or both of them, and with Mr. Earnest Crawford, your uncle, to take John Perry to the wine cellar, the night after the funeral, I think it was, and didn't you have, then and there, at the wine cellar, pretty much the same conversation, telling them the same thing over again?

A. No, sir; I never told them the same thing.

Q. Didn't you take John Perry down to the wine cellar that night?

A. Yes, sir.

Q. Were you not with your uncle, at that time, frequently, and with the Baldwins, and telling them at various times of the bad treatment of your father towards your mother?

A. No, sir; I never told them once of my father's bad treatment toward my mother. I never have, and I want to tell you now that Mr. Earnest Crawford, my uncle, has tried his best, in every way, shape, and form, to get John Perry to say, "Oh, my God, you are killing me." He tried his best to get him to say that, and John stuck to this statement, "Oh, my God, Sam, they are killing me." He stuck to that statement through and through.

Q. Didn't you take from John Perry yourself a statement and bring it to these gentlemen, exactly to the contrary?

A. I asked John about it, and he gave that statement, and then he denied it emphatically.

Q. He gave you this statement, then, which is in writing?

A. Yes, sir.

Q. Is this your handwriting (handing witness paper)?

A. This is mine.

Q. Did you deliver that paper to Mr. Baldwin, as the statement made by John Perry to you?

A. I took that and read it over, and Mr. Baldwin took it from my hands.

Q. You delivered it to him?

A. I did not deliver it to him.

Q. He took it from your hands?

A. Yes, sir.

Q. It was a statement, which you took down, and as having been made by John Perry?

A. I took it down. I said, "John, are you telling me the truth?" I went back after that paper had been gotten, and I said, "John, are you telling me the truth?" and he said, "No, sir; I am not; I can tell but one tale and tell the truth."

Q. Didn't John Perry tell you that he had testified before the coroner's inquest that he heard a voice say, "Sam, he is killing me," and that he was afraid to tell the truth then, but this was really the true facts of the case, what you have in this paper, and that he was afraid to tell it before those gentlemen?

A. I do not understand your question.

Q. Didn't John Perry tell you that he testified before the coroner's inquest, and that he hadn't told the truth; that he was afraid to tell the truth? Didn't he tell you that?

A. He said to me—he made that statement to me—and then he said to me—I came back to him and said, "John, are you telling the truth here?" and he said, "No, I am not," and

he said at the time, "Those gentlemen have tried to persuade me to tell something I don't know. I have made a written statement, but I deny it right now and here." That is what he said to me at the stable.

Q. He was referring to this statement you wrote down and took to the Baldwins?

A. Yes, sir; but I never took that statement to the Baldwins.

Q. Didn't you, no longer than yesterday and the day before, tell Earnest Crawford that when you came on the stand, you were going to tell exactly the truth, and tell what you had told him, about this whole matter?

A. I didn't tell him so. I told him what I was going to say would be nothing but the truth, and that is what I have told.

Q. Didn't you tell him, not once, but repeatedly, in the last few days that you were not telling counsel on the other side or anybody about what you were going to say when you came on the witness stand, but that when you came on the witness stand you were going to stick to the truth, and tell the same thing you had told him all along?

A. I told him I was going to stick to the truth, and that is what I have done.

Q. Didn't you also tell him that you stood by the statements you had made, and that they were true, and that when you came on the stand, you didn't care who it hurt, you were going to tell the truth?

A. I told him I had not made a statement to anybody, and wasn't going to make any to him. He tried his best to get a statement out of me, and I would not give it to him. He has tried it repeatedly, but he has never gotten a statement, and he has tried it in the last few days.

Q. During the time, or for the first few days after the killing of your mother, were you not frequently in conference with the Baldwins, and gave them all the assistance you could,

and telling them that your father had killed your mother, and that you wanted all the facts to come out?

A. I think Mr. Baldwin and Mr. Crawford were generally coming to me; I wasn't going to them.

Q. But you were with them. Where did you meet them frequently? Didn't you meet them at the Gleason Hotel frequently?

A. I went to the Gleason Hotel at their request.

Q. And you conferred with them?

A. Yes, sir.

Q. And you made arrangements with John Perry to come to the wine cellar and have an interview at night?

A. No, sir; I did not; they made it themselves.

Q. Were not the Baldwins staying at the Gleason Hotel?

A. I could not swear where they were staying.

Q. You went there to see them?

A. I got a 'phone message that somebody wanted to see me at the Gleason Hotel, and I went to the hotel, and it was Mr. Baldwin.

Q. Didn't you go there four or five times to see them?

A. No, sir; I did not.

Q. How often did you go?

A. Twice. I went once after receiving the 'phone message at home—some one at home answered the 'phone, and they told me somebody wanted me, but wouldn't give any name. I think Mr. Dinwiddie answered the 'phone, and I went there, and it was the two Mr. Baldwins and Mr. Crawford, and then once coming from school.

Q. You did not go up and confer with the Baldwins?

A. Yes, sir.

Q. You did not tell Albert Baldwin and Earnest Crawford that your father and mother had had a violent quarrel, and that she ran into your room—before this killing, of course—and

jumped into the bed with you, and that your father followed her with a pistol into your room, and pointed the pistol at her bosom?

A. No, sir; I never made such a statement to anybody.

Q. Didn't you also say that she got over behind you, and asked you to protect her, and that your father threatened you with the pistol then?

A. No, sir; I did not.

Q. You deny that?

A. I deny it, emphatically.

Q. That was on Tuesday night when you were with Mr. Baldwin and Mr. Crawford at the wine cellar. Now, didn't you go down there with John Perry?

A. Yes, sir; I did.

Q. You took him there?

A. I did not take him there.

Q. How did he get there?

A. He went of his own accord.

Q. He went with you?

A. No, sir.

Q. Did he ask you to go?

A. John Perry; I came down High street, and John Perry was at Charley Brown's house, and he walked down with me.

Q. Didn't you arrange how he was to get there so as not to be observed? Isn't that a fact?

A. I didn't arrange so he could get there so as not to be observed; not at all.

Q. It was on your request and suggestion that he did go there?

A. I told him that Mr. Baldwin wanted to see him and myself at the wine cellar.

Q. You went together?

A. No, sir.

Q. How far did you go apart?

A. He came through the lot, I suppose, and I went up town and went to the drug store and I staid there a good while.

Q. And you all met at the wine cellar?

A. Yes sir.

Q. Didn't you tell Mr. Julian Paoli that you were in a terrible fix; that you did not know what to do at the drug-store on Main street? Didn't you tell him that you were in a terrible fix, and you did not know what to do; that if you told the truth it would hang your father, and people would always point to you as the man who had been instrumental, or was the cause of hanging his father?

A. No, sir; I did not make such a statement to him.

Q. You deny that?

A. I deny that I ever made a statement that my statement would hang my father; I never did.

Q. Do you deny having any talk with him?

A. He said, "William, I sympathize with you greatly," that way, and he went on to say, talking about this thing, he said to me at the time, and he said the first thing that Mr. Link thought of "what would William think of this," or something to that effect.

Q. Didn't he tell you he sympathized with you greatly, and advised you, as your mother was dead, or was killed, to tell the truth about it, no matter what the consequences was? Didn't he tell you that?

A. Yes, sir; he did.

Q. Didn't you also tell Mr. W. G. Baldwin that you had seen as many as fourteen letters, written by women, to your father?

A. No, sir; I did not.

Q. And tell them how some of them were signed.

Question objected to by counsel for prisoner upon the

grounds—first, it is illegal, and he is asking him if he did not make a statement without having laid the foundation to begin with; and in the second place, he is seeking to get before this jury by indirect testimony, the fact that some fourteen women had written letters to Mr. McCue, the defendant here, and we say it certainly is irrelevant and improper at this time.

The Court: I think you are right.

Mr. Woods: As to that point, I will lay the foundation for it, and he can be recalled on that point.

The Court: As I understand, all of this testimony is for the purpose of discrediting this witness.

Q. State to the jury who has carried the meals daily from the house to the jail, to your father.

A. John Perry.

Q. This colored boy?

A. Yes, sir.

Q. Where has John Perry been living ever since your mother was killed?

A. At our home.

Q. In your home?

A. Yes, sir.

Q. And he has taken the meals daily for your father to the jail?

A. Yes, sir.

He then stated that his father and mother went to church the night his mother was killed, and he was in his room, and just before they started to church he went to Mr. Massie's and got his father a paper. His father returned to the house and asked him where his mother was. . . He went upstairs, as his father stood in the front door. It was five or six minutes after they started to church when his father returned and asked where his mother was. He never saw his father again until after the killing. He was in front of the City Hall when

he first heard of the murder.   A gentleman told him that the house had been robbed, and then he ran first to the office for a pistol, and could not get into the desk, and ran from the office, in the middle of the street, and ran straight home.   The first person he met was Mr. and Mrs. Frank Massie, and Dan Grady next, and Dr. McCue next.   Four or five days after the killing he went to his father's office and got certain letters and gave them to Baldwin, at Baldwin's (the Commonwealth's detective) request.   He could not say whether it was before or after his father's arrest.

At this point court adjourned till next morning.

J. William McCue recalled by the Commonwealth.

Q.  Now, in order to understand me better, sir, don't you remember going to Mr. Link's drug store on Tuesday evening after your mother was buried?

A.  Yes, sir.

Q.  Don't you remember seeing Mr. Juilan Paoli there?

A.  Yes, sir.

Q.  You know Mr. Paoli well?

A.  Yes, sir; I do.

Q.  He was a friend of yours?

A.  Yes, sir.

Q.  Do you remember that Mr. Paoli said to you that he deeply sympathized with you in your trouble?

A.  Yes, sir.

Q.  And don't you remember saying to him, "I suppose you know how I stand in this matter?"

A.  No, sir.

Q.  And that Mr. Paoli said, "No, I do not.   Mr. Link asked me this morning if I knew, and I told him I did not"?  Do you remember that?

Mr. Lee (of counsel for prisoner): Mr. Stenographer, read back there where this line of examination began.

(Stenographer complied.)

.. Mr. Lee: Now we want it understood we object to all these questions from beginning to this particular matter.

He declined to state a reason when requested by court, and the objection was overruled.

The court instructed the stenographer to let the record show that the court asked for reasons in each case, and counsel for defense declined to give reasons.

Q. Now, Mr. McCue, I will read this conversation which I described at first, which occurred between you and Mr. Julian Paoli. Do you remember that Mr. Julian Paoli told you on that Tuesday evening that he deeply sympathized with you, and you said to him, "I suppose you know how I stand in this matter"; that Mr. Paoli then said, "No, I do not; Mr. Link asked me this morning if I knew, and I told him I did not"? Then, did not you say to Mr. Paoli, "I have sided with my mother," and then Mr. Paoli said, "William, your mother is dead. I wouldn't make any fight on my father, but would tell the truth, and let it fall where it would"? Then do you remember saying to Mr. Paoli, "If I tell the truth and my father is hung people will point at me and say his evidence (that is, my evidence) hung his father"?

A. No, sir; I deny that.

Q. Then, didn't Mr. Paoli say to you, "That is not proven yet, but they can better say that than that you should perjured yourself"? Do you remember that?

(Counsel for prisoner announced that it was understood that all these questions and answers are excepted to.)

A. No, sir.

Q. You deny that that statement was made by you?

A. Yes, sir; and I deny that I went down there to have a conversation with Mr. Paoli. I went there to make a purchase; didn't go there to have a conversation with him at all.

Q. What I desire to know is whether or not you admit you

had that conversation. I do not care what you went for. Did you have that conversation with Mr. Paoli?

A. I did not have that conversation as you have read it.

Q. You deny having said to him what I have read to you?

A. I do admit this, that Mr. Paoli said this: "Old man, I sympathize with you, and you have my deepest sympathy."

Q. That is all you admit?

A. Yes, sir.

Q. You deny the balance?

A. Yes, sir.

Q. I questioned you yesterday about a conversation between yourself and Mr. Earnest Crawford and Mr. Albert Baldwin on the porch of your father's house on Tuesday morning, in which I asked you if you did not tell these gentlemen that your father and mother had had many quarrels, and that on Sunday night when the killing took place they were mad with each other at the supper table, and that you went out on the front porch and your father followed you out there; that he was very mad, just raving, and that he remarked then, "I'll be damned if I put up with this another day," all of which you denied?

A. I deny that, emphatically.

Q. Now, in that same conversation with Mr. Earnest Crawford and Mr. Albert Baldwin, did you not also state that when you went to Harrisonburg a few weeks before, your mother had asked you to hide the pistol; and that while you were at Harrisonburg you received a letter from your father giving you hell about hiding that pistol?

A. No, sir.

Q. You deny that?

A. Yes, sir. I want to say right here that I received a letter from my father asking me where his pistol was; that he was going to West Virginia and needed it—he was going to

Bluefield to a coal mine. But he never gave me any hell in the letter at all, in any way, shape, or form.

Q. Now, Mr. McCue, did you not then, and on the afternoon of the same day—wait a minute. As I understand, you denied that you had a talk on Monday afternoon about three o'clock, the day after the murder, with Mr. Earnest Crawford and Mr. Edgar Crawford, your uncles, out in the yard, near the oak tree, in which you told them that your father had a terrible quarrel with your mother some time before; that he pursued her with a pistol; that she ran into your room and jumped into bed behind you; that you got up to interfere, and he pointed the pistol at your breast and threatened to shoot you?

A. I deny that.

Q. Didn't you make that same statement on Monday at three o'clock; and didn't you make it on Tuesday morning again to Earnest Crawford and Albert Baldwin; and didn't you make that same statement afterward on the afternoon of Tuesday, the afternoon after the murder?

A. No, sir.

Q. And didn't you make that same statement to Earnest Crawford and to both of the Baldwins at the Gleason Hotel more than once?

A. I deny that statement being made to any of them.

Q. You deny making that statement to any of them?

A. Yes, sir.

Q. Did you not on Monday, the day after the murder of your mother, tell Earnest Crawford and Edgar Crawford, your uncles, that your father and mother lived like cats and dogs for three or four years, and that home had been like a hell on earth?

A. No, sir; I deny that.

Q. Did you not go to the Gleason Hotel to see the Baldwins about four o'clock on Tuesday after your mother's burial?

A. I got a telephone message to meet them at the Gleason Hotel, at their request, not mine.

Q. Did you not go to the room of Albert Baldwin—

A. Let me state right here that several times I received 'phone messages and did not answer them; did not go to where I was told to come.

Q. On this occasion, on Tuesday afternoon, did you not go to Albert Baldwin's room at the Gleason Hotel?

A. On Tuesday evening?

Q. Yes.

A. I did.

Q. Did you not then tell Mr. Baldwin that your uncles had warned you to keep away from Earnest Crawford?

A. I deny that.

Q. Did you not then, on talking with Mr. Baldwin, agree that you would have John Perry at the wine cellar at nine o'clock that night—Tuesday night—and didn't you have him there at that time?

A. I did not agree to anything of the sort. He told me he wanted to see John Perry at the wine cellar at nine o'clock, and I told John, and don't know what he did after that. I came down town and staid quite awhile. I went into Link's drug store and bought a coca-cola, as well as I remember, and went down the street towards the Presbyterian church, towards the wine cellar, and John Perry was standing at Charley Brown's house, and we walked down from Charley Brown's house to see Mr. Crawford and Mr. Baldwin, at their request. And let me say right here that Mr. Earnest Crawford tried in every way to get John Perry to say, "Oh, Sam, you are killing me." He tried in every way imaginable to do it, but never got it out of him.

Q. Well, now, let's take that up. Did you not, at the wine cellar, tell John Perry, in the presence of Mr. Baldwin and

Mr. Earnest Crawford, say, "John, you tell these men what you have told me about how that thing happened"?

A. I told John to tell them the truth, and he told them.

Q. Didn't you then say to John Perry, "John, you told me this morning how that thing happened; now tell these men what you told me"?

A. No, sir; I deny that.

Q. And did not John Perry then hang his head and make this statement, or of the same character, that he made before the coroner's inquest?

Q. That is in substance?

A. John made the same statement he made at the coroner's inquest.

Q. That is what I asked you.

Q. And didn't you say, "John, hadn't you better think this matter over. You told me differently this morning. Hadn't you better think this matter over now carefully and tell the truth about it"?

A. I told him to tell the truth about the matter, and John told them there several times. They tried in every way imaginable to get John to say that mother said, "Oh, Sam, you are killing me," but John still stuck to the statement, "Sam, he is killing me."

Q. Didn't you then say to John, in the presence of those gentlemen, "John, you told me differently this morning," or in substance you said that to him?

A. No, sir, I did not.

Q. Tell, then, what you told him.

A. I told John to tell the truth.

Q. Then you did not state to Mr. Baldwin and Mr. Crawford that you would see him in the morning, and see if he would tell the truth as he had told it to you?

A. I went down in the morning and asked John who told

me as I had written there. After writing it I went back to John and asked, "Are you telling the truth?" He said, "No, I am not. I am going to stick to the answer made at the coroner's inquest."

Q. He made that statement to you, that he would stick to that?

A. Yes, sir; he made that statement inside of half an hour.

Q. This paper has been identified. You wrote that, and did he make the statement?

A. Yes, sir; he made the statement to me and denied it.

Q. Now, Mr. McCue, he made you this statement and you wrote it down?

A. He gave me that statement, and then denied it.

Q. You wrote it down as he stated it?

A. No, sir; I didn't write it down as he stated it. I went to the house and wrote it, and then I says, "John, are you telling the truth about this thing?" He says. "No, William, those gentlemen are trying to make me tell that, and I deny that statement."

Q. After you had written that?

A. Yes, sir.

Q. Did he make this statement to you that you wrote?

A. He changed that. When Mr. Baldwin took the statement he says, "Do you think John is telling the truth?" I told him I did not know.

Q. This statement was passed by you to Mr. Baldwin?

A. I was there and took it out and Mr. Baldwin took it from my hand.

Q. Mr. Baldwin remarked to you that you had dated it wrong; that it should be the seventh?

A. No, sir; I do not remember that at all.

Q. Didn't you tell Mr. Baldwin when he asked you what that on the back of it here was, that—

A. Yes, sir; I wrote that.

Q. Didn't you tell him you wrote that on the back for fear some one would come in while the statement was being made, and if so you could make it appear you were writing a letter?

Excepted to by counsel for defense.

The Court: The objection in each case is overruled; the general ground being stated by counsel for defense that they object to its illegality.

Mr. Coleman (of counsel for prisoner): In reference to this statement, we object to it on the ground that any conversations between this witness introduced by the Commonwealth and Mr. Baldwin, in the absence of the accused, are incompetent.

The Court: Only to impeach the witness.

Mr. Coleman: We shall contend it is not admissible for that purpose.

The Court: I will pass on that when it is raised.

Q. Did you not go to see the Baldwins at least four or five times during the first week at the Gleason Hotel?

A. No, sir.

Q. You deny that?

A. Yes, sir.

Q. How often did you go?

A. I went twice—once at their request—and I got several 'phone messages at home to meet them at different places. Mr. Dinwiddie answered the 'phone and told me, and I said then I'm not going.

Q. You deny that you went to see them four or five times?

A. Yes, sir; once I stopped off from school when Albert Baldwin was in Payne's livery stable.

Q. About two weeks after the death of your mother do you remember going to the Gleason Hotel, and that you went from there with Albert Baldwin to Payne's livery stable?

A. I deny that.

Q. You didn't go with him?

A. I deny that I met Albert Baldwin. He was standing in Payne's livery stable, and Mr. Earnest Crawford had told me before that Mr. Baldwin wanted to see me, and I passed there and happened to see him.

Q. You deny calling for him at the Gleason Hotel, and going with him to Payne's stable?

A. I didn't call for him at the Gleason Hotel.

Q. Did you not then, at Mr. Payne's stable, tell Mr. Albert Baldwin that you had been to see your father at the jail, and that your father had made you promise not to tell about the pursuit of your mother by him with a pistol?

A. I deny that.

Q. And that you had to tell your father you could not forget it?

A. I deny that.

Q. You saw him at Payne's stable?

A. Yes, sir.

Q. You deny you made the statement to him at that point?

A. Yes, sir.

Q. Now, Mr. McCue, do you remember seeing your father in jail some days after he was put in jail, and your father asked you, "William, that statement of Crawford's that your mother was pursued by me with a pistol, and that she ran into your room and jumped into your bed. That is not true, is it?" Do you remember that?

A. That is untrue.

Q. Do you remember that you remarked, in reply to that question, to your father, that it was true.

A. He never asked me such a question.

Q. Do you not remember in the jail, in the same conversation, that your father said at once, "Didn't your mother have the pistol"?

A. I do not remember any conversation of that kind.

Statement.

Q. And didn't you reply, "What did she run for and get into my bed if she had the pistol?"

A. I make no such reply at all; wasn't asked any such question.

Q. You deny all of them?

A. Mr. Will McCue and Charley McCue and several people were in the jail; Mr. Burnley Sinclair; I think.

Q. You deny that such a conversation occurred?

A. Yes, sir.

Mr. Coleman (of counsel for prisoner): We except to that. Even if true, as stated by the Commonwealth's Attorney, it would be inadmissible evidence.

The Court: The court understands that all of this evidence is introduced for the purpose of impeaching the witness, and rules that it is admissible for that purpose.

Q. Now, Mr. McCue, having laid the foundation for the question, I will ask you this: About two weeks after your mother was murdered, didn't you drop into the Gleason Hotel and see Albert Baldwin, and go with him down to Payne's stable, and didn't you, at Payne's stable, tell Mr. Baldwin that your father had tried to get you to forget, or not stand up to, that statement about his (your father's) having pursued your mother with a pistol and pointing it at her, and when you tried to interfere he pointed it at you, and that you said you could not forget it, or something to that effect?

A. I want to say that I was going home from school and Mr. Baldwin was sitting in Payne's livery stable. I had been told by Mr. Crawford that he wanted to see me, and I saw him there, and he spoke to me, and I walked in. I deny the statement he has made there.

(It was understood among counsel and the court that the defense excepted to all of the foregoing questions and answers, as illegal, and the court overruled their objections and

instructed the jury as to each question and answer that they could only be considered for the purpose of impeaching the witness and not as evidence of the guilt or innocence of the accused.)

The witness further stated that he probably remained in Charlottesville two weeks after the death of his mother, and then went with his brothers and sister and Uncle Will McCue to Mr. Newton Dixon's, at Ronceverte, W. Va. Mr. Newton Dixon was the father-in-law of Mr. Will McCue. They remained at Ronceverte three weeks lacking one day: They got on the train going to Ronceverte at Basic City, having driven by his aunt's, Mrs. Minnie Durrette's, and his uncle Will's, near Afton.

Cross-examined:

The witness stated that he had been living in his present house thirteen or fourteen years. He had spent most of his life at home, only spending half a session at the Episcopal High School, at Alexandria. The relations between his father and mother were generally cordial. Of course, they had family spats—about the children and horses—that was all. They were not serious. His father gave his mother everything she wished. She had a horse and buggy of her own, and went to the springs when she wished. Every wish of her heart was granted as far as his means would allow. She left for Red Hill on the 12 M. train going South over the Southern railway on the Friday before the killing. When he came in from tieing the horse that Sunday evening he thought his father had gone to take a bath. His father arrived about 6 P. M. and he and mother came to the tea table together. There were no indications of any unpleasantness between them before they went to church. The front door was unlatched when he went out while his father and mother were at church. The back door in the hall leading to John's room was latched. It is al-

ways laughed. Father never failed to kiss mother and the children after meals when he was going away.

Re-examined:

Witness drove his mother to the depot Friday morning. He denied that she was crying, or that he had so told Earnest Crawford and Albert Baldwin, or had ever told them that his mother was jealous of his father. He denied telling Miss Gertrude Irving the Sunday after his mother was killed that his people were reticent, and that he dreaded going upon the witness-stand, and that he would rather die than tell what he would have to tell. He denied that he would have shot himself the night of the murder but for the fact that two weeks before the murder his mother asked him if anything happened to her to look after the little children.

Q. Didn't you then tell the Baldwins that as soon as you heard of the killing of your mother that you knew your father had killed her.

A. I deny that, emphatically.

Question and answer excepted to by counsel for defense, and objection overruled by court and jury instructed as before.

He denied going in the room where his mother's body was with W. G. Baldwin, but admitted going there with his father and others. His father never told him where he was going when he left Friday.

At a later stage of the trial J. William McCue was recalled by the Commonwealth.

He was shown a letter he wrote his aunt in Athens, Ga., September 17, 1904, as follows:

"Ch'ville, Va., *Sept. 17th, 1904.*

"Dear Aunt Sallie:

"I received your kind and affectionate letter a few minutes ago, and will answer it now, as I am afraid I will forget it. We are at home with Aunt Sammie and Uncle Marshall Dinwiddie, who are very kind and good to us; but I come home

and miss my dear mother, whom I put before my God, and who I miss many times in the day. Aunt Sallie, I am fighting one of the greatest battles now. Here I am among all of my father's people, and they, of course, wonder why I took such a step in this case. But I am going to do what I think right in God's care, in spite of any human being living. I never will be in worse trouble than this. I cannot sleep, and when I go to bed and wake up with the same trouble I feel as though I cannot stand it. I have got only one thing to live for now, is my little sister, who is dearer to me than ever before.

"Sam, Ruby and Harry are all well, and join me in love to you and Uncle Ernest and little Rachel. I am,

"Your affectionate nephew,

"J. WILLIAM M'CUE."

He admitted writing the letter.

Albert Baldwin, Wm. G. Baldwin, Edgar Crawford, Earnest Crawford, Miss Irving and Mr. Paoli were then examined and contradicted the statements made by J. William McCue—severally declaring that he had made the statements to them, respectively, indicated in the questions propounded to him. As each of these witnesses was examined, the court instructed the jury that the statements of the witness were received only for the purpose of impeaching the witness, J. William McCue, and not as evidence of the guilt or innocence of the accused.

Exception was also taken to the action of the court in permitting W. W. Brand and Geo. Thomas to testify as to the demeanor of the prisoner towards his wife. This exception was not deemed of sufficient importance to be specifically noticed in the opinion of the court. The testimony of these two witnesses was substantially as follows:

W. W. Brand stated that he was a plasterer, residing in Charlottesville, and that last summer, while working at the

prisoner's house, he heard the prisoner speak "very rough and bitter to his wife, like he would like to kill her in a second," but he could not recall the words used, nor the month when they were spoken.

Geo. Thomas (a colored man) is 60 years old, and janitor for the City Hall. He cleaned up McCue's office as Mayor of Charlottesville in the above hall. Once late in the evening he saw McCue come to the City Hall with a satchel, and Mrs. McCue drive up about the same time. Mrs. McCue spoke, but he never heard him speak. He went in his office and she waited for him. When he came out she asked him, "Mr. McCue, are you going home with me?" He said, "No," and went down the street. She remained until he had crossed the street. and went home. He had been away several days. This was in late spring or early summer of 1904. Mr. McCue's manner was not as pleasant as a man should use in speaking to an affectionate wife—like I speak to mine.

After the evidence was all in, the court gave to the jury twenty-nine instructions. Those numbered from 1 to 13 inclusive were given at the instance of the Commonwealth, and the residue at the instance of the accused, the court having first modified number 21 against the remonstrance and objection of the prisoner. The court also refused two instructions offered by the prisoner. These and the ruling of the court thereon sufficiently appear in the opinion of the court.

The instructions given were as follows:

(1)

The court instructs the jury that the rule of law is that a man shall be taken to intend that which he does, or which is a necessary consequence of his acts.

(2)

The court further instructs the jury that whenever the kill-

ing is wilful, deliberate, and premeditated, the law infers malice from this fact.

## (3)

The court instructs the jury that every homicide in Virginia is presumed to be murder in the second degree. In order to elevate the offence to murder in the first degree, the burden of proof is upon the Commonwealth, and to reduce the offence to manslaughter, the burden of proof is upon the prisoner.

## (4)

The court instructs the jury that murder is distinguished by the law in Virginia as murder in the first degree and murder in the second degree..

## (5)

The court further instructs the jury that circumstantial evidence is legal and competent in criminal cases, and if it is of such a character as to exclude every hypothesis other than that the defendant is guilty is entitled to the same weight as direct testimony.

## (6)

The court instructs the jury that whoever kills a human being with malice aforethought is guilty of murder; that a murder which is perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, and premeditated killing is murder in the first degree.

## (7) .

The court instructs the jury that the credibility of witnesses is a question exclusively for the jury, and the law is that where

a number of witnesses testify directly opposite to each other, the jury is not bound to regard the weight of the evidence as equally balanced, the jury have the right to determine from the appearance of the witnesses on the stand, their manner of testifying, and their apparent candor and fairness, their apparent intelligence, and from all the other surrounding circumstances appearing on the trial, which witnesses are more worthy of credit, and to give credit accordingly.

(8)

The court instructs the jury that a reasonable doubt is such a doubt as may be honestly and reasonably entertained as to charged. Reasonable doubt must be based upon the evidence, any substantial and material fact essential to prove the offence or that is suggested by the evidence, or grows out of the evidence itself. It must not be arbitrary doubt without evidence to sustain it. It must be serious and substantial in order to warrant an acquittal. It must be a doubt of material fact or facts necessary for the jury to believe to find a verdict of conviction, and not of immaterial and non-essential circumstances.

(9)

The court instructs the jury, as a matter of law, in considering the case, the jury are not to go beyond the evidence to hunt up doubts, nor must they entertain such doubts as are merely chimerical or conjectural. A doubt to justify an acquittal must be a reasonable doubt, and it must arise from a candid and impartial investigation of all the evidence in the case, and unless it is such that were the same kind of doubt interposed in the graver transactions of life it would cause a reasonable and prudent man to hesitate and pause, it is insufficient to authorize a verdict of not guilty. If, after con-

sidering all the evidence you can say that you have an abiding conviction of the truth of the charge, you are satisfied beyond all reasonable doubt. On the other hand, the jury must not go beyond the evidence to hunt up inferences of guilt.

(10)

The court instructs the jury that on a charge of murder malice is presumed from the fact of killing. When the killing is proved, and is unaccompanied with circumstances of palliation, the burden of disproving malice is thrown upon the accused.

(11)

The court further instructs the jury that to constitute a wilful, deliberate, and premeditated killing it is not necessary that the intention to kill should exist any particular length of time prior to the actual killing. It is only necessary that such intention should come into existence for the first time at the time of killing, or any time previously.

(12)

The court further instructs the jury that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any provocation, or even with slight provocation, is *prima facie*, wilful, deliberate, and premeditated killing, and throws upon the prisoner the necessity of showing extenuating circumstances.

(13)

The court further instructs the jury that in determining the weight to be given the testimony of different witnesses in this case, the jury are authorized to consider the relationship of the

witnesses to the parties, if the same is proved; their interest, if any, in the result of this case; their temper, feeling or bias, if any has been shown; their demeanor whilst testifying; their apparent intelligence; their means of information, and to give such credit to the testimony of such witnesses as under all the circumstances such witnesses seem to be entitled to.

### (14)

The court instructs the jury that in all criminal prosecutions, a man has a right to be confronted with his accusers, and the witnesses against him, and no statement made by any witness, or other person, elsewhere than in court, and in the presence of the accused, constitutes evidence against him. The sole purpose for which evidence of any such statement is admitted, or for which it can be used, is to enable the jury to judge whether or not the witness is entitled to credit.

### (15)

The court instructs the jury that the law presumes every person charged with crime to be innocent until his guilt is established by the Commonwealth beyond a reasonable doubt, and this presumption of innocence goes with the accused through the entire case, and applies at every stage thereof; and if, after having heard all of the evidence in this case, the jury have a reasonable doubt of the guilt of the accused upon the whole case, or as to any fact essential to prove the charge made against him in the indictment, it is their duty to give the prisoner the benefit of the doubt, and find him not guilty.

### (16)

The court instructs the jury that the failure of the accused

to testify creates no presumption against him, and in consider-ing his guilt or innocence, his failure to testify is not a circum-stance which the jury is entitled to consider.

### (17)

The court instructs the jury that murder by poison, lying in wait, imprisonment, starving or any wilful, deliberate and pre-meditated killing, or in the commission of, or attempt to com-mit, arson, rape, robbery, or burglary, is murder of the first degree. All other murder is murder of the second degree.

### (18)

The court instructs the jury that, upon the trial of this case, if a reasonable doubt of any fact necessary to establish the guilt of the accused as charged in the indictment be raised by the evidence, or lack of evidence, such doubt is decisive, and the jury must acquit the accused, since a verdict of "not guilty" means no more than that the guilt of the accused has not been established in the precise, specific, and narrow form prescribed by law.

### (19)

The court instructs the jury that, even though they may believe from the evidence that the witnesses, William McCue and John Perry, may have made statements in conflict with, or in contradiction of, the evidence given by them on the witness-stand, in considering the guilt or innocence of the ac-cused of the crime with which he is charged, the jury are not at liberty to take into consideration any such contradictory or conflicting statements of the said witnesses, or either of them, but must consider the case of the accused as if such statements had never been made, except that they may consider such

statements for the sole purpose of determining whether said witnesses, or either of them, are worthy of belief.

### (20)

The court instructs the jury, even if they are satisfied from the evidence, beyond a reasonable doubt, that the accused took the life of the deceased, then the jury are instructed that the law presumes, *prima facie*, that such killing was murder of the second degree, and the burden rests upon the Commonwealth to elevate the offense to murder in the first degree by proving, beyond a reasonable doubt, all of the elements of that crime as defined by another instruction.

### (21)

The court instructs the jury that all statements which they may believe from the evidence were made by J. William McCue, the son of the accused, or John Perry, to other persons, not in the presence of the accused, can only be considered by the jury for the purpose of discrediting the said William McCue and the said John Perry, and the jury are instructed that such statements shall not be considered by them as evidence against the accused, but only for the purpose above stated, and said statements should, in considering the question of the guilt or innocence of the accused, be wholly disregarded by the jury and treated as if they had never been made.

### (22)

The court instructs the jury that if, upon the whole evidence in the case, there is any reasonable hypothesis consistent with the innocence of the accused, they must find him not guilty.

### (23)

The court instructs the jury that upon the trial of a criminal

case by a jury the law contemplates a concurrence of twelve minds in the conclusion of guilt before a conviction can be had. Not only is this true with respect to the guilt of the accused, but it is likewise true with respect to the degree of crime. Therefore, although the jury may believe, from the evidence, that the accused is guilty of the killing of the deceased, still, if any individual member of the jury, after having duly considered all of the evidence in this case, and after consultation with his fellow-jurors, should entertain a reasonable doubt as to the degree of the guilt of the accused, it is his duty not to surrender his own convictions as to such degree of guilt simply because the balance of the jury entertain different convictions with respect to such degree.

(24)

The court instructs the jury that the failure of the evidence to disclose any other criminal agent than the accused is not a circumstance which may be considered by the jury in determining whether or not he was guilty of the crime wherewith he is charged. The prisoner is presumed to be innocent until his guilt is established, and he is not to be prejudiced by the inability of the Commonwealth to point any other criminal agent, nor is he called upon to vindicate his own innocence by naming the guilty person.

(25)

The court instructs the jury that upon the trial of a criminal case by a jury the law contemplates the concurrence of twelve minds in the conclusion of guilt before a conviction can be had. Each individual juror must be satisfied beyond a reasonable doubt of the defendant's guilt before he can, under his oath, consent to a verdict of guilty. Each juror should feel

the responsibility resting upon him as a member of the jury, and should realize that his own mind must be convinced beyond a reasonable doubt of defendant's guilt before he can consent to a verdict of guilty. Therefore, if any individual member of the jury, after having duly considered all the evidence in this case, and after consultation with his fellow-jurors, should entertain such reasonable doubt of defendant's guilt as is set forth in certain other instructions in this case, it is his duty not to surrender his own convictions simply because the balance of the jury entertain different convictions.

(26)

The court instructs the jury that where evidence is adduced of any statement of the accused, such statement must be considered as a whole. A part of it cannot be considered and a part rejected. The jury must consider all or none. And if the prosecutor uses the declarations of the prisoner, he must take the whole together, and cannot select one part and leave another.

(27)

The court instructs the jury that when, upon a charge of murder, the evidence is wholly circumstantial, as is the case here, the absence of all evidence of an inducing cause or motive to commit the offence charged, affords of itself a strong presumption of innocence.

(28)

The court instructs the jury that in the application of circumstantial evidence to the determination of the case, the utmost caution and vigilance should be used. Such evidence

is always insufficient where, assuming all to be true which the evidence tends to prove, some other reasonable hypothesis may still be true, for it is the actual exclusion of every other reasonable hypothesis which invests mere circumstances with the force of truth. Where the evidence leaves it indifferent which of several hypotheses is true, or establishes only some finite probability in favor of one hypothesis, such evidence cannot amount to proof, however great the probability may be.

And the court further instructs the jury that all the evidence in this case which tends to establish that the accused is guilty of the crime with which he is charged, is circumstantial and not positive evidence.

Therefore, although the jury may believe, from the evidence in this case, that there is a strong probability that the accused is guilty of the offence charged in the indictment, still, if, upon the whole evidence, there is any other reasonable hypothesis consistent with his innocence, they cannot find the accused guilty, and this is true, although it may appear from the evidence that the probabilities of his guilt are greater than the probabilities of his innocence.

(29)

The jury are finally instructed that the instructions given are all the instructions of the court, and must be considered as a whole.

The objections made to the statements of Capt. Woods, who was assisting in the prosecution, and to the action of members of the jury in reading the newspapers pending the trial are fully considered in the opinion of the court.

A motion in arrest of judgment was made on the ground that the verdict of the jury was insufficient and defective, in that it failed to ascertain and fix the degree of murder of

which accused was found guilty. The verdict was written on the back of the indictment, and was in the following words:

"We, the jury, find the defendant guilty, as charged in the within indictment, for murder in the first degree."

The contention was that the words "for murder in the first degree" were descriptive of the indictment, and not a finding of the degree of the defendant's offense.

Finally, a motion was made to set aside the verdict because it was contrary to the law and the evidence. This motion was overruled by the trial court. As the case is heard here as on a demurrer to the evidence, it is unnecessary to refer to evidence introduced by the prisoner to contradict that given for the Commonwealth. The main facts of the case are set forth in the narrative first hereinbefore given, but the evidence of the principal witnesses for the Commonwealth, in addition to that already given, was as follows:

Dr. Frank C. McCue testified that he was a physician and surgeon and had resided in Charlottesville five years this coming December, and will be thirty-one years old next April, and is a brother of the accused. He resided at 402 Park street, about three and a half or four squares from the residence of the accused, and on the same street—only he resided on the east side and the accused on the west. The first knowledge he received of the murder on September 4, 1904, was about 9:15 P. M. or 9:30. He and his wife's cousin, and his little baby, had gone upstairs to retire. He was nearly undressed when the telephone rang. He went to the 'phone, and the accused, whose voice he recognized, said: "Frank, come down right quick. Somebody is in the house, has knocked me (accused) senseless, and possibly shot Fannie (the wife). He (Dr. McCue) hung up the receiver quickly, went to his room, dressed, with his wife's assistance, and started. As he started out he asked his wife for his pistol, and recalled that it had been

loaned out. He usually carried a pistol. He went to his office door on High street, came up to the corner to Park street, went down on the right of Park street to Mrs. Pugh's, or between Mrs. Pugh's and Sinclair's, then crossed the street and did not get on the street until near Letterman's, and kept on that side until he reached his brother's gate. He went up the front steps, found the door ajar, pushing it open with his emergency grip. The first person he saw was the colored boy, John Perry, going from him, with his back to him, toward the staircase. Dr. McCue did not take off his hat, and kept his grip in his hand. There was a low light in the hall. He met his brother on the steps a little higher than the center. There was a dim light in his brother's room, on the upper floor. J. Samuel McCue had on a pair of dark pants, a pair of slippers, and undershirt. He had a wound on his right cheek, and some blood on the right side of his face. He did not reply to several of Dr. McCue's questions, and seemed dazed, and would give no definite history of the case. He pushed Dr. McCue back, and said, "Go on and hunt Fannie." Dr. McCue went up the steps, put down his grip, took matches and struck a light. About that time Policeman Grady arrived in the door. Grady came up the steps before Dr. McCue made the first light. There was an odor and fumes of powder in the upper hall, and water running in the bath-room. Going into the bath-room he struck a light, and asked John Perry where the gas jet was. Perry said behind the door. After lighting the gas jet the first thing he saw was the body of Fannie McCue lying in the tub, with the right-hand spigot turned towards the base of the tub. She was pulseless, lying almost straight out, right leg drawn out against the base of the tub and left knee raised, with her gown floating above her body. She had a wound on her right ear, and on the left side of her nose, near the center, and her face towards the wall.

She was without color, and her mouth was partly open. Some one asked if she was dead, and about that time Sam asked the question, while he stood outside the bath-room door. Dr. McCue replied, "Yes," and Sam said, "Oh, my God, my darling wife," and dropped. The window at the door was open. Some one came in just then. The water was within four inches of the top of the tub. Her arms were folded across her breast. Dr. McCue took hold of her head, Grady took hold of her body, and John Perry took hold of her feet, and lifted her out of the tub on a rug on the bath-room floor. No water had entered her body, and nothing passed from her nose, eyes, or mouth. There was no discoloration of the water. There was a slight hemorrhage from the side of her head, which trickled down at the head of the tub. The water did not cover her. Dr. McCue told Grady that he had nothing to protect himself with, and he had best remain with him (Dr. McCue). Dr. McCue lighted a gas jet in a back room, and Grady called his attention to a window being up in that room. This was in Ruby's room. Grady called out of the window, "Watch out," or to "keep a watch out," as parties outside were surrounding the house. Then Dr. McCue and Grady came out of the room, down stairs to the front hall, entered the parlor, where there was no light. Dr. McCue struck a light. One of the parlor windows was up. They then returned to the bath-room and removed the body to Wm. McCue's room, and laid it on the bed, and covered it with a sheet, and then for the first time he noticed the gunshot wound. Dr. McCue and Grady returned to the bath-room, and for the first time noticed Sam McCue's pump-gun by the door leading into Perry's room, in the upper hallway. Perry picked up the gun, said it was Mr. Sam McCue's, and pushing back the fixtures an empty shell rolled out. Perry said he did not know what the gun was doing there. Dr. McCue was backwards and forwards through

the house.   Then he let the water out of the bath-tub.   He
observed before she was removed her feet, as above stated.
The spigot was turned towards the base of the tub, and the
water comfortably warm.   Her gown was saturated with water,
and her hair partially tucked up.   The above were the only
wounds he then observed.   He went to his brother Sam several
times, offering assistance.   Sam was lying on a sofa, and
seemed to be suffering pain.   On his right cheek a hemorrhage
was running from the side of his face.   When Dr. McCue
went into Sam's room some one back of him, while he sat hold-
ing his brother's pulse, observed, "What is that bat doing
there."   It was to the right of the mantlepiece, standing on
the floor.   That was the first he had seen of the bat. . .   He
raised the bat and noticed a discoloration near the larger end,
but could not say it was blood.   He made no further examina-
tion of the bat.   He never looked at the clock when he re-
ceived the 'phone message—did not look at the clock until the
next morning.   He could not state how long it took him to get
ready and start, but it was not long.   He went at once to his
brother's house after receiving the 'phone message.   While
standing on the stairs Grady arrived.   He thought he heard
Grady behind him as he came down the street.   He was past
half way upstairs when Grady came in the front door.   The
body in the bath-tub was Mrs. Fannie McCue's, the wife of
J. Samuel McCue, and she was between 45 and 48 years old.
They had four children—one girl and three boys.   She would
weigh from 100 to 110 pounds.   Her body was warm when
first found.   The warm water spigot was running.   Her head
was entirely out of the water, and the water close up to her
shoulders, and had reached the wound in her bosom.   The
wound was an inch or inch and a half below the collar bone.
There was no flow of blood from the wound, and her gown
was entirely free from blood.   There was no manifestation of

hemorrhage at all from the wound. It was discolored with powder, an irregular opening.

He was present later when a thorough examination of the body was made, but could not tell the time. The examination was made by Dr. Early and Dr. Venable. He was standing in the hallway when those doctors asked him to go with them. They went to the bath-room and struck matches in addition to the gas light, and got down and searched the floor and wall, and found nothing. Then they searched the hall wall and stairway going to Sam's room. They asked Dr. McCue to go and examine the body with them. Dr. Early lighted a candle in addition to the gas. Dr. McCue, as a spectator, held the candle for Drs. Early and Venable to examine the body, in the presence of the undertaker. Previously the undertaker had ripped her gown down in front, which was the only garment she had on. He told those present not to interfere with the body until the examination was made. To his knowledge nothing had been done to the body before the examination. When the examination commenced the body was still prone back on the bed, as it was taken in, and witness knew of no blood coming from the gunshot wound prior thereto. They first searched for the number of wounds. The first wound was on the right ear and side of the head, the next on the left side of the nose, about the center, a little scratch in the center of the head found by Dr. Early, and the gunshot wound. They were looking over the body, and he looking too. He saw no evidence of blows on the throat at that time. Dr. Early pulled her gown back, and introduced his finger in the cavity of the gunshot wound for the first time, and that was the first blood to come from the wound. They rolled her from front to back investigating what direction the gunshot wound took, and its effect. He could not say just what they did. That was the first time he observed the gown saturated

with blood.  They had made an examination previously to the permanent examination.  He could not say how long after the body had been placed in Willie's room.  It was later in the night that Mr. Gilmer called up Drs. Early and Venable and asked them to make a thorough examination.  There was no discharge of blood previous to the last examination.

The undershirt that J. Samuel McCue had on was removed during the last examination of her body, later in the night. The undershirt was identified as like the one Sam had on when he arrived.  He was not present when Sam removed his undershirt.  It was delivered to him when the undertakers were working on her body, just before cleaning up every-thing—the bedding, sheets, &c., blood, &c., in the room by the undertakers.  He was asked by Mr. Gilmer to get the shirt, and to place it with the other articles.  He went to his brother's room and asked for the undershirt and found it in the clothes-basket by his dresser.  At that time he thought his brother was on a sofa in the room.  He did not remember whether he or some one else asked Sam where the shirt was. He did not remember whether he or some one else got the shirt out of the basket.  There were some strangers in the room.  Before going into his brother's room for the shirt, he was sitting in the room talking to the undertaker and Mr. Marshall Dinwiddie quite a while before deceased was dressed. Just as they were putting the clothes on her, and her gown lying to itself, and the bloody bed-clothes and sheets, mattress, &c., were raised up by Mr. Dinwiddie and Mr. Biery and thrown out the window, he went and got the shirt from his brother's private room and brought it to Mr. Dinwiddie.  Mr. Dinwiddie took the shirt in his hands, just as his hands were from handling the dirty, bloody bed-clothes, &c., and handled it, and Mr. Biery, the undertaker, rolled it up with the gown and laid it aside, and Mr. Biery went to the bath-room and

washed his hands, accompanied by Mr. Dinwiddie, whom he asked to remove the blood stains from the bath-tub. He could not say if the shirt was in the same condition as when he received it. The shirt was a little torn down the front lapel, and some evidence of hemorrhage down the front. There was some blood actually on it. He did not observe the back of the shirt particularly at that time. He could not recall the spots on the back of the shirt. He observed blood coming from his brother's face when he first saw him. He did not remember the shirt being damp when taken out of the clothes-basket, but it later came in contact with the gown, which was saturated with water and blood. Mr. Dinwiddie's and Mr. Biery's hands were bloody when they received the shirt. His hands were clean. He thought the shirt was dry when he received it, but would not say positively. There was only a little blood stain on the gown prior to the examination. When he went into his brother's room for the undershirt he had changed it.

The base-ball bat was identified as the one looking like the one found in the room. When it was found some one said, "I will take that for the Commonwealth." An inch, or an inch and a half, near the larger end was discolored. The stain shown him on the bat he presumes to be the stain he saw on the bat that night. He thought Cliff. Rogers, the City Sergeant, was the one remarking about keeping the bat for the Commonwealth, but would not swear to it.

The gun was shown witness. After placing the body in Willie's room he saw the gun for the first time to the right of the door leading into John Perry's room, in the upper hall. He did not touch the gun. When the boy took it up he placed it on the left side of the hall. The gun shown looked like the gun, but he could not say for certain. Perry waits on his brother at his house, attending to his horses. Perry had been there some time. He could not say for certain where Perry

slept, but presumed in the room at the end of the upper hall, beyond the bath-room, just across a little passage, about two or three feet. John Perry is colored. When he arrived Perry was downstairs, and Sam coming down the steps. No one had gotten there to his knowledge before him.

When he received the 'phone message he took no steps to notify the police. He only went as far as to discharge his duty. When called he attended to his business, and did not look out for trouble. He could not tell how long after he arrived before people began to come. The house began to get crowded with people very shortly. When the body was removed from the bath-room he heard a voice in the direction of his brother's room like a lady's. He could see Sam through the crack of the door. That was shortly after the body was laid on the rug. He had not been to his brother's house since September 4, and he did not think the sofa was now in the same place as the 4th, because they have a fire there now. Sam could see the body on the rug, but did not come farther than the bath-room door, and did not touch the body, to his recollection. He was only a spectator at the examinations of the body, and did not make an examination. He was present and held the candle and looked on. The undertaker was not present, and he could not say if he was in the house. He had been there before, and had asked the undertaker not to touch the body until after the examination. The only thing the undertaker had done was to rip the gown down in front. The undertaker was asked to go out of the room for the examination, and he could not say when he returned, but it was after the physicians had examined the body. From the completion of the examination the undertaker was not in the room all the time. Mr. Biery, the undertaker, placed her on the cooling board after the examination.

The wound on the right ear was contused, with bruised

flesh, with break of flesh in front of the ear. His emergency grip was about 8 by 16 inches, and from 4 to 6 inches deep. He did not give any alarm as he went to his brother's house. He went so fast he did not think about it. He thought some one would get there as fast as he did. He remembered his direction distinctly. There was no blood on the rug when the body was laid on it, to his knowledge. The rug was shown him, and he said he could not identify it. The gown was shown, but he could not identify it.

Prior to that 'phone message he had not been out of his house since 5 P. M. He did not go to church. He did not observe fumes of smoke until he made a light in the hall. Never before in his life had it been necessary to administer medicine to Sam. Sam did not take medicine, and he had been his family physician for the last two or three years. He offered to give Sam what he thought proper, but Sam refused it, remarking he thought he could stand it. The medicine was a hypodermic of strychnia and morphia— the strychnia to stimulate, and the morphia to calm, the system—but he refused it, as he always had refused medicine. He had his instruments. Dr. Early had previously drawn his syringe out and was preparing it. He asked him to take care of William McCue, and he would attend his brother. Sam seemed to be suffering a good deal all the time he was there.

When he first entered his brother's room he could not recall the position of Mrs. McCue's clothes. Some of them were on her chair to the left of the wardrobe, but he did not know what clothes. He could not say if the chamber was in order.

The gun was shown him, but he could not say whose gun it was. He could not say if the chiffonier, bed, &c., were in the same position as that night. He could say for certain if he could point out to the jury the position they were in that night. When he reached there his brother seemed dazed, and could

only give him an indefinite history, and would not answer questions, and continued that way for a day or two afterwards. He could never get it out of him.

As well as he could remember, he heard water running in the bath-room while on the steps. Sam never told him where to look for Fannie, and stated nothing to indicate if he knew she was living or dead. He went and looked for her. Sam lives in Charlottesville, and she was killed in this city. He thought Sam was in his room when the gun was found, and John Perry stated whose it was. Sam came just inside the bath-room door while the body was on the rug. He acknowledged saying before the coroner's jury, "as well as I remember he was standing just outside the bath-room, in the doorway," but that was the first time Sam ever said anything. He did not put that in. It just did not come to his mind; it has come since.

On cross-examination this witness stated that he recognized his brother's voice at the 'phone, and the message was, "Come down here, Frank, right quick. Somebody is in the house, knocked me senseless and possibly shot Fannie." That is all that was said. He did not stop on the way to his brother's, nor go into any other yard on the way, nor speak to any one. There cannot possibly be any mistake about that. He was perfectly sure that he went without pause or stop from his house to his brother's. The front door was ajar when he arrived. He went upstairs without going into the lower rooms. Sam was about five steps from the top of the stairs. When he entered the house John Perry was going towards the stairs, between the front door and the stairsteps. They went up the steps together, passing Sam on the steps. He observed the wound on his brother's face when he first saw him on the steps. There was a light in the hall. Sam was in a stooping position, with his head on one hand and the other on his side.

He would not be positive that his brother had on slippers when he saw him on the steps, but after considering it was positive that he had on slippers. There was a gas jet in the upper hall, which he lighted, but no light in the bath-room when he entered. The cold water spigot was not running. He could not say whether the hot water spigot was running full force or partially. In the excitement he did not observe it. When he entered the bath-room Grady was just behind him. When he said she was dead Sam said, "Oh, my God, my darling wife," and sank at the window, and he could not see who lead him away, but the voice was that of a woman, but he could not see who she was. That could only have been a few minutes after he arrived. She was out of the tub then. Sam asked her condition, and when told made the above exclamation. He had not removed his hat. After taking her out of the tub, Grady and he shut the door and searched the back room, up the staircase, and then went downstairs and searched the parlor. At first the bath-room door was partially opened. Position of the bath-tub was described. The door opens into the bath-room and comes in contact with the bath-tub when opened. He was on his knees when searching the bath-room with Dr. Venable and Dr. Early that night. A careful search was made of it. While on his knees he used matches and the gas jet was burning. The search was made for evidences of this trouble. The gas jet was burning brightly. Nothing at that time was discovered. He was an active participant in the search. He looked all over the floor. He did not think it possible for a piece of shirt to have escaped his search. No such thing was seen by either searcher. That search was made just after the preliminary examination and the permanent examination called for—he could not state the time of night—late the same night of the death of Mrs. McCue.

The wound on her nose was small and contused, with some

discoloration, with slight incision, about a quarter of an inch in length, about the center, and on the left side. It was not a severe wound. The wound on her right ear, or right side of her head, was a contused wound. He could not state its effect. He thought it would produce insensibility, but could not say how long insensibility would have lasted. Ruby's room, with the window open, was in the rear of their chamber. The lower third, or right hand, window in the parlor was open, and the blinds were wide open. It opens on the front porch and has inside blinds. They did not go into the dining-room and kitchen, and did not know their condition. His brother was on the sofa when he tendered him the physic, and complained of suffering with pain in the head. He seemed to be suffering from general pain in his head. Dr. Early gave my brother's son, William, some medicine to produce sleep, but he did not know what it was.

The wound on his brother's face produced swelling, discoloration, and the skin was broken, and some blood running from it. It was caused by a blunt instrument with some surface. It might have been made from a sandbag. He could not state certainly how a sandbag was made. It has a good deal of surface, and the contents solid. With a leather or cloth filled with sand or small shot, it would be possible to knock his brother unconscious—render him senseless. As to the injury produced by the surface of the bag, he could not say exactly, but it would be a good blow to produce that injury. The insensibility from such a blow is caused by concussion. He could not state if a base-ball bat would produce it. He could not state certainly that his brother's nose was bleeding when he first saw him. When called back in the chamber he noticed Sam was suffering a good deal of pain, and seemed overcome. The pillow showed his nose was bleeding. He saw blood issuing from his brother's nose. That is one of the symptoms

of a severe blow on the head. It is possible that his nose would bleed from a severe blow on the head at some place other than the nose or face. It is one of the results looked for from such a blow. He found other soiled clothes on top of the undershirt in the basket. As far as he knew, it was found in the regular clothes-basket. He was told by some one it was in the clothes-basket, and that statement was made in Sam's presence and hearing. No objection was made to any article of clothing being taken. The undershirt was so torn as to expose his breast. After a while lady friends of his wife began to arrive. If he had been in his natural condition he would have thought that he should not go where ladies were with his shirt in that condition. It was some little time before he changed his shirt. Dr. McCue thought he put on a negligee shirt that was checked.

Re-examined:

· Before Mr. Gilmer left the house the last time after the special examination, he asked witness to get the shirt, and leave it with Mr. Biery, as well as he remembered. It was early in the night when Mr. Gilmer asked for the shirt—about the time the doctors were sent for. He was not excited at the 'phone message. He did not tie his shoes or button his collar before he set out for his brother's after receiving the message. He had seen a sandbag, but had never examined its contents.

Dr. Charles S. Venable testified that he was a practicing physician, residing in Charlottesville. He first learned of the tragedy while putting his horse in a livery stable, and went straight to McCue's house, and arrived there between half an hour and an hour after it occurred, accompanied by Dr. Browning. When he first entered the house he was asked to go upstairs. There were a great many people at the house, all excited. At the top of the steps he was met by Dr. McCue, who asked him in the bath-room, where the body was found. They

examined it. The floor was wet, a little rug was on the floor, which was saturated with water and a little blood on the head end of the tub, streaked down. From the bath-room he went into the hall. Later he asked Dr. McCue how his brother Sam was getting on. Dr. McCue said he was doing pretty well, and said go in and see him. He went into the front room to speak to J. Samuel McCue, found him on a lounge, lying down, and one or two other gentlemen in the room, including Judge Duke. Dr. Browning, going just about the same time, spoke to and shook hands with McCue. He sat on the edge of the sofa a moment talking to McCue, and expressing his sympathy, and McCue thanked him. He asked McCue how it happened, and McCue said he did not know, it was all so quick; that some one had run in, he thought, from Ruby's room, grappled with him, and it was all over so quickly he really did not know how it was. As witness was about to leave, some one mentioned something about a bat. McCue asked, "Is she dead?" Dr. McCue came from behind him to his brother's side and said in an undertone, "Yes, she is dead." McCue said, "Oh, my God." Witness then again expressed his sympathy for McCue, and bade him good night, after asking if there was anything he could do, and offering to do it, if there was. He was holding McCue's hand when he asked the question about Mrs. McCue, and Dr. McCue answered it. He noticed some change in his pulse, and nervousness at the time. He was surprised that McCue did not know she was dead, and at his question and expression. His expression was unchanged. There was neither excitement nor grief. There was no tremor of his hand. On McCue's face, just about his cheek, which he was wiping with a handkerchief, was oozing a little blood. (Dr. Venable shows place of wound on his own face.) It was an abrasion, just as a child will fall down and skin its knee on a brick pavement— scrape the skin off. There was no bruise or swelling observed

by him. It was caused by a glancing lick. A heavy blow at that place would be bound to have a great deal of diffused blood under the skin, what is commonly called a black eye. The tissues there are much looser than in other parts, and, therefore, blood can diffuse, and does diffuse, more easily and from slighter injury there than elsewhere. You (to the jury) have all observed that a man's eye will swell there from kidney disease because it lets the fluid out into the tissues. The tissues are looser. Witness examined the wound the next day about noon. There was no swelling or diffused blood (ecchymosis) in the skin at all. McCue said he had pain, or soreness, at the back of the head, but could not locate it. He looked through McCue's hair pretty carefully, but could find no evidence of a bruise or any other mark. It is possible for a man to be struck by a sandbag on the hair and knocked insensible without causing any mark. Possibly there would be some swelling afterwards, he imagined. He never saw a sandbag, but did not see how such a lick could be had without causing a knot the next day, but there might not be an abrasion the next day. The only evidence of a blow he saw was the abrasion on the right cheek. Afterwards he examined McCue's hands, arms, and around his neck, but did not go down to his waist or feet. He had seen wounds like it most frequently in foot-ball players, by scratching the face on the ground, or walking into the edge of a house or bricks that would be rough, and which would just scrape the skin off; remove the epidermis without producing a bruise. In addition, it would give a blueness and swelling before it would remove the top skin, without injuring the top skin. There was no evidence or sign of any injury to his mouth or teeth—they were examined. If a lick had been struck on the cheek at that place sufficient to produce insensibility it would have produced an enormous swelling, the eye blackened, probably closed, and

the bone in all probability fractured—if struck by a sandbag, even. A blow on the front of the face does not readily produce unconsciousness. As he was leaving the house Dr. Early asked him to see the body. He looked at it, and Dr. Early removed the sheet and showed him the wound. He did not care to see it. He did not think it had then been cleaned and prepared by the undertaker. At that time he made no examination of the wound—just stood at the head of the bed and saw there was a chest wound—the gown having been pulled back over it. There was a hole or burnt mark in the gown, and that was pulled up so he could see the wound. It was a gunshot wound. The gown was wet, but no blood stains on it at all at that time. There was a little stain about the neck, but none on the gown, which he imagined came from her nose or ear. At that time he went straight home, but was later called back to make a thorough examination—about twelve o'clock that night, or a little after. He made that examination with Dr. Early; Dr. McCue requesting that he should not be called on to look into the case as an expert, but he went into the room with them to see them make the examination, of which they were very glad. Mr. Biery (the undertaker) was just outside the door when they went in the room. Dr. McCue had a candle; the gas being bad and on the far side of the room. The body had not been disturbed since he first saw it. After calling Dr. McCue's and Mr. Biery's attention to the fact that there was no blood on the gown except about the neck, they came to the breast of the gown where there was an angular place where the gunshot had gone through and torn the gown. Above was a linear tear up, and ripped across above the hole made by the gunshot. The lace around the collar, at the neck, was torn off, or not entirely off, but ripped away from the neck band. First, her right ear had been struck by a blunt instrument in a downward and backward direction, as the cartilage

just at the angle of the ear was torn.  There was an incised
or lacerated wound torn right through the ear.  The ear was
much discolored.  There was a discoloration all around that
portion of the head and behind.  The ear had bled freely, and
the blood had worked down the side of her neck.  The next
wound examined was the one on the nose, which was a small
lacerated wound on the left side of the nose, which had bled,
and the blood streamed down her face, and was dried there.
No bones were broken in the nose, or on the skull, or about the
head.  The next wound examined was a small transverse wound
just at the back of the head, probably a quarter or a half inch
long, but with no bruise, and a very small amount of blood,
very little, which he concluded happened after death, as there
was no blood or anything about it.  He thought it was pro-
duced by a glancing lick very readily by falling and hitting
the head on the bath-tub.  The body was examined before the
gunshot wound was, but there were no wounds or anything the
matter anywhere else.  When they came to the gunshot wound,
the gown was pulled back, and there were powder marks right
in the wound.  There were none scattered around, but put
your finger in the wound and you could get powder all over
your finger.  The shot went from the left downward, back-
ward, and slightly to the right.  It had entered right at the
junction of the second rib and breast bone, leaving undisturbed
the first rib and collar bone, where they join the breast bone.
The breast bone was blown off backwards, so that its front
half on the right side, or front quarter, was left intact, though
fractured there.  The shot went back through the aorta, which
is the artery that comes from the heart and arches, and comes
down.  It went right through that arch, and there was an
opening you could get your finger in.  Shot was stuck in the
spinal column on the right side, the majority going farther
to the right, tearing all to pieces the fifth, sixth and seventh

ribs on the right side. The wad was taken from the spinal column, just behind the aorta. There was much disorganized blood all through the cavity. The lung had collapsed, and.the cavity was full of blood. The body was turned over to examine her back, to see if the shot came through, and found they did not come through, but had come to the skin and were rolled with their fingers. All blood in the cavity passed through the hole, and the bed, gown, and everything became saturated with blood. That was all the examination that night. The next morning he was asked back to make a further examination, and found a broken finger nail and some marks on the neck as if they were left-handed marks. There were four on her right side; the second from the top being the deepest, third next, and fourth and first palest. On the other side was a single mark. He did not observe them the night before. They were discolored, bluish. In his opinion they indicated finger marks. That discoloration could not have been produced by handling the body after death. You cannot mark a body after death, nor bruise it. A bruise is the settling of blood in a part, and there is no blood circulating after death at all. They were produced before death. He saw no difference between McCue's physical and mental condition the night of the killing than the next day.

McCue did not go into details, and had no blood on his nose upon arrival. Dr. Browning went with him to see the body. When he first went to the house he went to the bath-room and examined it after the body had been removed. When he went to examine the body again about twelve he re-examined that room. The tub was empty. They examined the tub, the blood stains and streaks on the back of the tub, at the head end, extending from about the top and trickling down four or five inches, and then stopped where it was washed and stopped. There was a rug on the floor. They got down and

examined the floor and looked at the rug and floor, which was all saturated with water, and then they went up the hall looking at the floor and sides of the hall, looking for blood marks, and found none. He did not look under the bath-tub. He thought the wound on the ear could have been made with the base-ball bat. The gunshot wound caused death, momentarily— one or two, or possibly three, heart beats—practically instantaneous death. The body was measured. It was the same length as the bath-tub—five feet and some inches—he could not remember the inches. He did not think it possible for a person shot as Mrs. McCue was to have gotten in the bath-tub and placed herself as Dr. McCue described her position when found. He did not think the wound on McCue's cheek would have caused unconsciousness. When they examined the bath-room the door was opened, afterwards closed, and then opened when they were inside. They were looking for blood stains, but found none. They first saw the undershirt McCue had on Monday or Tuesday, during the coroner's inquest. Witness takes shirt and shows to the jury on the front of the shirt, at the lower end, where the buttons come together from the bottom, are what he took to be blood stains, and also lower down there is a faded condition of stains, such as would be produced by washing out blood, where it has been weted, as though done by washing out blood—water evidently having been on it. Over towards the left side there is another stain, which does not look like it had any water on it, and about the left shoulder of the arm, near the elbow, there is some more, a very dark one and with the characteristic stiffness about it, and it does not appear to have had water on it. On the wrist-band is a mark, then up to within an inch of that (indicating) there has been water, and there is washed blood along the wrist-band, and along the edge, and on the back and all around the wrist-band, on the left side. This wrist-band (indicating)

has also been weted, and washed, and there is blood on that, just a little on the front, on the right side, and it is washed around to the side.  Blood on the back of the collar, back to the neckpiece, that has not been washed, and some further down and back over on the left side there are three marks which have not been washed.  On the right side, about below. the shoulder blade, some that have been washed.  That is all he could find.

The gunshot wound could not have been inflicted on Mrs. McCue while in the bath-tub in the position described by Dr. McCue, because that would have put her left side against the wall.  The wound was about an inch long, or an inch and a half, and an inch from above downward.  The powder stains were in the wound, and right at the edges of the wound.  The muzzle of the gun must have been very close because there was no scattering of powder or powder marks about the wound at all.  It went in solid.  The gown was identified, and the gun-shot wound pointed out on it, and shown to the jury, and the tear and torn lace also.  The gown was the only garment she had on when first seen.  When she was turned over, the gown was torn down all the way and stripped back of her arms, and back under her.  McCue was perfectly rational the night of the killing and the next day.

Cross-examined:

He meant that some blood spots on the shirt had been washed, not scrubed.  Witness shows the jury the different spots on the shirt, and which have come in contact with water and which have not—showing eight washed and eleven un-washed.

Dr. McCue and others were with him when he first examined the bath-room.  They did not get down on the floor.  Many people were in and out the bath-room that night.  He could not state if Dr. Early was present at the first examination of

the bath-room.   The gas was lighted, and he had a faint recol-lection of some one striking one or two matches.   In the second examination of the bath-room, candle and matches, in addition to the gas, were used.   They examined the room carefully for evidences of the crime.   He could not say if any one else en-gaged in the search looked under bath-tub, but he never looked under it.   He was not prepared to say that Dr. McCue did not look under the bath-tub.   He imagined that the bath-tub was on iron legs, but could not swear what kind of legs.   The bot-tom of the tub is two or three inches from the floor.   He said he did not see the small piece of undershirt with blood on it while looking under the bath-tub, and did not know that he would have seen it if it had been there.   The gas jet was over the tub, and a candle used to give better light on the floor. Dr. Early and Dr. McCue were present when the second search was made, and all three were looking over the room.   It was not a scrutinizing search.   The bath-room is not big; a good portion is taken up with the tub.

· He might have stated before the coroner's jury that a person wounded like Mrs. McCue might have had six of seven heart beats, meaning a few, not literally two or three, and that she might have fallen into the tub after she was shot.   A violent blow on the back of a man's head is likely to produce uncon-sciousness, but in his opinion there would be a swelling.   It is practically impossible for a man with a heavy suit of hair like McCue to be hit on the back of the head with a sandbag a blow sufficient to cause unconsciousness, and not leave some external evidence of it.   He did not see finger marks on Mrs. McCue's throat the night she was killed, although he made a right careful examination, and she had been dead over an hour. The marks on a dead body become deeper the longer after death, because decomposition sets in, and the settling is greater. Decomposition sets in more rapidly and markedly where there

has been an injury before death. Those marks must have been made during life, and could not have been done after death. She wore her finger nails quite long, and on the left·hand one was broken to the end and turned back. He saw the under-shirt while on McCue, but made no examination of it then, and also saw it the next morning.

Re-examined:

Did not see McCue touch his wife's body.

To a juror:

There was an oil-cloth matting on the bath-room floor. The floor was soaked with water. When the rug was lifted up the water ran back. The rug was soaking wet.

Re-cross-examined:

The water had gotten on the floor by reason of Mrs. McCue's body being lifted out of the tub. He did not know whether or no water was all over the floor.

Marshall Dinwiddie testified that he was 58 years old, mar-ried an aunt of McCue's, and at present resides in his house. At the time of the homicide he resided on Park street, just outside the corporation, about half a mile from McCue's. On his way to church the evening of the tragedy, when between Dr. H. T. Nelson's and Dr. Browning's, he saw Mrs. McCue cross the street in front of him, going from High street on the cross street to the Presbyterian church. She walked in front of him, to the Baptist church, when she stopped and spoke to a colored man. When he came up he told her, "Good evening," and she replied, "Hold on, I will go with you." They then walked together to church, each going to his and her usual seat. She sits on the right and he on the left. Dr. Petrie is the pastor. Church opens at eight o'clock. Ser-vice had not begun when he entered. It begun within not over three minutes. No one was with Mrs. McCue when he first saw her. It was two or three minutes of eight o'clock.

She asked him if he had seen Sam. Sam came in a very short while after he did, and toook a seat by his wife. The services had not regularly commenced, he thought, when Sam came in, but they might have played the voluntary, may be the first hymn. He did not see either of them after church, until they turned from High street into Park street. He did not know which left church first. He came from church up Market street to Fourth, and then across the courthouse yard, entering High street at the corner of that yard—the nearest way to come. He was alone. When he got on Park street, near Edward McCue's house, and wanting to see Sam and his wife, he stopped to see if they were coming; being satisfied he was ahead of them, and seeing them enter Park street. He walked leisurely until he came to their gate, and stopped until they came up. When they came up he said, "You all walk slower than usual to-night." Mrs. McCue remarked that they had been talking to some one on High street who walked very slowly, which delayed them. Both of them asked that he should go into their house, but, having been to the country all day, was tired, and his wife being at home, he went home. He did not remember the time, but was under the impression he looked at his watch and it was five minutes after nine when he got to the corner of High and Park streets, but he did not know, and was not accurate—probably between five and ten minutes after nine when he got to High street. He did not know how long Mr. Petrie's service lasted that night. It never lasts over an hour, sometimes shorter, but there is no specified time. He did not stop in front of McCue's house over three minutes. He told them of the death of one of McCue's cousins in Maryland, and asked Mrs. McCue after friends at Red Hill and where her little girl was. When they parted he went home and to bed. He received information of the killing from a negro man who had just come from McCue's. He got up,

and he and his wife went to McCue's. The colored man who told him of the killing said it was eleven, and he supposed it took half an hour to get to McCue's. The streets were lighted that night, but he did not remember about the moon and stars. When they arrived McCue was lying on a lounge, and said he was suffering from a lick in his face and on the back of his head, and Mrs. McCue was dead. He said some one had come in the room, knocked him down, and shot his wife. He said he was knocked senseless while he was standing near the chiffonier and Mrs. McCue on the other side of the room, at a dressing case. He did not remember or ask McCue the exact part of the room he was in when struck. McCue said it was all done so quick he could not tell how it was done, and Mrs. McCue ran out, he (Dinwiddie) supposed. McCue said when the man first came in he (McCue) tried to get his gun, and did get it partly out of the case when the man took it from him. The gun was between the wardrobe and the wall. McCue did not say he was standing or what, but was in that part of the room farther from the door than Mrs. McCue was standing when the man entered. McCue said he had his gun partly out of the case when it was taken from him and he knocked senseless. This conversation took place in his room between 11:30 and 12 o'clock. McCue said he was also suffering from a fall, and seemed to be rational while talking. He saw a bruise on McCue's face—some abrasion and bruise on the right cheek. He did not examine McCue. Several doctors had been in there. McCue asked him to see about the house, and he went from place to place looking after the house and things, not staying long in any place. He left the house at six o'clock the next morning, and went home. After staying two hours he returned to McCue's. Not to his knowledge did Sam see his wife that night. Most of that Monday morning he was about McCue's, and McCue, to his knowledge, never saw his

wife. After her body was dressed he asked McCue if he wished to see the remains. McCue said he would prefer remembering her as she lived. He again asked McCue when they were ready to place the body in the coffin, and McCue went to see it several times afterwards. He would not have asked McCue to see his wife until she was dressed, under any circumstances. It was morning when he first asked McCue if he wished to see his wife. The body was not put in the casket until the next afternoon. Mrs. Dinwiddie remained all that night. He did not know of the house being robbed of anything, and never heard McCue or anyone else say the house had been robbed of anything.

Cross-examined:

McCue and his wife were walking together when he saw them on Park street. No one was with them then. They gave him a cordial invitation to come in their house that night. He saw nothing unusual about them—nothing at all that indicated strained relations. Their deportment to each other and to him was pleasant. Her body was in the boy's room when he arrived. Afterwards, and after the physicians had examined the body, he assisted in handling and dressing it to prepare it for burial. At that time there was a great deal of blood on the body and bed, and he got a great deal of blood on his hands. After they had finished dressing the body and covered it up with the undertaker's cloth, they went to work to get the bedding out of the room. The bedding and her gown were bloody, and they had to handle it to get it out the window. Biery said he had been requested to save the gown for the coroner's jury, and he was rolling the gown up in a piece of paper, and then he said he had been requested to get the shirt too—the undershirt McCue had worn. Dr. McCue offered to get it. Dr. McCue went and brought it in his hands and handed it to Dinwiddie, and Dinwiddie handed it to

Biery. They had been handling the bloody clothes and had not washed their hands. Biery had not washed his hands after handling the clothes saturated in blood when he handled the shirt, and so did he (Dinwiddie). He supposed that Biery rolled the shirt up and put it with the gown. McCue said he had his gun partly out of its case when the man took it from him. The bruise on McCue's right cheek was about the size of a quarter. It did not require a critical examination to see the bruise on his cheek. A mere casual glance would show the bruise and some swelling. After the body was prepared he (McCue) took his little children and went in the room where the body was. There was nothing unusual about McCue's distress, and he seemed much distressed, just like any other man. They cannot realize it at first or comprehend it. McCue was excited, like any other man. The coroner's inquest was held in McCue's house, in Willie's room, and McCue was subject to all the excitement and agony natural thereto.

Re-examined:

When McCue went first to see the body Monday evening he only went with him, and it was afterwards the children went with their father. He did not hold the undershirt long, passed it to Biery, and right straight Biery rolled it up. He could not recall who went in the room where the body was with McCue and his children, but think there were others. McCue went that time at his own instance. He knew nothing about the gun.

Chas. A. Skinner (a colored man) testified that he was born December 18, 1870, and lived at Mr. Moran's the night of the killing. That night he was in his room in an outhouse back of Moran's house, occupying an upstairs room nearest McCue's. On the night of Sunday, the 4th day of September, he was lying on his bed in his room, with his night shirt on, reading the Wash-

ington Sunday Post, when he heard crying and screaming. He did not pay much attention to it at first, and kept on reading. After a while he got up and looked out the window on the lane. At first he did not know where the crying and screaming came from, but while at the window ascertained it came from Mc-Cue's. It was like some one in distress, as if some one was dead. He had not heard of any one being sick or dead at Mc-Cue's. He remained at the window a little while, and returned to his bed and reading. Then he heard a shot, when he dropped the paper, and in a few minutes went to the window again. James Lewis was talking under Moran's back porch to Lelia Henderson, the maidservant. He told them something had happened at McCue's and called James Lewis to the window. When James came to his window they talked awhile, may be a minute. He (Skinner) had on his night-shirt, and he put on his pants, shoes, coat and hat, and came down and stood probably a minute. Presently he heard footsteps running in front of Moran's on the pavement. He started out of the back gate into the lane, and asked two men who went into McCue's back gate what had happened. They said look out, and he said, "Wait a few minutes; let me get out," and he came out of McCue's back gate into Moran's back gate, which are nearly opposite, and came around in front of Moran's and McCue's houses. Lots of people had then come—kept going in and coming out of McCue's gate. After awhile a gentleman told him what had happened. After awhile he called Moran and told him what had happened. Mrs. Moran answered and told Mr. Moran, who presently came down and went into McCue's house. He was looking out of a small window nearest McCue's house. Mr. Moran was occupying the room upstairs and farthest from McCue's on the opposite side. The crying and screaming he heard was like a woman, and was going on three or five minutes before he got up, probably longer. He did not re-

member hearing a man's voice at all. There was a light up-stairs at McCue's, but could not say in which room. It seems as if he saw only one light, towards the front of the house. It was a pretty fair night. He had only his night-shirt on, and all the windows were up. After the shot he heard no noise there for awhile, but when he got downstairs he heard heavy crying, like a man. He heard no crying or screaming after the shot until he' dressed and came into the yard. He saw no one run out of McCue's back yard after the shooting. He had lived with Moran two years in the coming December, most of the time in Washington. They only spend the summer here. He had been living in Charlottesville two or three months this summer. He had never been in McCue's house or yard until the coroner's inquest.

Dr. J. E. Early testified that he practiced medicine in the Marine Hospital one year, and then had practiced in Char-lottesville over ten years, and resides at 409 Park street. He had retired the night of September 4, and heard a police whistle diagonally across the street at E. O. McCue's, or in that neigh-borhood. He got out of bed, went to his window, and stood there to hear and find out what was going on. He heard a colored man say some one had broken into Sam McCue's house. Thinking it was only a trivial affair, he went to bed again. The police whistle continuing to blow, he went to the window again. He noticed some one going into G. B. Sinclair's house. There was a light inside. He went to the 'phone and. asked what was the matter. Some one in a lady's voice said Sam McCue's house had been broken into and Mrs. McCue shot. He dressed and went to see what he could do. When he ar-rived at McCue's, in his lower hall, some one asked him to go upstairs and see what he could do for them. He went into McCue's chamber and found McCue lying on the floor, face down, crying, and William on the bed. There were several

ladies in the room, but he could not recall them. Not seeing;
any physician there, he fixed something to quiet them. He
took out his hypodermic case and started to fix something,
when Dr. McCue came in. He told him he was fixing some-
thing for Sam, and he could go ahead and attend him. Dr.
McCue said, "You attend to William, and I will attend to
Sam." He induced William to go into another room. William
is McCue's oldest son. He treated William, and quieted him.
He then returned to Sam's chamber. As he entered Dr. McCue
said, "Doctor, I wish you would give this to Sam. He will not
take it; won't let me give it to him." He went to Sam, who
was then lying on the sofa, and said, "Sam, I want to give
you something to quiet you." Sam said, "Emmet Early, you
nor Frank (Dr. McCue) either one can't give me a hypodermic
of morphia"; that he had never taken it, and did not want to.
They put up their hypodermics. Sam spoke rather command-
ingly. He did not remember what transpired during the next
few minutes. He had no conversation with Sam at all that night.
He was requested that night to examine Mrs. McCue's body for
the coroner's inquest. When he saw Sam lying on the floor he
saw no injuries, but when he returned to the room saw a bruise
on Sam's right cheek, and he was wiping it with his handker-
chief, and there seemed to be blood. He did not examine the
injury at all that night. It seemed to be a slight abrasion,.
but he did not make a thorough examination until the next.
day. It was just over his cheek bone. The next day the
coroner asked him and Dr. Venable to examine McCue from
head to feet. On his cheek they found a slight abrasion, like
a foot-ball man, or some one sliding on the face, or like a boy
knocking his knee on the sand, a very slight contusion, and
looked as if it had been scratched with something. Then they
examined McCue's head, parted his hair and examined it thor-
oughly, and found no bruise or contusion. Then they looked

from the top of his head to his toes, and found no bruise or cut of any kind. The scalp was examined thoroughly, but there was no sign of injury. This examination was made Monday morning, after the tragedy. It was the following day, he could not say whether morning or afternoon. There was comparatively no swelling on his cheek—no bruise or discoloration whatever.

He saw Mrs. McCue's body Sunday night shortly after he arrived there. He got there about 9:30, and about three-quarters or half an hour afterwards the coroner got his jury. The coroner asked him to examine the body for the jury, which he did. He noticed a cut on the bridge of the nose, and some bleeding. The body was then in the northwest room. He pulled down the sheet, and noticed an incised wound on the nose, from which a small amount of blood had flown; but no broken bones. The right ear was cut almost in two, as if a lick had been struck from above downward and backward like. It skinned the ear, and cut it in two for a short space, perhaps half an inch. Then there was a marked contusion on the front and rear of the ear. The ear was held together by a small part, and had bled a good deal. On the back of the head there was a very slight cut, perhaps a quarter of an inch. Turning her gown down there was an opening in her chest, at the left of the chest bone, about an inch below the clavicle, under the collar bone. He made no further examination at that time, thinking what he had done was sufficient. In his opinion the gunshot wound caused the death. After that he returned home and retired. At the first examination there was no blood on the gown, except a little near the neck. There was only a little blood stain near the wound, no spurting or arterial bleeding. After returning home and retiring, about 12 o'clock, some one knocked at the door. He went to the door, and found the Attorney for the Commonwealth. The Attorney for the

Commonwealth requested him to return, and to make a more thorough examination with another physician. He suggested Dr. Venable, who was then 'phoned up. Afterwards he returned to McCue's, and, with Dr. Venable, accompanied by Dr. McCue, made a more thorough examination of the body, finding the wound on the head as described. In the chest wound he introduced his finger to find the direction of the load. It penetrated downward, backward and to the right, cutting off the inner extremity of the second rib, tearing away a portion of the breast bone, the left side of it, where it joins the second rib, and breaking the bone above in small pieces where it joins the first rib. It went downward and backward, cutting in two on the back of the right side the ends of the fifth, sixth, and seventh ribs, or fourth, fifth, and sixth ribs. He tried to get out some shot, but they were very small, perhaps sixes or sevens, or perhaps eights. He found gun wads on the front of the back bone—one was of leather. The flesh around the wound, and going into it, was colored with powder marks. The gown had been penetrated by the load. There was a tear above the gunshot hole. Then the body was turned over, and the blood flowed from the cavity. The whole cavity seemed filled with clotted blood. It poured out on the bed and gown. Just under the skin the shot had come through. No other injury was found. Then Dr. Venable, Dr. McCue and himself went and examined the bath-room. There was some blood on the north side of the tub, at the top. Then they struck matches and looked on the sides of the walls, facings, &c., to see if blood could be found, but found none. There was a rug on the floor, and that and the floor were saturated with water. This examination was between 12 and 2 A. M. Monday morning. He did not look under the bath-tub, as it was wet. He did not think the floor was examined. He did not think the blow on McCue's cheek could have produced insensibility. There

was no indication of a blow on the head found when examined the next morning. If McCue had been struck by a sandbag, or any instrument sufficiently hard to have produced insensibility, there would have been some evidence of it at the point struck. It would be impossible to knock a man senseless without some contusion, no matter what the instrument used. There were marks on Mrs. McCue's neck as if she had been choked by a left-hand grip. There were the impression of four fingers in a vertical line as if it had slipped somewhat, and on the left side one horizontal line. It looked as if the tissues had been a little disintegrated before death, and some blood forced into those tissues. He paid little attention to them that night, but the next day they were marked. If a person were choked and died shortly afterwards there would be some slight disintegration of the tissues, and after death the blood from the surrounding tissues would be forced into this from low vitality. It was bruised, a contusion like. Those bruises could not have been produced after death. Any lick about the eye nearly always causes a swelling and discoloration. There was the least little swelling on McCue's cheek when he saw him that night—no discoloration.

That gunshot wound would have caused almost instantaneous death. She might have breathed once or twice. After that wound he thought she would have dropped in her tracks. The gun inflicting that wound was not over two feet from her. The wound on the ear might have been caused by the base-ball bat. He did not see McCue's nose bleeding. The wound on McCue's face could not have been caused by a base-ball bat. The undershirt is proved to be in the same condition as when shown to the coroner's jury. The stains on it look like blood. The spots that have not come in contact with water, and those that have come in contact with water, were pointed out on the shirt. McCue always appeared as a stout, vigorous man. He

thought McCue about 45, and weighed from 150 to 160, and his wife would weigh about 115 to 125 pounds.

Cross-examination:

They saw nothing of the piece of undershirt while searching the bath-room floor. If it was under the tub he would not have seen it. He did not make a thorough examination of the floor, and did not know if Dr. McCue and Dr. Venable did. The wound on McCue's face could not have been struck by an instrument, or sandbag, so as to have produced unconsciousness. A lick to cause unconsciousness would produce some contusion, or laceration. He never saw an injury from a sandbag. The blow on Mrs. McCue's temple is too low to have produced death by itself. He did not examine the skull to see if there was a fracture, but there was no incision, and it was not probed. He could not say if any bones were broken there. That blow might or might not have produced unconsciousness.

Re-examined:

A blow with a sandbag, or some other instrument that caused insensibility, would show some evidence thereof, by swelling or discoloration.

In answer to a question by a juror the witness said McCue looked as usual that night and the next day.

Re-examined:

She was leaning forward, and the party with the gun above her. It was impossible for both parties to have been standing when she was shot. The charge was practically not deflected, and from its direction the position of the parties could be ascertained. McCue's mind was perfectly clear. The shot lodged in her back about 3 inches to the right and 4 inches below the entrance. He put his finger in the wound and felt shot in her back and broken ribs. She was about 4 or 5 inches through—very thin. She was about 5 feet 1 inch.

C. L. Demott recalled:

At the request of the Attorney for the Commonwealth he

went to McCue's house, turned on the hot water spigot, and filled the tub, keeping a record of the time required. There was a partial draft on the spigot below, or at some other part of the house, at the time at which the tub was full to the overflow spout. The total time from turning on the water until it reached the overflow spout was twenty-five minutes and fifteen seconds. The water was stopped in part three times for ten seconds, twenty seconds, and ten seconds, respectively, caused by partial draft on the pipe at other places. In his opinion the pipe was running only half of its capacity. It required twenty-four minutes and fifty-five seconds to fill the tub. The tub was first emptied. To the overflow pipe the tub holds forty-five gallons. From the bottom of the tub to the overflow spout is 11 3-4 inches at the centre of the tub, measuring endwise and crosswise. The human body weighs about the same as water. A body weighing about 115 pounds would displace 115 pounds of water. Water weighs about eight pounds to the gallon, therefore, that body would displace about twelve gallons of water. It would depend on how much of the body was immersed as to how much it would displace. Placing a body of the weight as Mrs. McCue's body is represented to have been, and the tub as represented, it would take thirty gallons of water to fill that tub, requiring 16 2-3 minutes; if the entire body was submerged, and more if less of it was submerged. He turned the spigot at right angles and straight up, and it took the same time to fill a two-gallon bucket, viz., one minute and fifteen seconds. In the day time a steam pump throws water into the main, and at night less is used, and the pressure is about the same day and night. More water is consumed in the day time than at night. The pressure, when he tested it, was about the same as on Sunday night.

H. A. Biery testified that he was an upholsterer and undertaker, and had charge of Mrs. McCue's body the night of the

killing, arriving there between 10 and 11 o'clock. Dinwiddie passed him the undershirt. The shirt was identified, and was in just about the same condition as then. When he first received it he laid it at the foot end of the bed on the floor, and no blood was there. Afterwards he wrapped it up separately. The shirt was laid to itself. Afterwards he took it to his home and put it in his office and locked it up. It was wrapped up in a newspaper—in two or three thicknesses of newspaper. The next morning a party came for the shirt and gown. They were wrapped up separately. They were delivered to Mr. John Gilmore (his employer) and Mr. Rogers, the sergeant. He did not think there was any blood on his hands when he received the shirt from Dinwiddie. He had washed his hands before he took the shirt. He did not remember how long after the body was cleansed before the shirt was delivered to him. The body had then been embalmed, and was on the cooling board. Her body had finger marks on her throat when he first took charge of it. He observed them when he washed the body. He saw the marks the next day, and they were a little more distinct.

Cross-examined:

He did not see McCue until the next day. It takes from a half hour to an hour and a half to embalm a body. He could not tell how long he was embalming the body. The shirt was handed him before he threw the bed-clothes out of the window. He got a paper to wrap the shirt in from off the wardrobe and wrapped up the gown afterwards. He thought later he wrapped up the gown first, but could not say for sure. He knew he did not wrap the shirt and gown together, so no blood from the gown could get on the shirt. The Attorney for the Commonwealth told him to keep them separate. Dinwiddie was there and heard it, but he could not say as to Dr. McCue. He could not say who brought him the undershirt, but Mr. Dinwiddie handed it to him.

D. C. Grady testified that he is a policeman of Charlottes-
ville. He first heard of the killing when he went into the
police office at the City Hall to get a drink of water, about two
squares from the court-house. The 'phone rang and he an-
swered it. Some one asked who he was, and he replied, "Police-
man Grady," and they either said, "Come or go to Sam Mc-
Cue's as quick as you can get there; there is a robber in the
house." He dropped the 'phone, went out, and rapped to see
if he could get another policeman, but getting no answer,
started as fast as he could go, and at the next corner recognized
Percy Payne. He called Payne to come with him to McCue's,
as there was trouble there, and they ran on out Park street.
On Park street he met two young men, one of whom had a
shotgun on his shoulder. That was somewhere near Randolph's
house. They put a shell in the gun and joined us. When we
got to McCue's lane he sent Percy Payne with the gun and
the others down the lane into McCue's back yard, to surround
the house, with orders not to let any one come out of the house
or yard. After giving them a chance to get to the rear of the
house, as they had farther to go than he, he went in the front
yard at McCue's and up into the house. He met Dr. McCue
and a colored boy in the lower hall. It was the colored boy
that works there, and he thought his name was John Perry,
and he asked them what was the trouble, and McCue said,
"Somebody had nearly killed him, and he reckoned had killed
his wife," or something to that amount. That is what Sam
McCue told him. McCue was holding his head with one hand
and his chest with the other, and said his head hurt awfully,
or his chest or breast hurt him worse than his head. McCue
said he believed they were in the house. He told the boy to
bring a lantern, and, hearing Dr. McCue on the upper floor,
he went up there until they met. They went into the bath-
room, and he told the boy to light all the lamps and fix the

lantern quickly, so the house could be searched. The boy did it. They went from room to room, and the house was searched. Mrs. McCue was lying flat on her back in the bath-room, and he thought the gas was lighted. McCue was inside the door, or just about the door, and Dr. McCue told him his wife was dead. She was lying on the rug when he first got there. When Dr. McCue said she was dead McCue said, "Oh, my God, my Maker, who could have had enough against me to kill my poor wife and do me as they have done," or something to that amount. Dr. McCue asked witness to assist him place her on a bed, and they took her in a room and placed her on a bed. Perry was right around there then, seeing about the lamps and things. It was not many minutes before Mr. Tom Williams came. He thought Williams the first after him to come, but would not be certain, but it was not long before several came. McCue and the boy were about the parlor door when he first got there. After searching the house he searched the yard, trying to keep people off the grass so as not to interfere with any bloodhounds that might be brought. He remained there that night. When he got in the house William and his father had just met, and he heard the father tell the son "his dear mother was dead," and William broke out into a powerful scream, both seemed to be taking it mighty hard, crying and screaming. Afterwards McCue told him "he (McCue) was undressed and heard a rattling at the door, and turned his head and looked, and from what time he had to see the person, that he seemed to be a tall, dirty looking white man, like he had been on the train or tramping. He seemed to be greasy and dirty. He had such little time he could hardly describe him. McCue said he reached for his gun, but the man grabbed him before he could get the gun, and he and the man had a considerable scuffle before he was knocked out, and did not remember anything after he was knocked out. He said the

man got hold of him before he got his gun, or got it in position to shoot him. He (Grady) did not remember exactly how McCue expressed it. McCue was excited and seemed to be suffering, and did not explain everything as it was, and Grady was in a hurry too. McCue did not say exactly where he was when he heard the rattling, but he was undressing, and Grady presumed McCue was near the bed. McCue said he and his wife were in the room undressing when the man came in, but did not say where his wife was. The young man he met near Randolph's was young Page, and he did not know the other. He was running down Park street when he met Page. He saw no one running in front of him as he came down Park street. Those two young men were the only persons he met on that street, but Tom Randolph said some one was ahead, but he never listened to what he had to say, as he was aiming to get there as soon as he could. When he first went in McCue's chamber there was a dim light, but there was light enough to see very well. He thought McCue said there was a lantern there, and he told the colored boy to get it. McCue looked rational, but very much out of fix, and seemed to be suffering a good deal, complaining of his head and breast. One of the young men he met near Randolph's had the gun on his shoulder, in a cloth case, but full length. He noticed it was a gun before they met, but would not be certain if it was in a cloth case. The colored boy showed him through the house, and Dr. McCue assisted part of the time. No one was near McCue when Dr. McCue told him his wife was dead but Grady. The colored boy was near. The gun was in the upstairs passage when he got there, in the right hand corner by the bathroom door. He did not examine the gun that night, but the colored boy did. In his presence the colored boy broke the gun, and an empty cartridge fell out, and said there was no more loads in it. Grady never had it in his hands. He did

not know whose gun it was, but they said it was McCue's. When they announced that his wife was dead he thought McCue retired to his room. At first he (McCue) looked like he was going to sink down when he heard his wife was dead. The gun was broken before Mrs. McCue's death was announced. A police whistle blew just before he got to McCue's. He did not know whose whistle it was, but later heard it was E. O. McCue's. Later heard a police whistle and went to it at E. O. McCue's. Everything was in all right condition in McCue's chamber when he entered it. He did not notice Mrs. McCue's clothes. He did not remember if he found a gun besides the pump gun, with the empty shell, but he thought he saw another in the house somewhere. The door leading to the kitchen steps was opened, one of the parlor windows was opened, with a lace curtain over it, and upstairs two windows were unlocked, and partly up. He watched a large white oak tree near the open window, thinking some one might be up that, as he might probably get off the porch on to the tree. Nothing about the house appeared to be broken, but he did not examine it very closely. He saw no weapon on McCue in the hallway.

A man could get out of the open window in Ruby's room on the porch roof to the ground easily. Nothing was in that window. The tree grows close to the porch roof, and a man could easily get from porch roof to tree. Ruby's room is back of the chamber. From the roof of front porch a man could easily get on that white oak there. He could have gotten out of house from front and rear, through windows or doors on ground floor, or upstairs through windows. He thought the voice speaking through 'phone was McCue's.

Miss Virginia Bragg testified that on that night she was working at the telephone exchange, and Mr. McCue rang up and said, "Central, give me some one," and being asked who he wanted, said, "Give me Mr. T. J. Williams' residence." She re-

plied, "It is busy," and he said: "Central, don't tell me their 'phone is busy. Some one is in the house and has shot, and, I think, killed my wife." She took the 'phone down and gave the connection, and he said: "Some one come to me at once. Some one has shot, and, I think, killed Fanny." Mrs. Williams said, "Oh!" and hung up receiver. Then she took it down and asked her if she heard what passed, and she replied that she did. Mrs. Williams said, "Have you called any one else?" She said, "No," and Mrs. Williams said, "Hadn't you better call the police?" She called up the police station and told the answerer "Go to Mr. McCue's residence on Park street at once." She did not know the reply. The Williams message was the first she remembered that night from McCue's, but Sunday night after church is a busy time. She was on duty from 6 P. M. all night. She remembered no 'phone message from McCue to Dr. McCue, and thought she would have remembered it. The messages from McCue's were in his voice. There are six boards right in a row in the telephone office. McCue's 'phone is No. 45, and Dr. McCue's No. 366, about five feet distant from each other, and if such a message had been received she would have had to pass it to Miss Busic, another operator. She took no notice of the strength of the voice from McCue's house. McCue never called up over the 'phone for a policeman. After receiving the message she crossed the hall to report it, and was absent about three minutes, when Miss Busic had charge of the 'phone..

Cross-examined:

She was excited by the message. A call from McCue's to Dr. McCue's would not have impressed her at all. She was not prepared to say she did not receive such a message, only she did not remember it.

Re-examined:

Q. You can't hear all messages and attend to your business?

A. "After connection is made I pay no attention to messages."

Miss Lillian Busic testified that she was the night operator at the telephone office on the 4th of September. She answered no calls for McCue that night at all. She took charge of Miss Bragg's board in her absence. No calls were made by McCue for Dr. McCue. She was certain. She operated the board on which it would be necessary to connect with Dr. McCue, and no call could have gone to Dr. McCue without going through her board.

Cross-examined:

There are 100 subscribers on witness' board. She could not give jury a list of the calls that night, but she made a great many connections that night.

A. V. Conway testified that he lived at 408 Tenth street, and had charge of the Charlottesville *Daily Progress*. On September 5th, in the evening, Mr. Harmon handed him a notice to be published in the daily paper six times as an advertisement, offering a reward of $1,000, and for 500 hand bills thereof to be printed and distributed. Original of it produced. He said it was in the handwriting of J. Samuel McCue. It read as follows:

"$1,000."

"A reward of one thousand dollars ($1,000.00) will be paid for the arrest and conviction of the person who made an attempt on my life and murdered my wife at my home in Charlottesville on the night of September 4, 1904.

"J. Samuel McCue."

"Every day for one week and hand bills."

The hand bills were posted around town by the *Progress* boy.

This witness was subsequently recalled, and stated that he desired to correct his former statement in this: "That he had since become convinced that the paper offering the reward for the ap-

prehension of the murderer was not in J. Samuel McCue's handwriting, but in the handwriting of his brother, E. O. McCue."

N. R. MARTIN testified that he was twenty-eight years old, and resided at the jail, and had been a jailer for the last three or four months. He was present at a conversation between J. Samuel McCue and his son William. It was on a Sunday evening before the grand jury met that indicted McCue, and three or four of his brothers and his son William were in the jail, and McCue said, "You know it ain't so," to his son. He (Martin) had not heard the preceding part of the conversation. McCue said to his son, "You know it is not so, about what Earnest Crawford said, about my drawing a pistol on your mother," and the son replied, "You did," and "that she ran in the room and got in bed with me and asked me not to let you shoot her." McCue then said, "How could I draw a pistol on her and threaten to shoot her, when she had the pistol"; and William asked, "Why did she run in there and get in bed if she had the pistol?" McCue then asked William what the fuss was about, and William said about "that woman." McCue asked, "What woman?" and William said, "He did not know what woman."

Cross-examined:

The brothers present at that conversation were here pointed out by Martin, viz.: William McCue (Sam's brother), John L. McCue. Mr. McCue with the glasses on was there.

JOHN S. WHITE testified that he is a son of Judge White, living at Locust Grove, near Charlottesville, is thirty-three years old, and a lawyer, and has been at the bar since 1895. He called to see McCue in jail on business. When he first went in he expressed to McCue his sympathy for him and regrets at having to trouble him. McCue said he understood that; that it was all dreadful; that he was innocent, and that he was being persecuted, and that he would come out all right. McCue seemed much distressed, and said that for four or five years his

life had been a perfect hell, and that that woman was the most jealous woman that he ever knew, or ever lived, and how he had scuffled to build up a practice and tried to make his family and home a happy one. . . He gathered from the conversation that McCue meant his wife by "that woman."

Cross-examined:

McCue always spoke respectfully of his wife, but did not change his voice during the conversation.

Dr. H. T. Nelson testified that he is a physician of twenty-seven years' experience in the practice, residing on High street, in Charlottesville. At 10:10 the night of the killing Bocock, at the Clermont Hotel, told him that McCue had been 'phoning for a policeman. Witness got on a car in three or four minutes and went to McCue's. On the car Murphy told him of the tragedy, and asked him to go with him to the house. He went in and spoke to McCue. They had always been on good terms. McCue was lying on a sofa on his back. He asked McCue how it happened, and McCue told him, "It began in that room." They tried to get him to take an anodine, but he refused. He (witness) was asked to see Mrs. McCue, and crossed the hall and saw the body, and did not see her afterwards. There were several scratch marks on the right side of McCue's face, or cheek bone. It was like a child had fallen down on the pavement or little rough surface. There was no swelling at all, and the wound very slight. A blow on a man's cheek that would produce unconsciousness would produce instant swelling, with immediate blackness, swelling to a considerable amount, and unless done with the fist would break the bone. McCue seemed perfectly rational in every respect, though worried. He never saw a sandbag, and never saw a known blow from a sandbag. He could not conceive of such a blow on a man's head without leaving a mark of some sort, and the man would be sick with vomiting, the pulse slow, and serious nervous disturbance. McCue showed no signs of having been knocked unconscious.

Cross-examined:

His opinion as to a lick from a hand bag was formed from reading and general observation from injuries inflicted with other instruments—from the human hand to bullets. Having never seen a blow from a sandbag, he did not consider himself an expert on sandbag blows. He had never read anything as to sandbags. A man's recovery from a blow that knocked him unconscious would not be sudden, but his nose might not bleed, nor he have nausea.

Mrs. F. A. MASSIE testified that she resides just across the street from McCue. About 9 o'clock she and her husband were on their front porch and saw Mr. and Mrs. McCue come down the street, stop at their gate and talk to Mr. Dinwiddie, but did not hear what passed. She did not hear Mrs. McCue's voice, but heard Mr. McCue invite Mr. Dinwiddie in. They were under the electric light. Then the McCues went into their house. There was a light in their hall—a small light in their front hall. They went in and shut the door. She and her husband talked for five or ten minutes, and she, getting chilly and not feeling well, went in and read while her husband took his usual walk. While reading heard a voice outside—loud voices in half an hour or twenty minutes—but paid no attention to it, thinking it was people returning from church. She heard some one say "Surround the house," very loud, and a police whistle. She continued reading, and almost immediately Mr. Massie came in the sitting room and said, "Come out; something has happened at Mr. McCue's," and seemed dreadfully excited. He said, "I saw Grady." She hastily arose, glanced at the clock (and it was 9:45) and went on the front porch and saw people at McCue's front gate. She hesitated about going, but her husband said: "We must. We are their nearest neighbors, and must help them." They started over together, and found half a dozen people at McCue's front gate. They pushed through

the crowd and entered the hall. The house was lighted everywhere. Coming down the steps were Mr. Tom Randolph, and then Mr. Williams next, and then Dr. McCue, and then Mr. Sam McCue, and behind a policeman. She asked McCue what had happened, and he, with his hands to his head, dreadfully agitated and nervous, said, "A burglar has shot and killed Fanny." She said, "Oh! tell me how it happened." He said, "I heard a noise, turned to get my gun, and the burglar shot and killed Fanny and made his escape." Then Mr. Massie asked what that was on his cheek, pointing to a small red spot the size of a quarter, and looked like a scratch, or finger nail scratch or a brush. She saw no blood from it. McCue put his hands to his face, and said, "The rascal must have shot me, too." Said he could not see him plainly. He was a dingy-faced fellow. Just then his son William came in, and he said: "William, William, your mother is dead. William, a burglar has shot and killed your mother." William cried, and after going upstairs returned and walked with his father, both crying. He said he was sure Mrs. McCue was dead. She (witness) declined to see Mrs. McCue, as she preferred to remember her as in life. She 'phoned to Maphis about it, and he came over. Dr. McCue took his brother upstairs. He was nervous and dressed in a gauze shirt, torn to the waist line, breast entirely bare and sleeve rolled up to elbow.

JOHN PERRY (colored) was called by the court, at request of the jury, after defense had rested, with the exception of Mr. Deckhart, and the Commonwealth had announced itself as through.

Witness said that his name is John Perry, and that he was at McCue's that night. He had been working there several months. He was in his room, in McCue's house, that night. He was in bed asleep, and did not hear them come in. He first heard crying from Mrs. McCue, and her saying, "Sam, come and

help me. He is killing me," or "he is killing me, and it is too bad for him to do me this way." He never heard McCue's voice. He tried to push the partition door open, and get into the house, but could not, and then loaded his gun. Afterwards a gun went off in the bath-room, and he heard her holler no more. He set his gun down and staid at the door, and heard a man run in the bath-room and come out and go back in there again, and then he went down the front steps. Later Mr. Mc-Cue came to his room and opened the door and says: "O John! I am in the worst trouble I have ever been in in my life. A burglar has been here, knocked me senseless, and left me lying on the floor, and I think he has injured my wife." He did not go out of the house that night, and his room was over the kitchen. (The above was in reply to a juror and the court. The court gave both parties the right to cross-question him.)

Cross-examined by defense:

He first saw Mr. Lee about a week or ten days after the murder, and at McCue's house. He was about the stable when they went to church, and shut up the house before they left. Mrs. McCue's screams waked him. He walked like a man with shoes on going down the front steps, and he never heard the man come back. Mr. McCue had on his slippers when John was let in. The front steps are carpeted. The window in bath-room was not up. He heard the water running in the bath-room. It was three or four minutes after the gun went off before McCue opened the door. He saw no blood on McCue's face at that time.

Cross-examined for prosecution:

He had been at McCue's one month, going on two, at time of tragedy, and ever since, and carrying meals to the jail every day for Mr. McCue, repeatedly going into his cell.

Witness was questioned as to conversation with Mr. W. G. Baldwin. He remembered seeing him and his brother Albert

Baldwin. He denied telling the Baldwins that the first thing he heard were two licks, and heard Mrs. McCue gurgle as if she was strangled, and in a few minutes heard a shot, and in a little while McCue opened the door and said: "John, get up and go down and open the front door Somebody has killed Miss Fannie." And he denied having stated to Baldwin that he heard Mrs. McCue say, "Sam, why do you treat me so?" "What have I done to you?" and "I will never do so again." Baldwin told him all he wanted was the truth, and that he had told Baldwin he cleaned the gun on Saturday. It was not loaded on Saturday. He denied that after the murder about Tuesday, going to Mr. Dinwiddie's, he met Susan Austin and Carrie Perry, two colored women at Judge Lyons', and stopped and talked with them, and that he heard a considerable fuss in the house, and as it came nearer and nearer to him he heard Mrs. McCue say: "O Sam! don't kill me. I am going to die anyhow." And during that time he ran his head out of the window to hear what was going on. He denies going to wine cellar and having the previously related (in William McCue's testimony) conversation with Earnest Crawford and Baldwin, although he admitted meeting them there and talking with them.

W. G. Baldwin, Albert Baldwin, Susan Austin and Carrie Perry contradicted John Perry as to statements made by him to them respectively. The court instructed the jury that the evidence of these witnesses was only admissible to impeach John Perry, and not as evidence of the innocence or guilt of the accused.

JAMES LEWIS (colored) was called at request of the jury. In answer to questions by the court the witness stated that on the Sunday night of the murder he was at Mr. Moran's, under his back porch, talking to his maid servant. He heard a report of a gun, and a second before had heard some one crying, but paid no attention to it. In a few minutes Skinner called him.

He thought he only heard one voice—just could hear. He heard no cry after the gun went off. After the gun went off he went to Skinner's window. He could not tell where the sound of gun came from.

Counsel for defense, after all the evidence was in, moved the court to exclude the evidence of J. William McCue and John Perry, which motion the court overruled and instructed the jury to only consider it as above directed.

The trial was presided over by Judge George W. Morris, judge of the Corporation Court of the city of Charlottesville, whose rulings were sustained on all of the forty-five points saved on the trial. The prosecution was conducted in the trial court by Frank Gilmer, Attorney for the Commonwealth for the city of Charlottesville; Micajah Woods and Richard S. Ker. The same counsel who defended the prisoner in the trial court filed the petition for the writ of error in this court. A synopsis of the petition is given below.*

*Lee & Howard, Caskie & Coleman* and *Walker & Sinclair*, for the petitioner.

(1) Every pleading, except confession and avoidance, must tender issue. If the issue tendered be one triable by a jury, the plea or replication must conclude "to the country." 4 Min. (Ed. '83), 722; Stephen on Pleading (Heard's Ed.), sec. 230; Code, sec. 3267. Replication here, although it traverses defendant's plea, concludes with verification. No verdict can be rendered, or judgment entered thereon, in any case unless issue shall have been first joined on the pleadings. *Preston* v. *Salem Improvement Co.,* 91 Va. 585; *Petty* v. *Frick,* 86 Va. 501; *Johnson* v. *Fry,* 88 Va. 695; *Rowans* v. *Givens,* 10 Gratt. 250; *McMillion* v. *Dobbins,* 9 Leigh. 422.

(2) A grand juror must have been a resident of the county

---

*Note by the Reporter.—The widespread interest taken by the general public in this case, and the fact that at the time this writ of error was refused there had been no confession, must furnish the apology for this lengthy statement.

or corporation in which the court is held one year. Code, sec. 3977. "Residence" often used to express different meanings, according to the subject-matter. In statute relating to settlements, right of suffrage and qualification for office it may have a very different meaning from that belonging to it in the statutes relating to attachments. *Long* v. *Ryan*, 30 Gratt. 718. In statutes relating to qualification for office, etc., "residence" is synonymous with "domicile," and to constitute one a resident within the meaning of such statutes he must reside at 'the place with no present intention of removal. *Lindsay* v. *Murphy*, 76 Va. 428, 24 Amer. & Eng. Enc. Law 694; *Frost* v. *Brisbin*, (N. Y.), 32 Amer. Dec. 429; *Berry* v. *Wilcox* (Neb.), 48 Amer. St. Rep. 711; *Langdon* v. *Doud* (Mass.), 83 Amer. Dec. 641; *DeMeli* v. *DeMeli* (N. Y.), 17 Amer. St. Rep. 652; *People* v. *Platt*, 117 N. Y. 159; *Sturgeon* v. *Korte*, 34 Ohio St. 525; *State* v. *Alrich*, 14 R. I. 171; *Wood* v. *Roeder*, 45 Neb. 311; *State* v. *Ross*, 23 N. J. L. 528. Acquisition of domicile matter of intention. Mere act of residing at a certain place does not constitute domicile, but such residence must be accompanied by intention to permanently abide at such place. *Pilson* v. *Bushong*, 29 Gratt. 229; *Viles* v. *Waltham* (Mass.), 34 Amer. St. Rep. 311; *Hairston* v. *Hairston*, 61 Amer. Dec. 532; *Gilmer* v. *Gilmer*, 83 Amer. Dec. 504.

A person can have but one domicile, and having once acquired a domicile, it continues until another is acquired elsewhere by actual residence with intention to remain permanently. *Ayer* v. *Weeks*, 23 Amer. St. Rep. 37; *Gilman* v. *Gilman*, 83 Amer. Dec. 502; *DeMeli* v. *DeMeli*, *supra*; *Starke* v. *Scott*, 78 Va. 180.

Evidence shows that Lyman's domicile is in Albemarle county; that he is residing in Charlottesville temporarily, intending to return to his farm in Albemarle as soon as he can build a house in which to live, having sold that part of his farm on which the house in which he formerly lived is located

Lyman ineligible to office in Charlottesville. *People* v. *Connell*, 28 Ill. App. 285.

(3) Stockdell incompetent juror, having admitted on his *voir dire* that he had formed opinion on newspaper evidence; that he could not say that he could give accused the benefit of the presumption of innocence, the presumption having been destroyed by what witness had read about the case. He made the unequivocal statement on his *voir dire* that he had not only formed, but expressed, an opinion based on the newspaper evidence; that what he had read seemed to him right, and that if these reports turned out to be true, he would certainly take action and a firm stand.

If reasonable doubt exist as to impartiality of juror, it must be resolved in favor of accused. *De Jarnette* v. *Commonwealth*, 75 Va. 867.

Venireman who has formed and expressed opinion as to guilt or innocence of the accused, whether opinion be formed on testimony he has heard, conversation with witnesses, or common report, is an incompetent juror. *Armistead's Case*, 11 Leigh 663.

When juror's own testimony does not clearly disclose the precise state of his mind in relation to case, he is incompetent. *Wright's Case*, 32 Gratt. 941.

However willing juror who has formed and expressed an opinion may be to trust himself, the law will not trust him. *Armistead's Case, supra; Wright's Case, supra.*

Presumption of innocence is evidence created by law in favor of accused whereby his innocence is established until sufficient evidence is introduced to overcome this proof which the law creates. *Coffin* v. *United States*, 156 U. S. 432.

When, therefore, Stockdell said he was afraid he would not be able to give accused benefit of the presumption of innocence,

it was equivalent to saying that he could not decide case according to the law and the evidence.

(4) Jud B. Wood glaringly incompetent. On examination on *voir dire* he stated unequivocally that he had formed and expressed a *decided* opinion on what he conceived to be the evidence in the case, and that he would go upon the jury biased by the decided opinion which he had formed.

Right to trial by an "impartial jury" is an inalienable one. Bill of Rights, sec. 8. If accused owes obedience to laws of his country, then his country owes him a fair and impartial trial. Error of court in accepting Wood not cured by his being stricken from the panel by accused under right of peremptory challenge. *Dowdy* v. *Commonwealth*, 9 Gratt. 737.

(5) Court erred in excluding Tyler from panel, ground of exclusion being that he would not convict on circumstantial evidence of an offense punishable with death unless case against accused proved "beyond the peradventure of a doubt."

Circumstantial evidence has been divided into two classes: (1) Certain, or that from which the conclusion in question necessarily follows; (2) uncertain, or that from which the conclusion does not necessarily follow, but is probable only. 97 Amer. St. Rep., 773. In order to convict of a capital felony upon circumstantial evidence it is necssary that the evidence should measure up to the first class.

"It is the actual exclusion of every other hypothesis which invests mere circumstance with the force of truth." *Johnson's Case*, 29 Gratt. 817.

"Beyond the peradventure of a doubt" is equivalent to "beyond the probability of a doubt," or "beyond a probable doubt."

Error to set aside a juror without good and sufficient cause, and the law will presume accused prejudiced by such error. *Montague* v. *Commonwealth*, 10 Gratt. 767.

(6) Court erred in permitting Kaufman and Eddins to ex-

press the *opinion* that the small piece of cloth alleged to have been found in bath-room on day following homicide was a part of the undershirt worn by accused on night of murder. Neither witness was anything more than salesman in a clothing store. The shirt and piece of cloth were produced before the jury, and they could determine for themselves by comparison whether they corresponded in texture, material, thread, etc., and should have been permitted to do so, uninfluenced by the mere opinions of any other persons. No question of science, or technical or expert knowledge involved, and the mere opinion of any person, or of any number of persons, upon the precise fact which the jury was called upon to determine was palpably inadmissible. *Milwaukee Ry. Co.* v. *Kellogg,* 94 U. S. 469; *N. & W. Ry. Co.* v. *Briggs, ante* p. 105, 48 S. E. Rep. 521; *Knowl* v. *State,* 55 Wis. 249, 42 Amer. Rep. 704. Last mentioned case strikingly in point. A physician was permitted by trial court to testify that hair found on a wheelbarrow in possession of the accused, in which it was claimed he had removed the body of the deceased after the killing, corresponded in length, magnitude, color, etc., with hair taken from the skull of the deceased, who came to his death by a fracture of the skull. Supreme Court unanimously reversed the judgment for this error. Where illegal evidence is admitted judgment must be reversed, as it cannot be said what effect it may have had on minds of jury. *N. & W. Ry. Co.* v. *Briggs, supra; Insurance Co.* v. *Treat,* 29 Gratt. 255.

(7) Court erred in permitting Covington to testify that deceased, who he met on the street a short while before the homicide, did not speak to him. The circumstance is not only trivial, and its admission over objection calculated to magnify its importance and mislead the jury, but no reasonable inference touching guilt of accused could be fairly drawn from it. Jury were expected to infer from circumstance in question that deceased was depressed, and from *this* inference to draw still an-

other, namely, that there had been some recent disagreement be-. tween her and accused. Inferences from inferences and presumptions resting on the basis of another presumption are not admissible. The circumstance, therefore, too remote for consideration of the jury. Law requires open, visible, connection or causal relation between the circumstance adduced and the fact. to be deduced therefrom. *United States* v. *Ross,* 92 U. S. 281, leading case.

(8) Court erred in permitting the jailer, Martin, to testify to an alleged conversation between accused and his son in jail, in which, according to witness, accused said to his son that he (the son) knew that the statement made by Ernest Crawford that accused had drawn pistol on his wife was not true; to which the son replied by affirming that accused did draw pistol upon his wife. When the alleged occurrence between accused and his wife, which was the subject of the alleged conversation in jail, transpired, the evidence not only does not disclose, but there is not the slightest suggestion or approximation of the time. Whether it was a week, or a month, or a year, or five years, or ten years before the homicide nowhere appears. Thus no causal relation, connection or proximity in time between the alleged occurrence and the homicide was shown. Commonwealth not showing the alleged occurrence or circumstance was not too remote to justify the inference intended to be drawn from it, the evidence was inadmissible. The testimony is also inadmissible because it tended to establish merely an accusation against accused brought by a third person, which accused then and there controverted and denied.

While admissions may, under certain circumstances, be implied from silence or acquiescence, it was gross error to permit an admission to be implied from a distinct and unqualified denial. Mere accusation, promptly and unqualifiedly denied, cannot, under any circumstances, be treated as evidence of the

truth of the accusation. Otherwise, evidence could be dispensed with, and mere accusation would suffice to convict. See *Coffin* v. *United States*, 156 U. S., at page 455.

(9) The court erred in admitting the testimony of Wm. Hurley as to alleged admission of accused "three or four years ago" that his wife was jealous of him. See same authorities cited in reference to testimony of Covington, *supra*.

(10) The court erred in admitting opinion of Dr. Nelson as to the effect or results of a blow struck on the head with a sand-bag or other soft instrument. Witness had never seen a blow with a sandbag; had never had any experience with injuries or blows with a sandbag or other instrument of like character; had never studied or read anything on the subject, and practically admitted that he was wholly ignorant in respect to the subject about which he was made to express an opinion.

"An expert may be qualified by study without practice, or practice without study, but mere observation, without either, is insufficient." Lawson on Expert and Opinion Evidence, page 210. Dr. Nelson, by his own confession, was lacking even in "mere observation" in respect to the effect of a blow with a sand-bag or other like instrument.

(11) The court erred in permitting the Commonwealth to impeach the witness, Wm. McCue. This witness was introduced by the Commonwealth, and after having been examined at some length (covering six type-written pages of testimony), the attorney for the Commonwealth announced, in the presence of the jury, that the witness had made a statement which was entirely different from what he had expected, and that he (the attorney) was "astonished" and "astounded" to find his statement so utterly different from what he had been advised by reputable people it would be.

(a) It is error to permit a witness to be impeached by the mere statement of counsel, or to permit counsel, in effect, to

denounce a witness as a turn-coat and a liar in the presence of the jury. 2 Enc. Pleading & Practice, page 38, and cases cited. Commonwealth, having introduced the witness, should not have been allowed to impeach him by proving by other witnesses that he had made contradictory statements out of court.

(b) The statute (sec. 3351 of Code, as amended by Act of January 24, 1900), under color of which the Commonwealth was permitted to prove not only statements alleged to have been made by the witness out of court, but *mere opinions* alleged to have been expressed by him as to the very fact of the guilt of the accused, and the acts, conduct, bearing and behavior of the witness out of court as well, has no application to a criminal prosecution. The genesis of section 3351 was an act passed by the General Assembly of the "Restored Government of Virginia" on the 29th day of January, 1864 (page 17 of the Acts of 1864, published at Alexandria). This act, in terms, applied only to civil actions or proceedings at law or in equity. On March 2, 1866 (Acts 1865-6, page 87), the General Assembly passed an act purporting to repeal the Act of January, 1864, but in fact amending it. This act also, in terms, applied to "actions, suits or other proceedings of a civil nature at law or in equity," and it contained the identical language of section 3351 of the Code of 1887 as it stood before the Act of January 24, 1900.

At the revision of 1887 the provisions of the Act of March 2, 1866, were embodied in "Title 48" of the Code relating to "Proceedings in Civil Cases," and not in "Title 53" relating to "Proceedings in Criminal Cases," nor in "Title 52" relating to "Crimes and Punishments."

In "Title 52" of the Code, embracing "General Provisions Concerning Crimes and Punishments," are found the corresponding provisions of the statute law applicable to criminal cases, while in "Title 53"—"Proceedings in Criminal Cases"—we

find it *specially* provided (section 4059) that sections 3475, 3476, 3483, 3492 and 3507, all of which except the last are embraced in "Title 48," "Proceedings in Civil Cases," shall apply as well to civil as to criminal cases. *Expressio unius exclusio alterius.* Thus it° is manifest, both from the history of section 3351 and from its arrangement, classification or collocation in the Code, that it was never intended or considered to be applicable to criminal cases. Indeed, the necessary import of its very language restricts it to civil cases. "A party called to testify for another," the Commonwealth has no right, of course, to call an accused person to testify on her behalf and against himself, while equally, of course, that entity known as "The Commonwealth" is incapable of being a witness. Section 3351, therefore, being plainly applicable to civil cases only, it must be assumed that when the Legislature amended that section, without in terms extending it to criminal cases, it was not intended so to extend it.

In *Anderson's Case,* 100 Va. 860, accused was tried and convicted at the December term, 1901, of County Court of Campbell. He applied to the judge of Circuit Court for a writ of error, which was granted, but the writ was dismissed at the hearing upon the ground that the bills of exception taken to the rulings of the County Court were not tendered to, and signed by, the judge until after the adjournment. Section 3385 of the Code in reference to bills of exception (Title 48) had been amended February 15, 1901, so as to allow bills of exception to be signed within thirty days after the end of the term, but the amendment did not (as a subsequent one does) apply, in terms, to criminal cases. The statute in reference to bills of exception in criminal cases is contained in section 4050 of the Code, Title 53. This court reversed the judgment of the Circuit Court, not upon the ground that section 3385 applied, which would have been an end of the matter, but upon the ground that this court

must presume from the record that the bills were signed *during the term.*

(c) Independently of the statute Commonwealth could not impeach a witness introduced by her. The enactment of such a statute is of itself a recognition of the necessity for resort to legislation to accomplish a change, and has been so regarded by the courts of the States where such statutes have been adopted. *Ryerson* v. *Abingdon,* 102 Mass. 526.

"A party may not show that his own witness had made statements contradictory of his testimony." *Cox* v. *Eayres,* 55 Vt. 24, 45 Amer. Rep. 583; *Ellicott* v. *Pearl,* 10 Peters 432; *Bullard* v. *Pearsall,* 53 N. Y. 230; *Coulter* v. *Express Co.,* 56 N. Y. 585; *Pollock* v. *Pollock,* 71 N. Y. 137; *Adams* v. *Wheeler,* 97 Mass. 67; *Ryerson* v. *Abington, supra; Hurley* v. *State,* 46 Ohio St. 320; 4 L. R. A. 161.

(d) Even if the statute were applicable to criminal prosecution, no warrant could be found therein for length to which the Commonwealth was permitted to go in this case in the impeachment of Wm. McCue. The only question as to which the witness had "proved adverse" up to the time when Commonwealth sought to lay the foundation for impeachment was the one as to what took place between his mother and father at the tea table on the evening of the homicide, the witness testifying that there was no disagreement or unpleasantness between them at the table. If Commonwealth was surprised at the unfavorable answer of the witness, she had no right to continue to ask him scores of questions after he was shown uncompromisingly adverse, and knowing that the answers would be unfavorable, but witness should have been stood aside and the impeachment confined to answers made by him up to that time. But a large and material part of the testimony, introduced ostensibly for the purpose of impeaching the witness, was wholly inadmissible for the reason that it related to matters entirely irrelevant to the

issue and in respect to which Commonwealth had no right to·
impeach the witness.   When a witness is cross-examined on a·
matter collateral to the issue, he cannot, as to his answer, be
subsequently contradicted by the party putting the question,.
and the test, whether the fact inquired of is collateral, is this::
Would the cross-examining party be entitled to prove it as a
part of his case tending to establish his plea?   *Langhorne* v..
*Commonwealth*, 76 Va. 1019.

Prior contradictory statements of a witness, in order to be ad-·
missible to impeach him, must be statements of fact, *and not mere·
opinions of the witness, although the opinion be inconsistent with
the conclusion which the facts testified to by the witness would:
tend to establish.*   10 Enc. Plead. & Prac. 298.

"An *opinion* expressed by a witness upon the merits is inad-
missible, though in conflict with his testimony."   *Schell* v..
*Plumb*, 55 N. Y. 599.

"A witness cannot be called to contradict another who denies
having made a particular statement if such statement was not
of a fact, but only of *a matter of opinion.*"   *Elton* v. *Larkins*,
5 C. & P. 385, 24 E. C. L. 617.

As conclusive of this point, see *Welsh* v. *State* (Ind.), 3 N. E.
Rep. 850; *People* v. *Stackhouse*, 49 Mich. 76, 13 N. W. Rep.
364, in which it was held that the *opinions or suspicions of the
witness,* out of court, although inconsistent with the conclusion
which the facts testified to by him on the trial would warrant,.
cannot be made the basis of impeachment.

For the purpose of contradicting the testimony of Wm..
McCue to the effect that there was no disagreement between·
his mother and father at the tea table, and that they had not
had frequent and violent quarrels, the Commonwealth was per-
mitted to show, for instance, that the witness had stated out of
court that if he told the truth and his father was hung, people
would point at him and say his evidence hung his father; that

he had written a certain paper purporting to be a statement made by John Perry to the witness and very damaging to the accused; that he had said that he dreaded going upon the witness stand, and would rather die than tell what he would have to tell; that he had said out of court that *as soon as he heard of the killing of his mother he knew his father had killed her;* that when asked by the detective if he *believed* his father killed his mother, he had stated two or three times that he did *believe* his father killed his mother; that he was satisfied his father had killed his mother, etc.   These statements of the *mere opinion and belief of witness,* when tested by the rule laid down by this court in *Langhorne* v. *Commonwealth, supra,* were plainly inadmissible in any conceivable view of the case, because Commonwealth was not entitled to prove them as a part of her case and as tending to establish the guilt of the accused.

(e) The opinion and belief of the witness, expressed out of court, were not inconsistent with his answers to the questions propounded to him with reference to what transpired between his father and mother at the tea table, and whether or not they had had frequent and violent quarrels, because it might be true that the witness *did* express the opinion and belief that his father had killed his mother, and still be true also that there was *no* quarrel between his parents at the table, and that they had *not* had frequent violent quarrels, just as in *Welsh* v. *State, supra,* the court said that the fact that a witness may have said that the accused was the murderer and offered to bet $250 that he was guilty was not inconsistent with the testimony of the witness that he did not hear an alleged confession of the accused.   It is easy to conceive that in any doubtful case the scale may be turned against the accused by the sheer weight and force of such testimony, theoretically, indeed, relevant to an entirely collateral issue only, but which no one should be so uncandid as to deny is, in fact, decisive of the main issue.

(12) The court erred in permitting the Commonwealth's witness, Brand, to testify that on one occasion accused spoke very "rough and bitter" to his wife, "like he could kill her in a second." The witness could not give, in substance, the language used, and his testimony, therefore, was nothing more than an expression of opinion on his part as to the character of the language used by accused. It was for the jury, not the witness, to say whether the language was "rough and bitter," and whether or not it indicated that the accused "could kill her in a second."

(13) The court erred in permitting the witness, Geo. Thomas, to testify that the accused's manner and bearing towards his wife on a certain occasion was not as pleasant as witness thought it should have been, and not as affectionate as witness' conduct towards his own wife. This evidence was inadmissible for the additional reason that no reasonable inference touching the guilt or innocence of the accused could be drawn from it. See Gillett on Indirect and Collateral Evidence, sections 54 and 55, where it is said that there exists a sharply defined exclusionary rule that remote and collateral facts, from which no fair and reasonable inference can be drawn, are to be excluded.

(14) The court erred in permitting the witness, John Perry, whose testimony, though not introduced by accused, was most favorable to him, to be impeached by a paper permitted to be read in evidence, written by Wm. McCue, and which the Commonwealth's detective witnesses testified that Wm. McCue said out of court embodied the statement made to him (Wm. McCue) by John Perry. Both McCue and Perry denied in court that Perry made the statement embodied in the paper, nevertheless it was admitted by the trial court for the purpose of discrediting John Perry—that is to say, permitted witness to be impeached by a paper he did not write, which was not written in his presence, which he repudiated and refused to sign when

shown to him, and, in the absence of any testimony tending to connect him with it, except that Baldwin said that Wm. McCue said that John Perry (the witness) said that the statement was correct.

(15) The court erred in its definition of reasonable doubt in the eighth and ninth instructions in telling the jury that reasonable doubt must be "based upon the evidence," or "suggested by the evidence," or "grow out of the evidence itself," and not be "without evidence to sustain it," and must be serious and substantial "in order to warrant an acquittal," thus plainly putting the burden of raising the doubt upon the accused, and telling the jury that there must be positive, affirmative evidence creating the doubt. That this definition is erroneous is attested by the overwhelming weight of authority. As has been well said, this definition implies that the doubt must be created or produced by the proof made, and excludes all reasonable doubts which might arise from the lack or want of evidence. *Wright* v. *State*, 69 Ind. 163, 35 Amer. Rep. 212; *Densmore* v. *State*, 33 Amer. Rep. 96.

. Besides making reasonable doubt a matter of positive defense, the instructions gave an improper standard or test by which to determine if a doubt be "reasonable," in that they told the jury that "a doubt to justify acquittal" must be such as "if interposed in the graver transactions of life would cause a reasonable and prudent man to hesitate and pause." The judgment of reasonable men in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of evidence, while in criminal cases something more is required. The conviction reached by each of the jurors must be such as would lead him to venture *to act upon it* in matters of the *highest* concern and importance to his own interests. *Burt* v. *State*, 48 Amer. St. Rep. 576; *Territory* v. *Bannigan* 1 Dak. 451; *Jenkins* v. *State*, 48 Amer. St. Rep. 292; *Jane* v. *Commonwealth*, 2 Met. (Ky.) 30.

(16) The court erred in giving the twelfth instruction. This instruction, while doubtless proper in cases in which there is no question as to the identity of the slayer, was wholly improper here, because there was no evidence that the gun with which the deceased was killed was ever in the possession of the accused, except the statement made by him to the effect that he was trying to get the gun out of the case when he was knocked insensible by an unknown intruder. There was no other evidence on the subject, and a statement of the accused which was intended to be, and was exculpatory, could not, by being garbled, be made the inculpatory basis of the instruction in question. See *Bowles* v. *Commonwealth, ante* p. 816, 48 S. E. Rep. 527; *Parrish* v. *Commonwealth,* 81 Va. 1.

(17) The court erred in refusing to instruct the jury that the law considers it better that ninety and nine (that is, an indefinite number of) guilty persons should escape than that one innocent person should be punished. This court has reiterated this principle. *Smith's Case,* 21 Gratt. 809; *Johnson's Case,* 29 Gratt. 820. The principle is peculiarly applicable to cases resting on circumstantial evidence as much so as the doctrines of presumption of innocence and reasonable doubt. It is the logical outgrowth of these. If this court itself deals with cases resting on circumstantial evidence in the light of the principle invoked, why should it refuse to enlighten the jury in respect to it?

(18) In respect to the statement made by Captain Woods that he had refused a large fee to prosecute accused it is submitted that that was not a matter which the Commonwealth could have given in evidence, or which the jury were entitled to know. If this statement had been made out of court to any member of the jury, or to the jury as a whole, and the matter had been brought to the attention of the court, it would, or should, have discharged the jury. When attention was called to it the court did not ask the jury to disregard it. Nor was the

improper statement justified by the "criticism" of Captain
Woods by counsel for accused. He had no right to state that
he had been the friend of the accused for twenty years, thus
using his friendship for the accused to his disadvantage and un-
doing. In *Cohn* v. *State*, 11 Tex. App. 399, the district attor-
ney said: "Good men in this county, and the best men in Gon-
zales county, desire the conviction of this man and his partner."
To the defendant's objection the court responded: "He speaks
at his peril. I will sign your bill of exception." The Appellate
Court, after characterizing the response of the trial judge as
astounding, and the remarks of the district attorney as obnox-
ious and flagrant, said: "We will not permit one accused of
theft, or any other offense, to be convicted by such means
though all the good, better and best men of this State desire his
conviction." (See 9 Amer. St. Rep. 563-4.)

(19) The evidence was wholly circumstantial and was in-
sufficient to justify the verdict. See *Johnson* v. *Commonwealth*,
29 Gratt. 796, in which this court held that the circumstances,
taken singly or all together, while they created a strong sus-
picion of guilt, were yet inconclusive and insufficient to prove
such guilt, being consistent with either the guilt or the inno-
cence of the accused, and in which *Moncure P.*, commenting on
*Smith's Case*, 21 Gratt. 809, said: "Every one who reads the
evidence in the case must be morally convinced that a murder
had been committed, and that the accused was guilty of the
offense, but there was not sufficient evidence of the *corpus
delicti* for his conviction, and this court, therefore, reversed the
judgment against him."

(20) The motion to set aside the verdict was also based upon
the ground that the jury were permitted during the progress of
the trial to read certain newspapers containing reference to
and comments upon the case. The jurors were examined upon
this question by the court, of its own motion, and while some

claimed not to have read anything about the trial it appears from the testimony of others of the jurors themselves that the headlines of the articles relating to the trial were read by them, which headlines, in the language of one juror, "anybody taking up a paper was obliged to see," and, in the language of another juror, "a man who looks at a paper is bound to read." Copies of the newspapers which appeared during the progress of the trial are made parts of the record, and in these headlines we find such expressions as these: "Feeling in Charlottesville decidedly against the prisoner"; "Prosecution scores a victory"; "General belief in guilt of accused"; "John Perry knocked out"; "Accused's house boy impeached and thus prosecution greatly strengthens case"; "How Capt. Woods nailed him." These headlines also teem with scandalous matters affecting the moral character of accused and calculated to degrade him in the estimation of his triers, and to furnish a motive for the crime with which he stood charged, matters of which there was not a spark of testimony given in court. In *State* v. *Robertson*, 20 W. Va. 760, it was held to be error in the trial court to refuse to set aside the verdict where the jurors, in a murder case in which the main defense relied on by the accused was insanity, were permitted to read articles in the *Washington Post* containing the testimony of Dr. Gray, who was examined as an expert in Giteau's case (which happened to be on trial at the same time), notwithstanding the jurors swore that they "were not in any manner affected or influenced, even in the remotest degree, in their consideration of this case by any newspaper, or newspapers, had or received by any of the affiants."

The statement of a juror will not be received to show by what motive he was actuated, or that any admitted fact, misconduct, or irregularity had no influence or effect upon his mind in producing the verdict. *State* v. *Harmon* (W. Va.), 15 S. E. Rep. 982 (3d paragraph of *syllabus by the court*). If it be said that

the jury asked and were given permission by the court to read newspapers, and that accused did not then object, we answer—

(1) The matter was not mentioned to accused, or his counsel, whose views in regard thereto it was deemed material to consult or consider;

(2) It was understood that the jurors were pledged not to read anything in reference to the case on trial, whereas, in fact, they (or some or them) did do so.

But it was unjust to place accused in the position of being called upon to object, or be concluded by his silence. The trial was likely to last a month. The jurors were brought from their homes and taken from their business, and were to remain in substantial captivity for an indefinite period. They were not likely to submit kindly to the denial of the privilege of reading the newspapers, but would undoubtedly esteem it a hardship; and, in view of the understanding that they were not to read anything about the case, would have regarded any objection as a reflection upon their integrity as well. *Accused's life was in the hollow of their hands!* Is it not then a monstrous proposition that the trial judge could shift the responsibility of dealing with this matter from his own shoulders to those of accused?

(21) The motion in arrest of judgment should have been sustained. The verdict was in these words: "We, the jury, find the defendant guilty as charged in the within indictment for murder in the first degree." The indictment was in the common law form, and was, therefore, an indictment for *murder generally*, embracing both degrees. *Livingston* v. *Commonwealth*, 14 Gratt. 596; *Kibler* v. *Commonwealth*, 94 Va. 809. The statute (Code, sec. 4041) provides that if a person indicted for murder be found by the jury guilty thereof, they shall in their verdict find whether he is guilty of murder in the first or second degree, and if the accused confess the indictment to

be true, the court shall examine the witnesses and determine the degree of the crime and give sentence accordingly. It was necessary, therefore, that the jury should fix by their verdict the degree of the crime. The last five words in the verdict—"for murder in the first degree"—refer to, and are descriptive of, the indictment. The jury found the accused guilty as charged in the indictment, which *indictment—not verdict*—is *mis*described as one for murder in the first degree. These *mis*descriptive words, therefore, must be discarded as surplusage, and what remains is a verdict finding accused guilty as charged; and inasmuch as the accused was charged with murder generally, no judgment could be entered upon the verdict.

Kᴇɪᴛʜ, P., delivered the opinion of the court.

Petitioner was indicted by a grand jury in the Corporation Court of the city of Charlottesville on September 19, 1904, for the murder on the 4th of September preceding of his wife, Fanny M. McCue. At a subsequent term of the court he was tried upon this indictment, and on the 5th day of November the jury found him guilty of murder in the first degree. The court sentenced him to be hanged, and he thereupon applied to this court for a writ of error, which was refused, the court being of opinion that the judgment complained of was plainly right. At a subsequent day a supplementary petition was filed, asking the court to rehear its judgment refusing the writ of error, and upon the original and supplemental petitions the case is now before us for consideration.

The first assignment of error is to the judgment of the Corporation Court upon a plea filed by the petitioner, in which he alleges that Lyman, one of the grand jurors finding the indictment, was not a resident of the city of Charlottesville. To this plea the Commonwealth, by its attorney, filed a replication.

Thereupon the court empaneled a jury, and made up and propounded to it the issue, whether or not said Lyman was at the time of finding the indictment a resident of the city of Charlottesville. This issue was found by the jury in the affirmative, and the action of the court in overruling prisoner's motion to set aside the verdict, and entering judgment thereon, constitutes the petitioner's first assignment of error.

It was decided in *Commonwealth* v. *Cherry*, 2 Va. Cas. 20, that by force of the common law, where a bill of indictment is found by a grand jury, one of whom is an alien, or otherwise disqualified by law, the bill or presentment may be avoided by plea. *Commonwealth* v. *Long*, 2 Va. Cas., Ib. 318.

In *Commonwealth* v. *St. Clair*, 1 Gratt. 568, it was pleaded in abatement to the indictment that one of the grand jurors was not a free-holder. Upon that plea an issue was made up, tried at the bar of the court by a jury, the issue found for the defendant, and the indictment quashed.

In *Day* v. *Commonwealth*, 2 Gratt. 563, the prisoner pleaded in abatement that one of the grand jurors was at the time of finding the indictment a surveyor of a highway. To this plea the attorney for the Commonwealth replied generally, and thereupon the court decided the issue against the prisoner. The General Court was of opinion that the issue so joined was one of fact, and that it should have been submitted to a jury, and for this error the judgment was reversed and a new trial awarded.

Counsel for petitioner criticise the replication which the court permitted to be filed to the plea in this case upon the ground that it concludes with an offer "to verify" when it should have been "to the country."

We shall not stop to inquire into this nicety of pleading. The injury of which the petitioner complained was that he had been indicted by a grand jury upon which there was a juror

incompetent by reason of the fact that he was not a resident of the city of Charlottesville. That issue was submitted to a jury, which heard the evidence and decided it against him. We cannot permit the grave interests presented in this case to be determined upon a consideration so trivial. It is certain that no right of the prisoner was prejudiced by the ruling of which he complains. The verdict of the jury upon this issue must be considered in this court as upon a demurrer to evidence, and the evidence, when so considered, was, in our judgment, sufficient to sustain it.

The second assignment of error is as to the qualification of the petit juror, J. Y. Stockdell, who was challenged by the petitioner.

He was asked if he had formed or expressed an opinion, to which he replied: "I formed an opinion on the newspaper evidence." He was reminded by counsel that in law the prisoner was presumed to be innocent, and was asked, "In your present state of mind could you go on that jury, starting out with that presumption of innocence in your mind?"

A. "I could not say that I could, sir, for the reason that I have read this evidence. Naturally there is some impression on my mind, but I cannot say that it is biased or prejudiced. The only thing I have heard is one side as published in the newspapers. I must say that everything I read in the newspapers was one side."

After further question and answer counsel asked the juror this question: "In spite of what you have read and heard, you could go upon this jury and give the prisoner a fair and impartial trial according to the instructions of the court and the evidence as detailed by the witnesses?"

A. "I feel that I am a fair-minded man."

Q. "But I also understand, Mr. Stockdell, that what you have read of this case has destroyed in your mind the presumption

of the prisoner's innocence; that you would not go on the jury presuming him to be innocent?"

A. "I don't know about that. It is a question as to drawing a line between thinking him innocent and knowing him to be guilty, which I don't know."

In answer to other questions the juror stated "that as a fair-minded man I could render a verdict according to the law and the evidence; not biased. I have no prejudice one way or other"; and that as to innocence or guilt he would be governed by the evidence and the instructions of the court.

After numerous questions had been asked and reiterated, the object of which was to ascertain the precise character and strength of the opinion which the juror had formed and expressed, counsel asked him the following question:

"Do you feel at this moment that there is a presumption in your mind that this defendant is an innocent man?"

To which he replied: "I would like to say this: that I feel that I am an honest and unbiased man, and as such that I could enter this jury unprejudiced and unbiased, and give the prisoner a trial according to the law and the evidence. If I did not feel so, I would want to be turned out, but at the same time I feel that I could serve, and am called here to serve, and that it is therefore my duty to serve."

(By the court): "Do you feel that you can go into this trial leaving your mind open to the evidence, free from any previously read accounts in the newspapers, and go through the trial believing him innocent until he is proved guilty "

A. "Yes, sir."

And thereupon the juror was accepted.

The cases upon this subject are almost without number, and they are not to be reconciled. The trend of recent decisions is in the direction of limiting, rather than extending the disqualification of jurors by reason of mere opinion. Whatever

the mind receives has an effect upon it, passing with almost infinite gradation from a mere impression to a fixed belief. The State strains every nerve to disseminate knowledge. By the diffusion of education it hopes to create a higher citizenship and to find the means of repressing vice and crime; but if the courts take an extreme position upon this subject, and hold that every opinion shall work a disqualification for service as a juror, the administration of justice will be confided, not to the most intelligent, but to the most ignorant of our citizens. The courts, therefore, while resolute in seeing that every man shall be tried by an impartial jury, inquire into the quality and degree of the opinion, and to that end search the conscience of the juror upon his *voir dire*, and look into the sources of the information upon which his opinion rests.

No man can read the rigid examination to which this juror was subjected without being impressed with his fairness, with his desire to deal justly by the prisoner, and with his conscientious purpose to discharge his duty as a citizen.

In *Moran's Case*, 9 Leigh. 651, two jurors were examined upon their *voir dire*. One stated that he had heard the case spoken of in the town, and rumors in regard to its circumstances, upon which he had expressed no opinion, though he believes those rumors to be true, and if they should turn out upon the trial to be true, he has a decided opinion in regard to the case; but he feels no prejudice, and is satisfied that he shall be able to decide the case upon the evidence which may be given in, uninfluenced by the rumors he had heard. His opinion was that if the prisoner had stabbed the deceased under the circumstances which he had heard, he ought to be punished. The other juror stated that he had made up no decided opinion; that he had heard a part of the evidence of one witness and formed an impression, and if the residue of the testimony should run that way, that impression would be confirmed; that so far as

the evidence went he had a decided opinion, if the rest should not run against it; but that he had no prejudice, had not expressed any opinion, and was prepared to decide the case according to the evidence which might be given in, uninfluenced by the portion of evidence he had heard. Both jurors were held to be competent.

In *Smith* v. *Commonwealth*, 6 Gratt. 696, a juror stated that he had read the evidence as published in the newspapers, and had formed and expressed the opinion, though it was not a decided one, that the prisoner was guilty; that he was satisfied that he could give the prisoner a fair and impartial trial, notwithstanding his impressions, and without being influenced by them, on hearing the evidence adduced at the trial. Another stated that he had formed and expressed a decided opinion, founded on a report of the evidence before the mayor, published in the papers, but not such an opinion as would influence his mind if accepted as a juryman; that the opinion so formed would naturally be recalled to his memory, but that he would be governed solely by the evidence which might be given in court. Held that both were competent jurors.

In *Clore's Case*, 8 Gratt. 606, a juror stated that he had not heard any of the evidence, nor had he heard any report of it from those who had heard it, but from the rumor of the neighborhood he had formed an opinion which at the time he spoke was existing on his mind, and which he should stick to unless the evidence turned out to be different from what rumor had reported it to be; that he had no prejudice nor partiality for or against the prisoner, and believed he could give him a fair and impartial trial according to the evidence that should be given in. Held that he was a proper juror.

In *Jackson's Case*, 23 Gratt. 919, Judge Moncure, delivering the opinion of the court, goes fully into this subject. He says: "There is no question, perhaps, about which there has

been more apparent conflict of decision in this State, or in regard to which it is more difficult to derive from our many cases on the subject any definite rules which will apply to all cases that may arise. The object of the law is to secure to every man who is charged with a criminal offense a trial by an impartial jury. And this rule has been established by the cases, if no other, that if a venireman has formed, and still more, if he has formed and expressed, a *decided* or *substantial* opinion as to the guilt or innocence of the accused, no matter upon what ground it was formed, whether from having heard the evidence on some former trial or examination, or from mere rumor or otherwise, he is an incompetent juror to try the case; and if, on the other hand, his opinion be merely hypothetical, he is not incompetent on that ground. The difficulty is in determining in any given case, whether the opinion be decided or substantial, or merely hypothetical, there being in almost every case some peculiarity of circumstance. And the desire to remove or lessen this difficulty by laying down certain other rules for our guidance has been the fruitful source of the apparent conflict in many of the cases. Thus, if a venireman has formed an opinion as to the guilt or innocence of the accused from having heard the evidence on a former trial or examination of the case, it would be difficult, if not impossible, to regard such opinion otherwise than as decided or substantial, within the meaning of the rule, and he would generally, if not always, be considered an incompetent juror, even though he might think and say that he could give the accused an impartial trial. So, on the other hand, if a venireman has formed an opinion as to the guilt or innocence of the accused, from mere rumor, the presumption, in the absence of evidence to the contrary, is that such opinion is merely hypothetical, and will be so considered, even though he speak of it as a decided or substantial opinion, if he says he has no prejudice against the accused and thinks he can give him

a fair and impartial trial. But if the court be satisfied, either from the venireman's own statement or otherwise, that the opinion is in fact decided or substantial, he will be an incompetent juror. There are intermediate cases which often give rise to difficulty on this subject. The venireman may have formed an opinion from having heard a part only of the evidence on a former trial, or from having heard the whole or part of the evidence given on a former trial, through persons who were present, in whose veracity and accuracy he may have more or less confidence, or from having read an account of such evidence in a newspaper. We cannot lay down any rule for the government of such cases except the general rule before stated, and the court must determine, as best it may, whether the opinion be decided or substantial, or merely hypothetical. It would be dangerous to lay down a rule, and no case has ever decided that a venireman who has formed an opinion from accounts received from witnesses out of court, and still less from accounts received from others, as to statements made by witnesses, either in or out of court, is therefore necessarily an incompetent juror, even though he may regard the persons from whom he received his information as persons of general veracity and accuracy, and may credit what he has heard from them. We know that witnesses who make statements out of court of transactions about which they may have testified in court, still more persons who profess to detail what they may have heard in or out of court often speak carelessly, and generally omitting particulars which may be very material. And we know that those who listen to them often listen carelessly, and, though they almost always form some impression or opinion of the case from what they hear, yet that opinion is not always, and perhaps not often, decided or substantial in the meaning of the rule aforesaid. The court must determine that question in all such cases, in view of all the circumstances."

In the course of his opinion he cites numerous authorities,

and quotes with approval the language of Judge Summers, in *Moran's Case, supra,* in which he uses the following language: "Sustaining challenges to jurors for favor on slight grounds tends to place the administration of public justice in the hands of the most ignorant and least discriminating portion of the community, by which the safety of the accused may be endangered and the proper administration of the laws put to hazard; and we are therefore not disposed to enlarge the grounds of challenge beyond those properly deducible from the cases heretofore decided."

As we have said, the cases are not reconcilable, but we believe those we have cited establish a wise and salutary rule. When to these considerations it is added, as has been frequently reiterated by this court, that great weight is justly due to the opinion of the trial judge, who sees and hears the venireman, we have no hesitation in rejecting this assignment of error.

These considerations lead to the same conclusion with reference to the juror Wood.

The next exception is as to the competency of the witness, Kaufman, who was introduced by the Commonwealth to prove that a piece of cloth found in the bath-room on the day following the alleged homicide was a part of the undershirt worn by the prisoner on that occasion.

Kaufman, it appears, is engaged in the clothing business, and is a salesman of and dealer in underwear, but has never manufactured it. Fontaine Eddins, a clerk in a clothing store, was introduced for the same purpose, and both were permitted to testify over the objection of the prisoner.

In this there was no error. It was for the court to say what evidence should be admitted. It was for the jury, before whom the witnesses were subjected to investigation as to their source of knowledge, to determine upon their credibility, and the weight to be given to their testimony.

The eleventh exception is to the admission of a conversation between the prisoner and his son, William McCue, as testified to for the Commonwealth by the witness, Martin. In this conversation petitioner, according to the witness, said that he (his son) knew that the statement made by Ernest Crawford about petitioner's having drawn a pistol upon his wife was not true, to which petitioner's son replied by affirming that petitioner did draw a pistol upon his wife. This is objected to upon the ground that there is no suggestion or approximation with respect to the time at which the occurrence took place, which was the subject of this conversation; that it nowhere appears "whether it was a week, or a month, or a year, or five years, or ten years before the homicide."

The testimony with respect to the incident in the jail was not introduced as proof of the circumstance narrated. It does not prove or tend to prove, and there was no purpose in its introduction to prove, that the accused at any time threatened his wife with a pistol and that she sought the protection of her son. Ernest Crawford had testified before the jury that William McCue so stated to him, and Martin's testimony was introduced solely for the purpose of showing that McCue endeavored to induce his son to deny the statement attributed to him by Crawford. If the circumstance to which Crawford referred was inadmissible for remoteness in point of time, or for any other reason, objection to it should have been made when Crawford was upon the stand, but there could be no objection to it when introduced for the purpose indicated.

The precise language of the prisoner on that occasion was as follows: The prisoner said to his son: "You know it is not so about what Ernest Crawford said about my drawing a pistol on your mother." To which the son replied: "You did; and she run in the room and got in the bed with me, and asked me not to let you shoot her."

Nor is the testimony of Martin inadmissible because "it was, in effect, an accusation against the prisoner which he then and there controverted and denied." The conversation was brought about by the prisoner who was apparently seeking to find the means of weakening the force of Crawford's statement, and he said to his son, "You know it is not true that I drew a pistol on your mother"; and the denial comes from the son: "You did; and she run in the room and got in the bed with me, and asked me not to let you shoot her."

What was said, with all the attending circumstances, was before the jury, and we are of opinion that there was no error in this ruling of the court.

There are several exceptions to evidence which seems to us to be immaterial, and to discuss which would unduly protract this opinion. That, for instance, of the witness Covington, who testified that he spoke to petitioner's wife at about twenty minutes before 8 o'clock; that he took off his hat and bowed to her, but that she did not speak. Of the witness Hurley, who heard the prisoner say that his wife's jealousy diminished his pleasure and enjoyment in life.

The fifteenth exception is to the testimony of Dr. Nelson, who was permitted to testify as to the effects of a blow struck by a sandbag or other similar instrument.

It hardly requires the learning or experience of a practitioner of medicine to know that if a man was struck by a sandbag a blow sufficient to render him unconscious, there would be, at least, some slight discoloration or external mark or after effect consequent upon the blow. This assignment of error is also overruled.

The assignments of error from the 16th to 33d, inclusive, present a question of much importance in this prosecution.

William McCue, a son of the prisoner, was introduced as a witness by the Commonwealth; and it speedily appearing that

he was adverse to the Commonwealth and favorable to the prisoner, the Commonwealth, alleging that it was surprised, asked and was permitted to introduce evidence to show that the witness had made statements inconsistent with his testimony.

So much of sec. 3351 of Va. Code (1904) as is pertinent to this inquiry is as follows:

"A party called to testify for another, having an adverse interest, may be examined by such other party according to the rules applicable to cross-examination.

"(1) A party producing a witness shall not be allowed to impeach his credit by general evidence of bad character, but he may, in case the witness shall, in the opinion of the court, prove adverse, contradict him by other evidence, or, by leave of the court, prove that he has made, at other times, a statement inconsistent with his present testimony, but before said last mentioned proof can be given, the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he has made such statement. In every case the court, if requested by either party, shall instruct the jury not to consider the evidence of such inconsistent statements except for the purpose of contradicting the witness."

The law just quoted is so comprehensive in its terms that we shall content ourselves with observing that it warrants the action of the court in this case unless, as the petitioner insists, its operation is to be confined to civil cases. The law of evidence is in general the same in civil and in criminal cases. In each case the object is the same—to place evidence before the jury which will enable it to arrive at a just decision upon the issues. It has long been a subject of investigation before courts, text-writers and legislatures how far it is permissible for a party to contradict his own witness.

In Wigmore on Evidence, Vol. 2, sections 897 to 908, in-

clusive, the whole subject is exhaustively discussed, and the views of eminent authorities given.

Lord Ellenborough is quoted as saying, in *Alexander* v. *Gibson*, 2 Camp. 555: "If a witness is called on the part of the plaintiff who swears what is palpably false, it would be extremely hard if the plaintiff's case should for that reason be sacrificed; but I know of no rule of law by which the truth is on such an occasion to be shut out and justice is to be perverted."

Chief Justice Tindal's remarks, in *Bradley* v. *Ricardo*, 8 Bing. 58, are cited. "The object of all the laws of evidence is to bring the whole truth of a case before the jury; . . . but if this contradicting evidence were excluded, that would no longer be the just ground on which the principles of evidence would proceed, but we should compel the plaintiff to take singly all the chances of the tables, and to be bound by the statements of a witness whom he might call without knowing he was adverse, who might labor under a defect of memory, or be otherwise unable to make a statement on which complete reliance might be placed."

The reasoning and authorities range all the way from permission to refresh the memory of an adverse witness by cross-examination to the practice which finds expression in the statute under consideration of proving his inconsistent statements.

In England the subject was referred to a commission composed of eminent jurists, and they reported in favor of the admission of impeaching testimony by proof of contradictory statements. For the admissibility of the proposed evidence it is said that this course "is necessary as a security against the contrivance of an artful witness who otherwise might recommend himself to the party by the promise of favorable evidence (being really in the interest of the opposite party), and afterwards by hostile evidence ruin his cause; that such a

power is necessary for the purpose of placing the witness fairly and completely before the court, and for enabling the jury to ascertain how far he deserved to be believed; that the ends of justice are best attained by allowing the fullest power for scrutinizing and correcting evidence, and that the exclusion of the proof of contrary statements might be attended with the worst consequences.    The chief objection to the proposed evidence appears to be that a party, after calling a witness as a witness of credit, ought not to be allowed to discredit him. The objection proceeds upon the supposition that the party first acts on one principle, and afterwards, being disappointed by the witness, turns around and acts upon another, thus imputing to the party something of double dealing or dishonest practice. But it is evident that this does not apply to the case where a party, having given credit to a witness, is deceived by him, and first discovers the deceit at the trial of the cause.    To reject the proposed evidence in such a case, and repress the truth, would be to allow the witness to deceive both jury and party."

In *Babcock* v. *People*, 13 Colo. 519, 22 Pac. 818, Judge Elliott said: "The tendency of recent legislation, as well as of modern decisions, has been to relax somewhat the rules of evidence, so as to afford better opportunity for the development of truth. Modern experience has also shown that a party may sometimes be deceived in the character and animus of a witness whom he has called, as well as in the testimony he is expected to give; and he learns after the witness begins to testify—a very inopportune time—that he has to encounter bitter and unscrupulous opposition where he had expected to receive only fair and honorable treatment.    This may be evidenced by reluctance or evasion on the part of the witness in answering questions, or by too great readiness in making or volunteering damaging statements contrary to his previous version of the matter.    Under such circumstances,    .    .    .    .    in extreme cases, where it is ap-

parent that a witness is giving testimony contrary to the reasonable expectation of the party calling him, such party should be allowed to cross-examine such witness for the purpose of refreshing his recollection with the view of modifying his testimony or of revealing his animus in the case,  .   .   .   and to ask him if he has not theretofore made other or different statements from those he has just given in evidence."

In this whole discussion, as given in Wigmore, the reasoning adduced and the authorities cited apply indifferently to civil and criminal cases, the civil cases being, of course, far the more numerous.

The English statute is given, passed in pursuance of the recommendation of the commission on procedure heretofore referred to. "A party producing a witness shall not be allowed to impeach his credit by general evidence of bad character; but he may, in case the witness shall, in the opinion of the judge, prove adverse, contradict him by other evidence, or by leave of the judge prove that he has made at other times a statement inconsistent with his present testimony."

"It is easy to imagine," says the author, "the confusion caused by this bungling paragraph, for the showing of an error by ordinary contradiction provided for in clause 3 was already freely permissible without interference by the judge and whether or not the witness was adverse;  .   .   .   As the statute stands, the present class of evidence, self-contradictions, is admissible only by leave of the judge, and in case of a witness deemed adverse by the judge. In the United States fortunately only a few jurisdictions have adopted the English statute. But the variety of attitude in the different jurisdictions, and the indiscriminate citation of rulings from other courts, together with the indecision of the earlier English precedents, has tended to produce confusion in our law, even within the rulings of the same jurisdiction. The sound and simple remedy would be by statute to

abolish all limitation on this kind of evidence, and this step has in some States already been taken."

The English statute quoted was passed in the seventeenth and eighteenth of Victoria. It applied only to civil cases; but by statute of the twenty-eighth and twenty-ninth of Victoria it was extended to criminal cases.

In *Hickory* v. *U. S.*, 151 U. S. 303, 34 L. Ed. 170, 14 Sup. Ct. 334, which was upon an indictment for murder, Chief Justice Fuller says: "When a party is taken by surprise by the evidence of his witness, the latter may be interrogated as to inconsistent statements previously made by him for the purpose of refreshing his recollection and inducing him to correct his testimony; and the party so surprised may also show the facts to be otherwise than as stated, although this incidentally tends to discredit the witness. . . . But proof of contradictory statements of one's own witness, voluntarily called and not a party, inasmuch as it would not amount to substantive evidence, and could have no effect but to impair the credit of the witness, was generally not admissible at common law.

"By statute in England, and in many of the States, it has been provided that a party may, in case the witness shall, in the opinion of the judge, prove adverse, by leave of the judge, show that he has made at other times statements inconsistent with his present testimony, and this is allowed for the purpose of counteracting actual hostile testimony with which the party has been surprised."

This citation is of value in two aspects. In the first place, it shows what the common law was; it shows the tendency of modern thought upon the subject; and, although made in a case where a man was on trial for his life, rests the statements of law upon adjudications in civil cases.

Under these circumstances the Legislature of Virginia adopted the statute which we are now considering. Its lan-

guage is broad and general; there is not a suggestion upon its face of the purpose to limit its operation to a particular class of cases. The evils are the same in criminal cases as in civil. It is invoked to-day by the Commonwealth. It may be to-morrow the last hope of an innocent man.

Against all this it is urged that the statute is found in the Code under the title of "Proceedings in Civil Cases." Embraced in that title are a number of chapters upon a great variety of subjects, many of which are obviously of a civil nature, others specifically declared to be of that character. In the chapter upon "Evidence," in which section 3351 is found, there are sections which, either from their subject matter or by their express terms, apply to civil cases. There are other sections which by their express terms apply to criminal cases—for example, sections 3346, 3352 and 3352a, the first mentioned referring to the competency of husband and wife to testify for or against each other in civil and criminal cases. We find, therefore, section 3351 placed in the midst of sections applicable alike by their terms to criminal and civil cases; and the operation of that section not extended upon the one hand, nor limited upon the other to a particular class of cases, but its application to be determined by other considerations. We cannot think that the mere collocation of this section should override every other consideration, and require the courts to confine it to civil cases, when it is a remedy for an evil as great in criminal as in civil cases, and the consequences of which may be even more serious.

We are of opinion that these assignments of error are not well taken.

A careful perusal of the instructions satisfies us that they fairly submitted to the jury the principles of law by which they should be governed in the consideration of the evidence. It would be impossible to prepare instructions to which an ingenious critic might not present plausible objection. The defini-

tion of "reasonable doubt" is attempted by the court. It is a difficult, if not an impossible, task so to define it as to satisfy a subtle and metaphysical mind bent upon the detection of some point, however attenuated, upon which to hang a criticism. But no unbiased person can read those instructions without having the conviction forced upon him that every safeguard which the benignity of the law throws around a prisoner upon trial was accorded to the petitioner in this case.

Two instructions asked for by the petitioner were refused by the court, one of which undertakes to define reasonable doubt, as follows: "The court instructs the jury that by reasonable doubt is meant such doubt as would cause a man of average prudence to hesitate about a matter of his own of like importance to himself as the case on trial is to the accused."

It would have been impossible for the jury to make any practical application of the proposition sought to be formulated in this instruction. There could be no case of importance to a man such as "the case on trial was to the accused," unless he himself stood upon his deliverance before a jury charged with a capital offense.

But the instruction was properly refused upon the further ground that the instructions of the court upon the subject of reasonable doubt were ample and correct guides to the jury upon that branch of the case.

The court was asked to instruct the jury "that under the humane policy of the law of this State it is considered infinitely better that ninety and nine (that is, an indefinite number of) guilty persons should escape punishment than that one innocent person should be punished; and, therefore, it is far better that the jury should err in acquittal than err in convicting."

We have heard it said, and it is sometimes stated in the opinions of courts, that it is better that ninety and nine guilty persons should escape than that one innocent person should be pun-

ished.    We have no fault to find with the expression as a rhetorical phrase, but as a guide to a jury in reaching a conclusion it is of no value.    That no guilty man should escape is equally indisputable, but it would hardly find a proper place in an instruction to a jury.    The object of courts and juries is to shield the innocent and to punish the guilty, and in this case the jury were told that the accused was presumed to be innocent until his guilt was established by the Commonwealth beyond a reasonable doubt; that this presumption of innocence goes with him through the entire case and applies at every stage thereof, and that if, after having heard all of the evidence, the jury have a reasonable doubt of the guilt of the accused, upon the whole case, or as to any fact essential to prove the charge made against him in the indictment, it is their duty to give him the benefit of the doubt, and find him not guilty.    And, further, that if upon the whole evidence there is any reasonable hypothesis consistent with the innocence of the accused, they must find him not guilty; that the failure of the evidence to disclose any other criminal agent than the accused, is not a circumstance which may be considered by the jury in determining whether or not he was guilty of the crime wherewith he is charged; that he is presumed to be innocent until his guilt is established, and he is not to be prejudiced by the inability of the Commonwealth to point to any other criminal agent, nor is he called upon to vindicate his own innocence by naming the guilty person.

It is also to be observed that the court was careful in instructing the jury as to the weight to be given to the evidence of contradictory statements made by the witness William McCue, and others.    The jury was warned that this evidence was admissible only to contradict the witness, and not to be taken as substantive proof of the facts related by the witness or, in the terms of the statute, that they were not to consider the evidence of such inconsistent statements except for the purpose of contradicting the witness.

During the closing argument for the prosecution Captain Micajah Woods, who had assisted the prosecution, arose, and in the presence of the jury, said to the court: "With the gracious consent of the gentlemen on the other side and the Commonwealth's attorney I would like to make one statement, not pertaining to the merits of this case, but in view of the attack, which may not have been so intended, but which sounded to me ungenerous, as an ungenerous attack made upon me by the distinguished gentleman, and who has made so able a speech, I desire to say that I refused a large fee in this case to prosecute"——

Counsel for the prisoner objected to the statement and asked that the jury be discharged in view of that statement.

It appears in the bill of exceptions that counsel for the prisoner had, in his argument, criticised the position of Captain Woods in acting as prosecutor, under the compulsion of public opinion, of a man he admitted had been his friend for twenty years.

The right of the public prosecutor to have associated with him an attorney to assist in the prosecution is established law in this State, and is not a proper subject of animadversion. He is as lawfully there to assist the prosecution as counsel for the defense to defend the prisoner; and, so long as he keeps within proper bounds, he is not open to criticism before the jury. It would be a strange thing if counsel for the accused were permitted to criticise opposing counsel, and that the latter should be obliged to submit in silence under the penalty we are asked to impose in this case. There is no merit in this exception.

The jury having rendered a verdict of guilty of murder in the first degree, the accused moved to set aside the verdict, among other reasons, because the jury were permitted during the progress of the trial to read, and did read, certain newspapers containing references to, and comments upon, the case, pending the trial of the same.

It appears that "before the jury was sworn, and in response to. a request from one of the jurors, the court stated to the members of the jury that they might be permitted to read such portions of the daily newspapers as in no way related to this trial, but that they must scrupulously avoid any parts of said. papers as had any reference to this trial, which the said members of the jury then and there severally promised to do.. And. the sergeants were then instructed to carry out this instruction of the court. At the time this instruction was given neither the. prisoner or his counsel, they being present, made objection,. though they were not asked by the court if they had objection."

In *Hunter* v. *State*, 43 Ga. 483, after some of the jury were· in the box, but the whole not impaneled, and in the presence of the court, those sworn were seen by counsel for accused reading a newspaper which contained an article reflecting upon the counsel for prisoner, and no motion was made or notice then taken in regard thereto. ·It was held that this was not such. irregularity upon the part of the jury as would be sufficient to· set aside the verdict, and that such acts transpiring in the court room, and in the presence of the court and of counsel, when not. objected to, will not be favorably regarded after the verdict.

In *Bulliner* v. *People*, 95 Ill. 394, counsel for a defendant. handed a juror a newspaper to read after he was sworn, but before the panel was filled, and afterwards, on the trial, his attention was called to the fact that another juror was reading a newspaper in which was an article purporting to contain a report of the trial, and commenting upon the case unfavorably to the defendant, and made no objection thereto, but stated privately to the court that it was best to say nothing about the matter, as it might give ·the article undue prominence and do the defendant more harm than good, it not appearing that the prosecution was responsible for the act. It was held that the irregu-- larity was waived, and could not be urged by the defendant in

error to reverse a judgment of conviction, and that a prisoner on trial has no right to stand by and suffer irregular proceedings to take place, and then seek a reversal for the same. Like any other defendant, if he neglects in proper time to insist upon his rights, he waives them.

In *McKinney* v. *People* (Ill.), 2 Gilm. 556, 43 Am. Dec. 65, it is said: "A prisoner on trial, under our laws, has no right to stand by and suffer irregular proceedings to take place, and then ask to have the proceedings reversed on error on account of such irregularities. The law, by furnishing him with counsel to defend him, has placed him on the same platform with all other defendants, and if he neglects in proper time to insist upon his rights, he waives them."

So it is uniformly held in civil as well as in criminal cases, for, as we have already remarked, the mode of procedure is substantially the same in both. A party who stands by without objection and sees proper evidence excluded, or improper evidence admitted, without objecting, will not be heard to make the objection after verdict. And so with instructions. In other words, litigants are not permitted to play fast and loose with the court. If they are silent when it is their duty to speak, they are not permitted to speak when it is their duty to be silent.

The case under consideration is far stronger than those cited. The court, in the presence of the prisoner and of his counsel, at the instance of the jury, permitted them to have access to newspapers under rules which it prescribed. It does not appear that the limits imposed by the court were exceeded, or that the prisoner was prejudiced by what occurred. But, however that may be, he had no right to sit mute, prepared to abide by the results if they were favorable, or to make objection if they were adverse.

We think it is the safer and better practice to exclude news-

papers from the jury. They are called upon to exercise the most sacred duty which can devolve upon a citizen, and in its discharge they must make such personal sacrifice as is necessary to its due performance; but under the circumstances of this case no reversible error is disclosed in this respect.

No one can read the petitions for a writ of error in this case without being satisfied that the accused has had every advantage that could accrue to him from the efforts of able and astute counsel. But no one can read the facts presented in evidence without being convinced that no advocacy, however skilled to make the worse appear the better reason, could have brought about any other result than that which has been reached. The evidence precludes every reasonable hypothesis of innocence, and points with unerring certainty to the guilty man. The record discloses a homicide, remarkable only for its atrocity, and the fact that it was committed by a member of the profession of the law who had been entrusted by his fellow-citizens with a responsible office, and that the victim was his wife.

We have gone through the record and discussed what seemed to us to be its more important features. There are exceptions to which we have not adverted. Some of them we deemed unimportant, others as controlled by principles well established, or covered by what we have said with reference to kindred exceptions, and there is but one other view which we are called upon to present.

Running through the petitions, and more particularly the supplemental petition, there is a subtle suggestion that this court has introduced a practice which tends to undermine the rights and abridge the privileges of those who stand accused of crime.

The theory propounded seems to be that a writ of error to the judgment of a trial court is one of the rights of a person

convicted of crime; while the truth is that a review by an appellate tribunal, whether upon an appeal or writ of error, is no part of due process of law.

The inalienable rights of a person accused of crime are thus stated in the bill of rights: That in all criminal prosecutions a man hath a right to demand the cause and nature of his accusation, to be confronted with the accusers and witnesses, to call for evidence in his favor, and to a speedy trial by an impartial jury of his vicinage, without whose unanimous consent he cannot be found guilty; nor can he be compelled to give evidence against himself; that no man be deprived of his life or liberty, except by the law of the land or the judgment of his peers.— Va. Constitution, sec. 8.

Our statute prescribes the rule which controls the action of this court. With reference to appeals and writs of error, section 3466 of the Code says: "In a case wherein the court shall deem the judgment, decree, or order, complained of plainly right, and reject it on that ground, and the order of rejection so states, no other petition therein shall afterwards be entertained."

We have no such practice as an absolute right of appeal in civil or criminal cases. But the law requires a petition, accompanied by a transcript of the record, to be presented to the court, or one of its judges, whose duty it is to examine the errors assigned and to grant or refuse a writ, as may seem proper. It is as much the duty of the court, or judge, to deny the petition when of opinion that the decision complained of is plainly right as it is to grant it when any doubt exists as to the propriety of the decision. The statute in its present form is found in the Code of 1849. Just when it took its place in the statute law we are not informed, but the uniform practice of this court, and of the General Court, its predecessor, as an appellate tribunal in criminal cases has been in accordance with the letter and spirit of that statute.

Opinion.

In *Vance* v. *Com'th*, 2 Va. Cases 162, a case of homicide which ended in a conviction of murder in the first degree, the report of the case shows that it was highly litigated, and that many errors were assigned; but an application for a writ of error was unanimously refused by the judges of the General Court.

Running through the "Virginia Cases," and other reports in which the judgments of the General Court appear, numerous instances will be found of writs of error refused in every description of felony. In some cases opinions are delivered; some are heard upon the petition only, while in others the attorney-general is permitted to reply.

By the Constitution of 1851 the General Court was abolished and appellate criminal jurisdiction was given to the Court of Appeals. Beginning with 1854, our records disclose cases involving every form of felony, and every degree of punishment applicable to that crime, in which the order entered upon the petition is that "the court, deeming the judgment complained of plainly right, doth reject the petition" upon that ground.*

---

* Writs of error were refused in the following cases:

ORDER BOOK No. 19.

*Archer* v. *Commonwealth*, p. 559; *Baxter* v. *Commonwealth*, p. 344; *Cronin* v. *Commonwealth*, murder, p. 679; *Gebhart* v. *Commonwealth*, p. 479; May 25, 1854, *Helms* v. *Commonwealth*, burglary, p. 514; May 15, 1854, *Keith* v. *Commonwealth*, felony, p. 688; February 28, 1855, *Murphy* v. *Commonwealth*, arson, p. 587; January 24, 1855, *Snyder* v. *Commonwealth*, p. 501; January 12, 1854, *Whalen* v. *Commonwealth*, murder, p. 429.

ORDER BOOK No. 20.

October 25, 1859, *Argentine* v. *Commonwealth*, forgery, p. 512; November 19, 1859, *Brown* v. *Commonwealth*, treason, p. 529; January 9. 1860, *Bayliss* v. *Commonwealth*, murder, p. 537; November 8, 1860, *Bragg* v. *Commonwealth*, p. 656; November 1, 1856, *Cornwell* v. *Commonwealth*, murder, p. 105; November 4, 1857, *Crowley* v. *Commonwealth*, murder, p. 220; November 9, 1860, *Craddock* v. *Commonwealth*, felony, p. 657; October 15, 1859, *Grubb* v. *Commonwealth*, rape, p. 509; November 28, 1859, *Gray* v. *Commonwealth*, felony, p. 499; April 21, 1858, *Hopkins* v. *Commonwealth*, p. 806; May 24, 1856, *Jones* v. *Commonwealth*, felony, p. 98; January 9, 1857, *Keene* v. *Commonwealth*, murder, p. 126; October 18, 1860, *Lacy* v. *Commonwealth*, felony, p. 644; May 18, 1856, *Moore* v. *Commonwealth*, p. 71; October 30, 1857, *Nickols* v. *Commonwealth*, felony, p. 218; January 17, 1856, *Parsons* v. *Commonwealth*, felony, p. 6; February 25, 1858, *Poff* v. *Commonwealth*, felony, p. 282; January 12, 1859, *Powell* v. *Commonwealth*, murder, p. 398; November 20, 1857, *Shiflett* v. *Com-*

## Opinion.

We think that it has been made sufficiently to appear that our practice is not an innovation upon that of our predecessors; that we are not perverting or diverting the administration of justice from its ancient and accustomed course; but that we

*monwealth*, felony, p. 231; January 12, 1858, *Smither* v. *Commonwealth*, murder, p. 240; November 19, 1858, *Sunderland* v. *Commonwealth*, murder, p. 369; January 8, 1858, *Saunders* v. *Commonwealth*, murder, p. 390; April 23, 1858, *Tyler* v. *Commonwealth*, murder, p. 307; April 26, 1860, *Taylor* v. *Commonwealth*, felony, p. 615; October 31, 1860, *Totty* v. *Commonwealth*, murder, p. 652.

ORDER BOOK No. 21.

January 24, 1862, *Austin* v. *Commonwealth*, felony, p. 110; February 2, 1861, *Crump* v. *Commonwealth*, murder, p. 15; January 12, 1867, *Foster* v. *Commonwealth*, felony, p. 410; February 22, 1861, *Jefford* v. *Commonwealth*, felony, p. 27; January 28, 1861, *Nesco* v. *Commonwealth*, felony, p. 12; October 12, 1866, *Paul* v. *Commonwealth*, p. 378.

ORDER BOOK No. 22.

March 25, 1872, *Dougherty* v. *Commonwealth*, felony. p. 518; November 16, 1871, *Brock* v. *Commonwealth*, to be hung, p. 371.

ORDER BOOK No. 23.

April 25, 1873, *Hardwick* v. *Commonwealth*, felony, p. 110.

ORDER BOOK No. 24.

April 21, 1877, *Agree* v. *Commonwealth*, felony, p. 501; March 14, 1876, *Chambers* v. *Commonwealth*, felony, p. 189.

ORDER BOOK No. 25.

May 2, 1879, *Bell* v. *Commonwealth*, felony. p. 377; March 12, 1878, *Gregory* v. *Commonwealth*, felony, p. 7; February 19, 1880, *Kenney* v. *Commonwealth*, felony, p. 515; March 23, 1879, *Russell* v. *Commonwealth*, felony, p. 227.

ORDER BOOK No. 26.

April 28, 1881, *Cook* v. *Commonwealth*, felony, p. 137; April 27, 1882, *Jones* v. *Commonwealth*, felony, p. 366; February 18, 1881, *Mitchell* v. *Commonwealth*, felony, p. 59.

ORDER BOOK No. 27.

November 9, 1885, *Banks* v. *Commonwealth*, felony, p. 458; March 30, 1886, *Gresham* v. *Commonwealth*, assault, p. 629; April 2, 1885, *Hamilton* v. *Commonwealth*, felony, p. 369.

ORDER BOOK No. 28.

December 7, 1888, *Abrams* v. *Commonwealth*, felony, p. 639; February 25, 1887, *Newton* v. *Commonwealth*, felony, p. 186; November 11, 1886, *Smith* v. *Commonwealth*, felony, p. 15.

ORDER BOOK No. 29.

November 13, 1890, *Hughes* v. *Commonwealth*, felony, p. 368; November 13, 1890, *Walden* v. *Commonwealth*, felony, p. 368; May 1, 1890, *Davis* v. *Commonwealth*, felony, p. 326.

ORDER BOOK No. 30.

December 12, 1893, *Justus* v. *Commonwealth*, felony, p. 377; January 15, 1894, *Mason* v. *Commonwealth*, felony, p. 392.

walk in the beaten path prescribed to us from the earliest period in this Commonwealth, by judges whose names will always be remembered and revered.

While those accused of crime have rights which should be held inviolable, society has rights which are no less sacred. While the accused is entitled to a fair and impartial trial, the safety of the law-abiding citizen demands that the accused, having had a fair and impartial trial, and been adjudged guilty according to the law of the land, should suffer with certainty and without delay the penalty imposed by the law upon his offense. Therefore, in obedience to the mandate of the statute, and in strict accordance with established precedent, having given careful consideration to the petitions and record, and being of opinion that no error is shown to the prejudice of the accused, we abide by the order entered at a former day of the term and deny a writ of error.

*Writ of error denied.*